UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH EQUITY SERVICES, LLC<br>d/b/a COMMONWEALTH FINANCIAL<br>NETWORK,<br><br>Defendant. | Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff the United States Securities and Exchange Commission ("SEC" or "Commission") alleges the following against defendant Commonwealth Equity Services, LLC doing business as Commonwealth Financial Network ("Commonwealth"), and hereby demands a jury trial:

## PRELIMINARY STATEMENT

1.      Commonwealth is an SEC-registered investment adviser that manages approximately $85 billion in assets for hundreds of thousands of advisory clients. As an investment adviser, Commonwealth owes its advisory clients a fiduciary duty to act in its clients' best interests and to fully disclose all material facts about the advisory relationship, including disclosing any conflicts of interest that might cause Commonwealth to put its own interests before those of its clients. From at least July 2014 through December 2018, Commonwealth breached its fiduciary duty to its advisory clients by failing to disclose certain conflicts of interest. Commonwealth was paid to select and manage investments for its clients, but failed to tell its clients that some investment choices generated additional multi-million dollar revenues

for Commonwealth (referred to as "revenue sharing") while other similar investment choices would have generated much less, or no, additional revenue.

2.      The undisclosed conflicts of interest at issue in this case created incentives for Commonwealth to select and hold investments for advisory clients that financially benefited Commonwealth over the interests of its clients, including the incentive to select and hold investments that were more expensive for clients.

3.      In particular, while Commonwealth disclosed it would receive revenue sharing for investments in a "no transaction fee" program offered by its clearing firm, it did not disclose that this revenue sharing arrangement meant that Commonwealth had differing financial incentives depending on which products it selected for its customers:  (1) in some instances mutual fund shares offered through this program had at least one lower-cost share class that clients could invest in for which Commonwealth received less or no revenue sharing, (2) Commonwealth also received revenue sharing on certain mutual fund investments for which the broker charged a transaction fee, and (3) there were certain mutual funds for which Commonwealth did not receive any revenue sharing and thus had an incentive not to select.

4.      By virtue of these failures to disclose material conflicts of interest, which are detailed further herein, Commonwealth negligently breached its fiduciary duty to its advisory clients in violation of Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"). Further, by failing to adopt and to implement written policies and procedures reasonably designed to ensure that Commonwealth identified and disclosed these conflicts of interest, Commonwealth violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

5.      The Commission seeks: (a) a permanent injunction prohibiting Commonwealth from further violations of the Advisers Act; (b) an order that Commonwealth disgorge its unjust

enrichment, plus prejudgment interest; and (c) imposition of a civil penalty due to the nature of Commonwealth's breach of fiduciary obligation.

## JURISDICTION

6.       The Commission seeks a permanent injunction and disgorgement pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The Commission seeks the imposition of a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

7.       This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14(a)].  Venue is proper in this District because Commonwealth transacted business and maintains a principal place of business in Massachusetts.

8.       In connection with the conduct described in this Complaint, Commonwealth directly or indirectly made use of the mails or the means or instrumentalities of interstate commerce.

## DEFENDANT

9.       **Commonwealth**, located in Waltham, Massachusetts, is registered with the Commission as both an investment adviser and broker-dealer. As of April 2019, Commonwealth, in its role as an investment adviser, reported approximately $85 billion in assets under management, with approximately $60 billion of those assets owned by persons who are non-high-net-worth retail clients, meaning clients with less than $1 million in assets under management or a net worth of less than $2 million.  Commonwealth is also an introducing broker, meaning that it accepts client orders, but has an arrangement with another broker, known

as a clearing broker, to execute and clear client trades and maintain custody of the investments held in Commonwealth's clients' accounts.

## OTHER RELEVANT ENTITIES

10.     **National Financial Services, LLC ("NFS"),** is registered with the Commission as a broker-dealer and investment adviser.  Commonwealth contracted with NFS to maintain custody of Commonwealth's clients' assets and to act as a clearing broker.  NFS is an affiliate of Fidelity Investments, which is a sponsor of "Fidelity" mutual funds offered by NFS.

## STATEMENT OF FACTS

**I.     Commonwealth's Advisory Services**

11.     Commonwealth offers its investment advisory services through approximately 2,300 investment adviser representatives ("IARs") who are located throughout the United States, and through three Preferred Portfolio Services ("PPS") programs, called PPS Custom, PPS Select, and PPS Direct.  It also provides clients advisory services through unaffiliated third-party asset manager programs.

12.     Clients who receive investment advisory services through Commonwealth's PPS programs or third-party asset manager programs generally pay management fees calculated as a percentage of their assets under management.  These fees are periodically deducted from clients' advisory accounts.

13.     Commonwealth's largest PPS program is PPS Custom.  As of the end of 2017, Commonwealth advised 262,061 accounts with assets under management of approximately $71.7 billion in the PPS Custom program.  In PPS Custom, IARs typically act as portfolio managers, with full investment discretion to develop custom investment portfolios for advisory clients.

14.     The next largest PPS program is PPS Select.  As of the end of 2017, Commonwealth advised 61,561 accounts with assets under management of approximately $6.8 billion in the PPS Select program.  In the PPS Select program, Commonwealth offers advisory clients a variety of model portfolios of particular share classes of pre-selected mutual funds. These model portfolios are created and managed on a discretionary basis by Commonwealth's internal Investment Management and Research Team.  Once the Investment Team creates these model portfolios, Commonwealth makes them available to its IARs and its client base through the PPS Select Program.

15.     The smallest of the three PPS programs is PPS Direct.  As of the end of 2017, Commonwealth advised 6,096 accounts with assets under management of approximately $2 billion in the PPS Direct program.  Similar to PPS Select, the Direct program offers clients access to a variety of model portfolios.  The model portfolios in PPS Direct, however, are not managed by Commonwealth.  They are managed by one or more third-party portfolio managers.

## II.     Mutual Fund Expenses and Share Classes

16.     Mutual funds are common investments for individuals.  A mutual fund pools money from many investors and invests the money in securities or other assets.  A mutual fund has various expenses that are paid from fund assets.  These internal expenses are reflected in the fund's "expense ratio."  Such expenses include fees paid to the adviser that manages the fund, operational expenses, and fees paid to the brokers that sell shares of, and provide services to, the fund.  These are ongoing fees and expenses charged throughout the life of the mutual fund investment.  Fees and expenses are an important consideration in selecting a mutual fund because these charges lower an investor's returns.

17.     A mutual fund frequently offers investors different "share classes." Each class will invest in the same "pool" or portfolio of securities and other assets, but each class will have different fees and expenses and, therefore, different returns. For example, some share classes have higher expense ratios because they pay brokers more for selling or servicing that particular share class. In contrast, other share classes of the same fund may have lower internal fees and expenses. A single mutual fund will often have share classes with different expense ratios, with the share classes that have higher expense ratios generally having lower returns than share classes with lower expense ratios. In other words, an individual investor may pay more, or less, for precisely the same mutual fund investment, depending on the share class.

18.     These internal fees and expenses are in addition to any fees a broker may directly charge customers on particular share classes, such as transaction fees at the time of buying or selling the fund shares.

19.     Between 2014 and 2018, Commonwealth's Investment Team, which was responsible for creating and managing the model portfolios that Commonwealth offered to advisory clients through the PPS Select program, had a practice of selecting the lowest-cost share class of mutual funds placed into the model portfolios. This practice was for the economic benefit of clients who invested through the PPS Select program. By contrast, during this same period, Commonwealth did not have a uniform practice of selecting the lowest-cost share class available of a mutual fund for clients in the much larger PPS Custom program.

**III.     Commonwealth's Revenue Sharing Agreement with NFS**

20.     Since at least 1998, Commonwealth has contracted with NFS to provide clearing services for its advisory clients. Commonwealth requires substantially all of its PPS advisory clients to select NFS as the clearing broker for PPS investment accounts.

21.     When investors purchase or sell mutual fund shares through NFS, NFS may charge a transaction fee.

22.     NFS has various programs through which investors can purchase and sell mutual funds.  Two programs are relevant here.  First, NFS offers a "no transaction fee" program, through which investors can purchase and sell from a menu of mutual funds without a transaction fee.  Second, NFS offers a "transaction fee" program, through which investors can purchase and sell from a different menu of mutual funds, with a transaction fee.

23.     Many mutual funds pay NFS a recurring fee to have their fund shares offered through these programs.  NFS generally charges a mutual fund a higher fee for no transaction fee mutual fund share classes than for transaction fee mutual fund share classes.

24.     Since at least March 2007, the clearing agreement between Commonwealth and NFS has provided that NFS will share this recurring fee, or mutual fund revenue, with Commonwealth based on Commonwealth's client assets invested in no transaction fee mutual fund share classes.  A significant exception is that there is no revenue sharing for Commonwealth client assets invested Fidelity mutual funds.

25.     When Commonwealth purchased or sold no transaction fee mutual fund share classes for clients, clients did not pay a transaction fee, but they did pay fees to the mutual fund for their share of fund expenses for as long as they held the fund.  In turn, the mutual fund paid a portion of these fees to NFS so that the fund would be available on NFS's platform.  NFS then shared a portion of the fees it received with Commonwealth.

26.     In September 2009, the clearing agreement between Commonwealth and NFS was amended to add revenue sharing based on Commonwealth's client assets invested in certain

transaction fee mutual fund share classes.  Adding this category of Commonwealth client assets

represented a substantial increase in the amount of revenue sharing available to Commonwealth.

27.     When Commonwealth purchased transaction fee mutual fund share classes for

clients, NFS charged a transaction fee for any purchase or sale of the fund shares, and, again, the

client paid ongoing fees to the mutual fund as their share of fund expenses for as long as they

held the fund.  The mutual fund paid a portion of the ongoing fees to NFS so that the fund would

be available on NFS's platform.  NFS then shared a portion of the ongoing fees it received with

Commonwealth.

28.     In September 2014, Commonwealth and NFS executed an "Amended and

Restated Fully Disclosed Clearing Agreement."  Among other things, the 2014 agreement

changed the parties' method for calculating the amount of revenue sharing that NFS paid to

Commonwealth for NFS's no transaction fee and transaction fee mutual fund programs.

Effective September 23, 2014, NFS agreed to pay Commonwealth eighty percent (80%) of the

mutual fund revenue that NFS received if Commonwealth invested its clients' money into the

mutual fund share classes for which NFS shared revenue.  Commonwealth continued not to

receive any revenue sharing on client investments in Fidelity mutual funds, which

Commonwealth can purchase for its clients without a transaction fee.  Commonwealth continues

to receive monthly payments from NFS under this arrangement.

29.     The September 2014 agreement included terms that specifically addressed

Commonwealth's fiduciary obligations to disclose conflicts of interest to its advisory clients.

These additional terms included a representation by Commonwealth to NFS that Commonwealth

had made and would continue to make all appropriate disclosures to its advisory clients,

including:  (i) "[a]ny conflicts of interest that may arise in connection with the [revenue sharing],

including without limitation, any incentive arising in connection with [Commonwealth's] receipt (or prospective receipt) of compensation or other payments on balances or positions in mutual funds to favor those types of investments over others;" and (ii) "[t]he nature, scope and other material terms of the payments that [Commonwealth] is eligible to receive pursuant to [the revenue sharing arrangement]."

**IV.    Commonwealth's Receipt of Revenue Sharing from NFS Created Significant Conflicts of Interest Between Commonwealth and Its Clients**

30.     As a result of Commonwealth's revenue sharing arrangement with NFS, Commonwealth's interests were in conflict with its clients.  The revenue sharing arrangement created financial incentives for Commonwealth to invest clients in mutual funds in a manner that would lead to greater revenue sharing for Commonwealth.

31.     In particular, Commonwealth had an incentive to select and hold more expensive mutual funds for clients, and to select and hold more expensive mutual fund share classes when lower-cost mutual funds were available for the same fund.

32.     When Commonwealth invested in a mutual fund for a client, it had more than one mutual fund to choose from, and could select or continue to hold mutual funds for which it would receive less or no revenue sharing.

33.     Further, when Commonwealth chose to purchase or hold a particular mutual fund for a client, it also sometimes had more than one mutual fund share class to choose from.  These available share classes included those that charged a transaction fee and those that did not.  The no transaction fee share classes often had higher internal expenses and paid more revenue sharing to Commonwealth than the transaction fee share classes.

34.     Over time, mutual funds participating in NFS's mutual fund programs have included more share classes with lower expenses.  These share classes often result in

Commonwealth receiving less or even no revenue sharing payments from NFS based on
Commonwealth's advisory clients' investments in such funds.

35.     For example, in 2016, Commonwealth invested clients in a certain non-Fidelity
mutual fund, which had different share classes with different expense ratios and that would
provide different revenue sharing payments for Commonwealth.  Three of the share classes
exemplify the conflict Commonwealth faced.

> a. Class D, which was part of NFS's no transaction fee program, had the highest
>    expense ratio (0.79%) and resulted in Commonwealth receiving the greatest
>    amount of revenue sharing (0.30% of client investment).
>
> b. Class P, which was part of NFS's transaction fee program, had the second
>    highest expense ratio (0.55%), but paid less revenue sharing (0.08% of client
>    investment) to Commonwealth.
>
> c. Class I had the lowest expense ratio (0.45%), and did not result in
>    Commonwealth receiving any revenue sharing from NFS.

36.     In 2016, Commonwealth had approximately $174 million of its clients' assets
invested in the "Class D" share class.  This resulted in approximately $515,000 in revenue
sharing payments to Commonwealth.

37.     Further, in October 2017, Commonwealth and NFS amended their clearing
agreement to expand Commonwealth's mutual fund revenue sharing arrangement beyond the no
transaction fee and transaction fee programs.  The October 2017 amendment added a third NFS
mutual fund program, one which offered institutional share classes with no transaction fee.  This
institutional share class program expanded the availability of lower-cost share class alternatives
that could be purchased outside NFS's no transaction fee program.  After the October 2017

amendment, Commonwealth began receiving revenue sharing payments based on client assets invested in these institutional no transaction fee mutual fund share classes.

**V.      Commonwealth Failed to Disclose its Conflicts of Interest to its Clients**

38.      As an investment adviser, Commonwealth is a fiduciary for its advisory clients. As such, Commonwealth owes its clients an affirmative duty of utmost good faith, must provide full and fair disclosure of all material facts, and has an obligation to employ reasonable care to avoid misleading its clients.  Commonwealth's duty to disclose all material facts includes a duty to tell clients about actual or potential conflicts of interest that might incline Commonwealth to render investment advice that is not disinterested.

39.      Commonwealth made disclosures about some of its revenue sharing arrangements with third parties, including some of its arrangements with NFS, in its SEC-mandated Form ADV Part 2A, commonly referred to as a "brochure," and on its publicly-available website.  At least annually, investment advisers like Commonwealth must file the brochure with the Commission and provide the brochure to advisory clients, including prospective clients prior to or concurrent with the execution of an advisory agreement.  Brochures must include required disclosures about an investment adviser's business.  At least once a year, from 2014 through 2018, Commonwealth filed a brochure with the Commission, posted a copy of the latest brochure to its publicly-available website, and mailed or emailed every advisory client a summary of material changes to the brochure, along with information on how to receive the latest brochure or view it on a publicly-available website.

40.      From at least 2014 through March 2017, Commonwealth's website disclosures about the asset-based mutual fund revenue sharing with NFS were substantially the same as the

disclosures Commonwealth made in in its SEC-mandated client brochures.  After March 2017, Commonwealth revised its SEC-mandated client brochures as detailed below.

41.     Commonwealth knew or should have known that it was required by law to disclose conflicts of interest to its advisory clients because, among other reasons, the instructions to Form ADV provided such guidance.

A.      **Commonwealth Failed to Tell Clients That It Had Incentives to Invest Clients in More Expensive Mutual Funds In Order to Receive Revenue Sharing, Including More Expensive Share Classes When Lower-Cost Share Classes Were Available for the Same Fund**

42.     From July 2014 through at least March 2018, certain of the mutual fund share classes offered through NFS's no transaction fee program to Commonwealth clients had higher on-going fees than other share classes of the same fund that were available, in at least some circumstances, outside the program.  These higher expense share classes generated higher revenue sharing payments for Commonwealth than the alternative, lower-cost share classes that paid less or no revenue sharing to Commonwealth.

43.     Commonwealth's receipt of revenue sharing payments associated with the no transaction fee share class created a material conflict of interest because, in situations where the same fund offered both a no transaction fee share class and one or more lower-cost alternative share classes, Commonwealth had an economic incentive to invest its clients' assets in the no transaction fee share class that would generate more revenue.

44.     From at least July 2014 through March 2017, Commonwealth disclosed that it received revenue sharing and, specifically as to revenue sharing from NFS, it stated:

> Additionally, NFS offers a "No Transaction Fee" program with more than 1,200 no-load mutual funds.  Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth.  None of these additional payments is paid to any advisors who sell these funds.

Commonwealth did not, however, disclose that mutual funds that were part of the no

transaction fee program for which it received revenue sharing from NFS were generally

more expensive for clients.  Commonwealth also did not disclose that there were

instances in which a mutual fund in NFS's no transaction fee program otherwise had a

lower-cost share class available, for which Commonwealth would receive less or no

revenue sharing, and that it thus had conflicts of interest associated with those investment

decisions.

45.     In light of the revenue sharing Commonwealth received from NFS based on client

investments in mutual funds in NFS's no transaction fee program, Commonwealth's disclosures,

without more, were insufficient because they failed to disclose the existence of higher internal

expenses that were present in some no transaction fee mutual fund shares, the existence of

mutual fund share classes of the same funds with lower expenses, and the conflict of interest

presented by this set of circumstances.  These disclosure failures were omissions of material fact

and were required to be disclosed to Commonwealth's advisory clients, and Commonwealth

knew or should have known that it had a duty to disclose such information.  Yet Commonwealth

failed to disclose any such information in, at least,  its July 2014, February 2015, March 2015,

April 2015, September 2015, March 2016, or May 2016 brochures.

46.     In March 2017, Commonwealth amended its disclosure to state the following:

Additionally, NFS offers an NTF [no transaction fee] program composed of no-
load mutual funds.  Participating mutual fund sponsors pay a fee to NFS to
participate in this program, and a portion of this fee is shared with
Commonwealth.  None of these additional payments is paid to any advisors who
sell these funds.  NTF mutual funds may be purchased within an investment
advisory account at no charge to the client.  Clients, however, should be aware
that funds available through the NTF program may contain higher internal
expenses than mutual funds that do not participate in the NTF program and could
present a potential conflict of interest because Commonwealth may have an

incentive to recommend those products or make investment decisions regarding investments that provide such compensation to Commonwealth.

47.      This amended disclosure was still deficient and misleading.  First, Commonwealth described the conflict as merely "potential" and acknowledged only that Commonwealth "*may*" have incentives to select more expensive investments based on its compensation.  In reality, Commonwealth had an actual conflict that did create those incentives.  Yet Commonwealth failed to disclose such information in, at least, its March 2017 or June 2017 brochures.  Second, Commonwealth still did not disclose that there were instances in which lower-cost share classes were available for a mutual fund in NFS's no transaction fee program, but that Commonwealth had an incentive to invest in the more expensive share classes for which it received revenue sharing.  Commonwealth failed to disclose such information in, at least, its March 2017, June 2017, August 2017, or September 2017 brochures.

48.      Commonwealth knew or should have known that these conflicts of interest were material.  Commonwealth in fact chose lower-cost share class alternatives for a subset of its clients (those in the PPS Select program).  Further, in July 2016, NFS provided Commonwealth with an analysis showing that certain no transaction fee mutual fund shares in which Commonwealth invested its advisory clients had lower-cost share class alternatives.  However, despite being on notice of the existence of lower-cost share classes, Commonwealth failed to disclose its conflict of interest fully and fairly to its clients.

49.      Commonwealth did not disclose that no transaction fee program share classes sometimes had higher internal expenses than other share classes of the same mutual fund, nor did it disclose the conflict created by Commonwealth's revenue sharing arrangements for client assets that were invested through the no transaction fee program, until March of 2018.

14

**B.**    **Commonwealth Failed to Tell Clients That It Received** Transaction Fee
**Revenue Sharing**

50.    Between July 2014 and December 2018, Commonwealth failed to disclose to

clients that it received revenue sharing based on client assets invested in mutual funds in the

transaction fee program.  Because Commonwealth failed to disclose that it received revenue

from NFS for transaction fee mutual funds, Commonwealth also failed to disclose its financial

incentive to invest its clients in transaction fee mutual funds that paid revenue sharing to

Commonwealth instead of other funds or share classes of the same fund that did not pay revenue

sharing.

51.    While Commonwealth's brochures and website mentioned revenue sharing with

NFS, those disclosures were limited to the context of the no transaction fee program.  Indeed,

those affirmative disclosures falsely implied that Commonwealth did not receive revenue sharing

on mutual fund investments in the transaction fee program.

52.    These disclosure failures were omissions of material fact, were required to be

disclosed to Commonwealth's advisory clients, and Commonwealth knew or should have known

that it had a duty to disclose such information.  Commonwealth failed to disclose such

information in, at least, its July 2014, February 2015, March 2015, April 2015, September 2015,

March 2016, May 2016, March 2017, June 2017, August 2017, September 2017, and March

2018 brochures.

53.    Commonwealth did not disclose that it received revenue sharing from NFS based

upon client assets invested in transaction fee mutual fund share classes, and the associated

conflicts of interest, until December 2018.

C.    **Commonwealth Failed to Tell Clients That There Were Certain Mutual
       Fund Investments That Did Not Pay Revenue Sharing to Commonwealth**

54.    From at least July 2014 through December 2018, Commonwealth did not tell
clients that NFS's revenue sharing arrangement with Commonwealth was limited to certain
mutual funds or, in other words, that Commonwealth did not receive revenue sharing on
investments in certain mutual funds.

55.    One example is Fidelity mutual funds.  Commonwealth clients could purchase or
sell Fidelity funds through NFS's no transaction fee program, but these investments did not
result in revenue sharing with Commonwealth.  There were also other non-Fidelity families of
transaction fee funds that would not result in revenue sharing with Commonwealth.

56.    Commonwealth's receipt of revenue sharing for only certain mutual funds created
an economic incentive for Commonwealth to invest client assets in mutual funds that paid
revenue sharing over those that did not.  Without this information, Commonwealth's clients did
not have sufficient information to assess Commonwealth's conflicts of interest or make an
informed judgment about whether to use Commonwealth as an adviser.  Commonwealth's
failures to disclose this information were omissions of material fact, Commonwealth was
required by law to disclose its conflicts of interest to its advisory clients, and Commonwealth
knew or should have known that it had a duty to disclose such information.  Commonwealth
failed to disclose such information in, at least, its July 2014, February 2015, March 2015, April
2015, September 2015, March 2016, May 2016, March 2017, June 2017, August 2017,
September 2017, and March 2018 brochures.

57.    In December 2018, Commonwealth disclosed for the first time that its revenue
sharing with NFS was limited to non-Fidelity mutual funds.

**D.      Revenue Sharing Commonwealth Received that Created Its Undisclosed Conflicts of Interest**

58.      Between July 2014 and March 2018, Commonwealth received approximately $58.7 million in revenue sharing payments from NFS related to advisory client assets invested in no transaction fee mutual fund share classes.

59.      Between July 2014 and December 2018, Commonwealth received approximately $77 million in revenue sharing payments form NFS related to advisory client assets invested in transaction fee mutual fund share classes.

60.      These revenue sharing amounts that Commonwealth received from NFS were sufficient to create meaningful incentives to invest clients' assets in share classes and mutual funds that were more expensive for clients, and more profitable for Commonwealth.  Thus Commonwealth had actual, not merely "potential," conflicts.

**VI.     Commonwealth Failed to Adopt and Implement Written Policies and Procedures Reasonably Designed to Identify and Disclose Conflicts of Interest**

61.      Commonwealth failed to adopt and implement written policies and procedures reasonably designed to identify material conflicts of interest that arose from its third-party revenue sharing arrangements.  Likewise, Commonwealth failed to adopt and implement written policies and procedures reasonably designed to ensure that such conflicts were properly disclosed to its advisory clients.

62.      Since at least 2009, Commonwealth has had a Written Supervisory Procedures manual ("manual") that required it to disclose "any form of compensation," including "revenue sharing arrangements with certain product and service providers," and stated that it was "essential" that various departments within Commonwealth provide written notice to Commonwealth's chief compliance officer ("CCO") or his designee of any compensation not disclosed in Commonwealth's brochure or client agreements.

63.     Despite the manual's written requirements, however, Commonwealth's CCO did not receive timely written notification of Commonwealth's revenue sharing with NFS, including the 2009 amendment adding terms for transaction fee program revenue or the 2014 agreement that materially altered the terms of the revenue sharing arrangement.

64.     Further, in Commonwealth's September 2014 agreement with NFS, Commonwealth represented that it has made and will continue to make all appropriate disclosures to its advisory clients.

65.     Despite the existence of the procedures outlined in its manual, and the explicit representations in the September 2014 clearing agreement, Commonwealth failed to identify the material conflicts of interest alleged in paragraphs 30 through 60 above, and failed to disclose those conflicts to its advisory clients.

66.     To date, Commonwealth also has not adopted a reasonably designed, and enforced, written policy for identifying material conflicts of interest.

67.     To date, Commonwealth has not implemented written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules by ensuring the disclosure of "any form of compensation," including the revenue sharing arrangement with NFS.

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 206(2) of the Advisers Act)

68.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-67 of the Complaint as if set forth fully herein.

69.     Commonwealth is an investment adviser defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

70.     Commonwealth, while acting as an investment adviser, directly or indirectly, by use of the mails or any means or instrumentalities of interstate commerce, engaged in

transactions, practices, and courses of businesses which operated as a fraud or deceit upon clients or prospective clients.

71.     By reason of the foregoing, Commonwealth violated, and unless enjoined there is a reasonable likelihood that it will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(2)].

**SECOND CLAIM FOR RELIEF**
**(Violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder)**

72.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-71 of the Complaint as if set forth fully herein.

73.     Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] provides that it is unlawful for an investment adviser to engage in an act, practice, or course of business which is fraudulent, deceptive, or manipulative. It further states that the SEC shall issue rules to define and prescribe means to prevent such misconduct. Rule 206(4)-7 under the Advisers Act [17 C.F.R. § 275.206(4)-7] requires, among other things, that investment advisers adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and its rules. Investment advisers must also review, at least annually, the adequacy of those policies and procedures and the effectiveness of their implementation.

74.     Commonwealth failed to adopt and implement written policies and procedures reasonably designed to prevent its breach of fiduciary duty in failing to disclose fully and fairly its conflicts of interest in receiving substantial revenue sharing from NFS.

75.     By reason of the foregoing, Commonwealth has directly or indirectly violated, and unless enjoined will likely again violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a permanent injunction restraining Commonwealth, as well as its agents, servants, employees, attorneys, and other persons in active concert or participation with it, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(2) & (4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7];

B.    Require Commonwealth to disgorge its unjust enrichment, plus prejudgment interest;

C.    Order Commonwealth to pay an appropriate civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

D.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

E.    Award such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial in this action of all issues so triable under the claims in this Complaint.

Respectfully submitted,

Alfred A. Day (Mass. Bar No. 654436)
Richard M. Harper II (Mass. Bar No. 634782)
Robert Baker (Mass. Bar No. 654023)
Naomi Sevilla (Mass. Bar No. 645277)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office

33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-4537 (Day direct)
(617) 573-8979 (Harper direct)
(617) 573-4590 (fax)
daya@sec.gov (Day email)
harperr@sec.gov (Harper email)

Dated:  August 1, 2019