# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:19-cv-11655-ADB |
| COMMONWEALTH EQUITY SERVICES, LLC, d/b/a COMMONWEALTH FINANCIAL NETWORK, | ) ) ) ) | |
| Defendant. | ) ) | |

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT COMMONWEALTH EQUITY SERVICES, LLC d/b/a COMMONWEALTH FINANCIAL NETWORK

Defendant Commonwealth Equity Services, LLC d/b/a Commonwealth Financial Network ("Commonwealth"), by its undersigned counsel, responds as follows to the Complaint filed by Plaintiff Securities and Exchange Commission ("Commission"):

1.      Denies the allegations of Paragraph 1, except admits that it is an SEC-registered investment adviser that manages assets for numerous advisory clients, that Commonwealth selected investments for certain clients, and that Commonwealth charged certain fees for its services; to the extent that paragraph 1 purports to state legal conclusions that Commonwealth owes its advisory clients a fiduciary duty to act in its clients best interests and to fully disclose all material facts regarding the advisory relationship, including disclosing any conflicts of interest that might cause Commonwealth to put its own interests before those of its clients and breached its fiduciary duty to its clients by failing to disclose certain conflicts of interest, no response is required; if any further response is required, Commonwealth denies such allegations.

2.      Denies the allegations of Paragraph 2.

3.      Denies the allegations of Paragraph 3, except admits that Commonwealth disclosed that it would receive revenue sharing with respect to the acquisition of certain mutual fund share classes on behalf of advisory clients, and that its disclosures complied with legal requirements, and refers the Court to such disclosures for their exact content and meaning.

4.      Denies the allegations of Paragraph 4; to the extent that Paragraph 4 purports to state legal conclusions that Commonwealth negligently breached its fiduciary duties to its advisory clients in violation of Section 206(2) of the Investment Advisers Act and violated Section 206(4) and Rule 206(4)-7 thereunder by failing to adopt policies and procedures reasonably designed to ensure that Commonwealth identified and disclosed conflicts of interest, no response is required; if any response is required, Commonwealth denies such allegations.

5.      Denies the allegations of Paragraph 5, except admits that the Commission seeks the specified relief.

6.      Denies the allegations of Paragraph 6, except admits that the Commission seeks the specified relief pursuant to the specified statutory provisions.

7.      Denies the allegations of Paragraph 7, except admits that the Commission bases jurisdiction and venue on the specified statutory provisions, and that Commonwealth transacted business and has a principal place of business in Massachusetts.

8.      Denies the allegations of Paragraph 8; to the extent that Paragraph 8 purports to state legal conclusions that Commonwealth directly or indirectly made use of the mails or the means or instrumentalities of interstate commerce, no response is required; if any further response is required, Commonwealth denies the allegations of Paragraph 8.

9.      Admits the allegations of Paragraph 9.

10.     Admits the allegations of Paragraph 10.

11.     Admits the allegations of Paragraph 11.

12.     Denies the allegations of Paragraph 12, except admits that clients who receive investment advisory services through Commonwealth's PPS programs or third-party asset manager programs generally pay management fees calculated as a percentage of their assets under management.

13.     Admits the allegations of Paragraph 13.

14.     Denies the allegations of Paragraph 14, except admits that Commonwealth's Investment Management and Research Team develops model portfolios that are available to Commonwealth's investment adviser representatives and advisory clients and that as of the end of 2017 there were 61,561 client accounts with portfolios that were aligned with one or more of the PPS Select model portfolios.

15.     Denies the allegations of Paragraph 15, except admits that the PPS Direct Program offers Commonwealth's investment adviser representatives and clients access to model portfolios, and that as of the end of 2017 there were 6,096 client accounts with portfolios that were aligned with models available through the PPS Direct Program.

16.     Denies the allegations of Paragraph 16, except admits that mutual funds have various expenses that are paid from fund assets, and which are reflected in the fund's expense ratios.

17.     Denies the allegations contained in Paragraph 17, except admits that mutual funds may offer different share classes that will invest in the same "pool" or portfolio of securities or other assets, and that the expense ratios of share classes of the same mutual fund may differ.

18.     Denies the allegations of Paragraph 18.

19.     Denies the allegations of Paragraph 19, except admits that Commonwealth's Investment Management and Research Team followed a practice of selecting the lowest-cost share class available to Commonwealth through its clearing arrangement with NFS for the model portfolios it developed for the PPS Select program.

20.     Admits the allegations of Paragraph 20.

21.     Denies knowledge or information sufficient to form a belief as to the allegations of Paragraph 21.

22.     Denies the allegations of Paragraph 22, except admits that NFS maintains various programs through which mutual fund share classes may be purchased, sold or exchanged.

23.     Denies the allegations of Paragraph 23, except admits that mutual funds may pay a fee to NFS in order that their share classes are available on platforms maintained by NFS.

24.     Denies the allegations of Paragraph 24, except admits that NFS shares certain of the revenue it receives from mutual funds with Commonwealth.

25.     Denies the allegations of Paragraph 25, except admits that when Commonwealth purchased or sold no transaction fee mutual fund share classes for clients, clients did not pay a transaction charge.

26.     Denies the allegations of Paragraph 26, except admits that Commonwealth's clearing agreement with NFS was amended in 2009 and that, as amended, the clearing agreement provided that NFS would share certain of the revenue it received from mutual funds with Commonwealth.

27.     Denies the allegations of Paragraph 27, except admits that NFS charged a transaction fee when mutual fund share classes were purchased for Commonwealth clients.

28.     Denies the allegations of Paragraph 28, except admits that Commonwealth and NFS executed an Amended and Restated Fully Disclosed Clearing Agreement in September 2014, and that Commonwealth continues to receive monthly payments under this arrangement.

29.     Denies the allegations of Paragraph 29, and refers the Court to the Amended and Restated Fully Disclosed Clearing Agreement for its exact content and meaning.

30.     Denies the allegations of Paragraph 30.

31.     Denies the allegations of Paragraph 31.

32.     Denies the allegations of Paragraph 32, except admits that, generally, there are multiple mutual funds available for purchase at any given time.

33.     Denies the allegations of Paragraph 33, except admits that certain mutual funds offered more than one share class, and that transaction fees were charged with respect to certain share classes and transaction fees were not charged with respect to other share classes.

34.     Denies the allegations of Paragraph 34, except admits that NFS' mutual fund platforms have included additional share classes with lower expenses.

35.     Denies knowledge or information sufficient to form a belief as to the allegations of Paragraph 35.

36.     Denies knowledge or information sufficient to form a belief as to the allegations of Paragraph 36.

37.     Denies the allegations of Paragraph 37, except admits that Commonwealth and NFS amended their clearing agreement, and refers the Court to that document for its exact content and meaning.

38.     Denies the allegations of Paragraph 38; to the extent that Paragraph 38 purports to state legal conclusions that Commonwealth, as an investment adviser, is a fiduciary for its clients, and owes its clients various duties, no response is required; if any further response is required, Commonwealth denies such allegations.

39.     Denies the allegations of Paragraph 39, except admits that Commonwealth prepared, filed with the Commission, and appropriately disseminated its Form ADV Part 2A or brochure at various times from 2014 through 2018; to the extent that Paragraph 39 purports to state legal conclusions that Commonwealth, as an investment adviser, is required to file brochures with the Commission and provide  its brochures to its clients, no response is required; if any further response is required, Commonwealth denies such allegations.

40.     Denies the allegations of Paragraph 40, except admits that Commonwealth's website disclosures regarding mutual fund revenue sharing were substantially reflected in its From ADV Part 2A disclosures, and that in March 2017 Commonwealth amended its disclosures.

41.     Denies the allegations of Paragraph 41, and refers the Court to the instructions to Form ADV for their exact content and meaning.

42.     Denies the allegations of Paragraph 42, except admits that from July 2014 through March 2018 mutual fund share classes had varying levels of fees and expenses, and that Commonwealth received varying levels of or no revenue sharing on mutual fund share classes.

43.     Denies the allegations of Paragraph 43.

44.     Denies the allegations of Paragraph 44, except admits that from July 2014 through March 2017 Commonwealth disclosed that it received revenue sharing, including from NFS, and refers the Court to its disclosures for their exact meaning and context.

45.     Denies the allegations of Paragraph 45, and refers the Court to Commonwealth's Forms ADV Part 2A for their exact content and meaning;  to the extent that Paragraph 45 purports to state legal conclusions that Commonwealth's disclosures were insufficient because they omitted certain information, that such disclosure failures were omissions of material fact and were required to be disclosed to advisory clients, and that Commonwealth knew or should have known that it had a duty to disclose such information, no response is required; if any further response is required, Commonwealth denies such allegations.

46.     Denies the allegations of Paragraph 46, except admits that in March 2017 Commonwealth amended its disclosure and refers the Court to Commonwealth's disclosure for its exact content and meaning.

47.     Denies the allegations of Paragraph 47, and refers the Court to Commonwealth's disclosures for their exact content and meaning;  to the extent that Paragraph 47 purports to state legal conclusions that Commonwealth's disclosures were insufficient and misleading because they described the conflict as "potential" and that Commonwealth "may" have incentives to select more expensive investments based on the compensation it received and because Commonwealth's disclosures omitted certain information, no response is required; if any further response is required, Commonwealth denies such allegations.

48.     Denies the allegations of Paragraph 48, except admits that lower-cost share classes were selected for certain clients, and denies knowledge or information regarding NFS' analysis regarding lower-cost alternatives; to the extent that Paragraph 48 purports to state legal conclusions that Commonwealth knew or should have known that conflicts of interest were material  and that Commonwealth failed to disclose conflicts of interest fully and fairly to its clients, no response is required; if any further response is required, Commonwealth denies such allegations.

49.      Denies the allegations of Paragraph 49, and refers the Court to Commonwealth's disclosures for their exact content and meaning.

50.     Denies the allegations of Paragraph 50.

51.     Denies the allegations of Paragraph 51.

52.     Denies the allegations of Paragraph 52; to the extent that Paragraph 52 purports to state legal conclusions that disclosure failures were omissions of material fact, that omitted disclosures were required to be disclosed to advisory clients, and that Commonwealth knew or should have known that it had a duty to disclose such information, no response is required; if any further response is required, Commonwealth denies such allegations.

53.     Denies the allegations of Paragraph 53, and refers the Court to Commonwealth's disclosures for their exact content and meaning.

54.     Denies the allegations of Paragraph 54, and refers the Court to Commonwealth's disclosures from July 2014 through December 2018 for their exact content and meaning.

55.     Denies the allegations of Paragraph 55, except admits that Commonwealth did not receive revenue sharing payments from NFS with respect to share classes of certain mutual funds.

56.     Denies the allegations of Paragraph 56; to the extent that Paragraph 56 purports to state legal conclusions that disclosure failures were omissions of material fact, that omitted disclosures were required to be disclosed to advisory clients, and that Commonwealth knew or should have known that it had a duty to disclose such information, no response is required; if any further response is required, Commonwealth denies such allegations.

57.     Denies the allegations of Paragraph 57, and refers the Court to its December 2018 disclosure for its exact content and meaning.

58.     Denies the allegations of Paragraph 58, except admits that between July 2014 and March 2018 Commonwealth received revenue sharing payments from NFS with respect to advisory client investments in no transaction fee mutual fund share classes.

59.     Denies the allegations of Paragraph 59, except admits that between July 2014 and March 2018 Commonwealth received revenue sharing payments from NFS with respect to advisory client investments in transaction fee mutual fund share classes.

60.     Denies the allegations of Paragraph 60.

61.     Denies the allegations of Paragraph 61.

62.     Denies the allegations of Paragraph 62, except admits that since at least 2009 Commonwealth has had written supervisory procedures, and refers the Court to those procedures for their exact content and meaning.

63.     Denies the allegations of Paragraph 63.

64.     Denies the allegations of Paragraph 64, and refers the Court to Commonwealth's September 2014 agreement with NFS for its exact content and meaning.

65.     Denies the allegations of Paragraph 65.

66.     Denies the allegations of Paragraph 66.

67.     Denies the allegations of Paragraph 67.

68.     Repeats its responses to Paragraphs 1 through 67.

69.     Admits the allegations of Paragraph 69.

70.     Denies the allegations of Paragraph 70.

71.     Denies the allegations of Paragraph 71.

72.     Repeats its responses to Paragraphs 1 through 71.

73.     Denies the allegations of Paragraph 73, and refers the Court to the cited provisions for their exact content and meaning.

74.     Denies the allegations of Paragraph 74.

75.     Denies the allegations of Paragraph 75.

**FIRST AFFIRMATIVE DEFENSE**
**(Failure to State a Claim)**

76.     The Complaint fails to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**
**(Failure to Plead With Particularity)**

77.     In alleging fraud by Commonwealth under Section 206(2) of the Investment Advisers Act, the Complaint fails to state with particularity the circumstances constituting fraud.

### THIRD AFFIRMATIVE DEFENSE
### (Failure to Allege Facts Showing Conflict of Interest)

78. Consistent with the expected trial evidence, the Complaint fails to allege facts supporting the existence of conflicts of interest. The Complaint fails to allege that information regarding the amount of revenue sharing that was paid by NFS with respect to particular share classes was available to Commonwealth's independent investment adviser representatives and/or internal team involved in developing or managing investment portfolios for advisory clients. Nor does the Complaint allege that anyone affiliated with or employed by Commonwealth tracked which particular funds or share classes paid higher or lower revenue sharing in order to influence the selection of funds and share classes by Commonwealth's independent and internal advisory personnel.

79. The Complaint alleges that the largest of Commonwealth's three Preferred Portfolio Services ("PPS") programs is its PPS Custom program, with 262,061 accounts, and that for this program, Commonwealth's approximately 2,300 independent investment adviser representatives located across the country, "act as portfolio managers, with full investment discretion to develop custom investment portfolios for advisory clients." (Complaint ¶¶ 11, 13)

80. However the Complaint fails to allege that any of these 2,300 independent investment adviser representatives managing these PPS Custom portfolios and making the investment determinations for these portfolios (i) knew which funds and share classes were subject to revenue sharing and in what relative amounts; (ii) knew how revenue sharing was computed; (iii) had any involvement in the negotiation, management or other aspects of any revenue sharing; (iv) received any part of the revenue sharing payments which NFS made to Commonwealth; or (v) had their personal compensation impacted by any revenue sharing.

81.     The Complaint alleges that Commonwealth's next largest PPS program is its PPS Select program, with 61,561 accounts, and that for this program, Commonwealth's internal Investment Management and Research Team creates and manages "a variety of model portfolios of particular share classes of pre-selected mutual funds," and that these model portfolios are then made available to Commonwealth's 2,300 independent investment adviser representatives to use for advisory clients.  (Complaint ¶¶ 11, 14).

82.     However, the Complaint acknowledges that Commonwealth's internal Investment Management and Research Team which developed the PPS Select model portfolios and made determinations regarding the mutual funds and share classes that would be included in these portfolios "had a practice of selecting the lowest-cost share class of mutual funds placed into the model portfolios ... for the economic benefit of clients who invested through the PPS Select program."  (Complaint ¶19)  And the Complaint fails to allege that any of the members of Commonwealth's internal Investment Management and Research Team (i) knew which funds and share classes were subject to revenue sharing and in what relative amounts; (ii) knew how revenue sharing was computed; (iii) had any involvement in the negotiation, management or other aspects of any revenue sharing; (iv) received any part of the revenue sharing payments which NFS made to Commonwealth; or (v) had their personal compensation impacted by any revenue sharing.

83.     The Complaint alleges that Commonwealth's smallest PPS program is its PPS Direct program, with 6,096 accounts, and that for this program, "one or more third-party portfolio managers," and not Commonwealth, manage "a variety of model portfolios," and that these model portfolios are then made available to Commonwealth's clients.  (Complaint ¶15)

84.     However the Complaint fails to allege that any of the third-party portfolio managers managing these PPS Direct portfolios and making the investment determinations for these portfolios (i) knew which funds and share classes were subject to revenue sharing and in what relative amounts; (ii) knew how revenue sharing was computed; (iii) had any involvement in the negotiation, management or other aspects of any revenue sharing; (iv) received any part of the revenue sharing payments which NFS made to Commonwealth; or (v) had their personal compensation impacted by any revenue sharing.

## FOURTH AFFIRMATIVE DEFENSE
### (Failure to Allege Facts Showing Insufficient Disclosure)

85.     Consistent with the expected trial evidence, the Complaint fails to allege facts supporting the conclusion that Commonwealth's disclosures deviated from any statute, rule or articulated standard relating to revenue sharing, or that its disclosures were otherwise insufficient.  The Complaint describes a series of disclosures that were appropriate when made, and that Commonwealth, in good faith, amended over time.

86.     The Complaint alleges that, from July 2014 through March 2017, "Commonwealth disclosed that it received revenue sharing" from NFS.  The Complaint quotes Commonwealth's disclosure as stating that, for the over 1,200 no-load mutual funds on the NTF program, "mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth.  None of these additional payments is paid to any advisors who sell these funds."  (Complaint ¶44)

87.     The Complaint next alleges that, in March 2017, Commonwealth repeated this disclosure that it received revenue sharing from NFS, and that Commonwealth expanded the disclosure to additionally state that "NTF mutual funds may be purchased within an investment

advisory account at no charge to the client.  Clients, however, should be aware that funds available through the NTF program may contain higher internal expenses than mutual funds that do not participate in the NTF program and could present a potential conflict of interest because Commonwealth may have an incentive to recommend those products or make investment decisions regarding investments that provide such compensation to Commonwealth."  (Complaint ¶46)

88.    Finally, the Complaint alleges that, in December 2018, Commonwealth again repeated these disclosures, and that Commonwealth further disclosed that it received revenue sharing from NFS on its TF program as well, and that it did not receive revenue sharing from NFS as to the Fidelity mutual funds.  (Complaint ¶¶53, 57)  As the Complaint notes, NFS is an affiliate of Fidelity Investments, sponsor of the Fidelity funds.  (Complaint ¶10)

### FIFTH AFFIRMATIVE DEFENSE
### (Failure to Allege Facts Showing Deception)

89.    In alleging fraud by Commonwealth under Section 206(2) of the Investment Advisers Act, and consistent with the expected trial evidence, the Complaint fails to allege facts supporting the required element of deception.

90.    The Complaint alleges that mutual fund sponsors paid a fee to NFS to be included in the NTF and TF programs, and that NFS in turn passed a portion of the fee to Commonwealth as revenue sharing.  The Complaint does not allege that these fee payments or revenue sharing payments deceived any of Commonwealth's clients.  Nor does the Complaint allege facts showing that Commonwealth's disclosure of this revenue sharing, as stated above, deceived any of Commonwealth's clients.  Nor does the Complaint allege facts showing that Commonwealth's omission of any particular additional information concerning this disclosed revenue sharing deceived any of Commonwealth's clients.

## SIXTH AFFIRMATIVE DEFENSE
### (Failure to Allege Facts Showing Materiality)

91.     In alleging fraud by Commonwealth under Section 206(2) of the Investment Advisers Act, and consistent with the expected trial evidence, the Complaint fails to allege facts supporting the required element of materiality.

92.     The Complaint alleges that, during the entire July 2014 through December 2018 period here relevant, "Commonwealth disclosed that it received revenue sharing" from NFS. (Complaint ¶44)  Yet the Complaint further alleges that, following this disclosure throughout the relevant period, Commonwealth continues to manage hundreds of thousands of accounts with $85 billion in assets under management.  (Complaint ¶¶9, 11, 13).  Following this and the additional disclosure in March 2017 and December 2018 described in the Complaint, and up to the present, clients continue to choose Commonwealth for advisory services.  The Complaint does not allege that Commonwealth's advisory clients were adversely affected or harmed in any way in connection with Commonwealth's receipt of revenue sharing payments.

93.     Disclosure of any particular additional information concerning this already-disclosed revenue sharing would not have mattered to clients.  The Complaint fails to allege facts showing a substantial likelihood that any such additional disclosure would have been considered important by a reasonable client, or showing a substantial likelihood that such information would have been viewed by a reasonable client as having significantly altered the total mix of information available about Commonwealth's disclosed revenue sharing with NFS.

## SEVENTH AFFIRMATIVE DEFENSE
### (Fair Notice Under Due Process Clause)

94.     The Complaint fails to allege any statutory or regulatory obligation requiring an adviser to always select the lowest-priced fund or lowest-cost share class.  Nor does the Complaint allege an obligation to always select funds and share classes that charge no fees.  Nor does the Complaint allege that an adviser's selection of funds and share classes for particular clients and for model portfolios may not depend on many different substantive factors.  For example, share classes with higher expenses that are available on an NTF platform may be preferable to share classes with lower expenses that are available on a TF platform for clients who desire to invest in a number of funds each of which pursues a different investment strategy, and who also desire to maintain specific ratios with respect to their mutual fund investments, which would require regular rebalancing of portfolios and significant transaction costs if share classes available on the TF platform were acquired for advisory clients.

95.     Nor does the Complaint allege that after "Commonwealth disclosed that it received revenue sharing" from NFS (Complaint ¶44), Commonwealth had an obligation to make specific disclosures as to particular aspects of its revenue sharing.  The SEC could, after following the notice and comment process required by the Administrative Procedure Act, have imposed such a rule, but it has not even today chosen to do so.  It cannot fill this void by bringing fraud charges to retroactively impose uncabined duties to disclose particular line items that *ex post* appear to be sound.

96.     For all or most of the 2014-2018 period alleged in the Complaint, sophisticated professionals and their counsel would not have expected Commonwealth's disclosures to be considered inadequate, and certainly would never have expected them to be charged as fraud violations.  The courts have repeatedly made clear that due process requires that laws and

regulations give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996). Stretching general fraud prohibitions to retroactively create new and unexpected obligations violates this fundamental requirement.

### EIGHTH AFFIRMATIVE DEFENSE
### (No Basis for Disgorgement)

97.     Consistent with the expected trial evidence, the Complaint fails to allege facts supporting a conclusion that any alleged insufficiency in Commonwealth's disclosure concerning revenue sharing caused it to obtain additional revenue of any specified type or amount. Courts will order disgorgement only of funds resulting from a violation of the securities laws, and not of funds resulting from lawful activities.

98.     Revenue sharing payments were made by NFS to Commonwealth in consideration of Commonwealth's performance of services that NFS would otherwise have performed and such payments do not constitute illicit profits. Mutual funds were the source of the funds which were paid to NFS and which NFS, in turn, paid to Commonwealth. Mutual funds had accrued for expenses that were to be incurred by the funds, including the performance of various shareholder services by an affiliate of the fund or by a third-party. The costs of such shareholder services were reflected in the fee tables included in the prospectuses of the relevant funds. Mutual funds entered into arrangements with NFS in order to have their share classes available on the NTF and/or TF platforms maintained by NFS and in order for NFS to perform shareholder services that an affiliate of the fund would otherwise have performed. NFS shared part of the revenue which it received with Commonwealth because, among other things, Commonwealth had expended a considerable amount of money on its technology infrastructure and performed shareholder services that NFS would have otherwise performed. The expenses paid by a mutual fund were fixed and were not impacted by a fund's decision to make revenue

sharing payments to a clearing firm such as NFS or NFS' decision to share the money it received from mutual funds with introducing firms, including Commonwealth.  Because shareholder services constituted fund expenses and were disclosed in the prospectuses of mutual funds and because Commonwealth performed shareholder services that would otherwise have been performed by an affiliate of the fund or NFS, Commonwealth has not received or retained any ill-gotten gains that could be required to be disgorged.

99.     Separately, it is respectfully requested that this Court and the First Circuit depart from prior rulings and hold that the Commission is not entitled to disgorgement, as it amounts to an additional form of penalty not authorized by Congress in its provision dealing with penalties in SEC enforcement actions.  15 U.S.C. §78u.  After noting the SEC penalties that Congress has authorized, and in the context of determining the applicability of a statute of limitations, the Supreme Court has held that "SEC disgorgement constitutes a penalty."  *Kokesh v. SEC*, 137 S.Ct. 1635, 1642 (2017).  However, the Court noted that it was not expressing "an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings, or on whether courts have properly applied disgorgement principles in this context.  137 S. Ct. at 1642, n. 3.  It is requested that these questions be addressed in the present case.

### NINTH AFFIRMATIVE DEFENSE
### (No Basis for Injunction)

100.     The SEC is not entitled to the injunctive relief sought in the Complaint.  The Complaint appears not to challenge Commonwealth's most recent voluntary expansion of its revenue sharing disclosure in December 2018.  (Complaint ¶¶53, 57)  Consistent with the expected trial evidence, the Complaint fails to allege facts supporting its boilerplate conclusion that "unless enjoined there is a reasonable likelihood that [Commonwealth] will continue to violate" the Investment Advisers Act and rules.

## TENTH AFFIRMATIVE DEFENSE
### (Res Judicata)

101.    This action is barred by the doctrine of res judicata.  In the recently concluded

case of *Matter of Commonwealth Equity Services, LLC*, IAA Rel. No. 5132, File No. 3-19035

(March 11, 2019), the Commission entered a final adjudicatory order on consent and without

Commonwealth's admitting or denying the findings contained in the order that resolved charges

at issue in this case.  Among other things, the Commission charged that Commonwealth

"purchased, recommended, or held for advisory clients mutual fund share classes" that charged

certain fees "instead of lower-cost share classes of the same funds for which the clients were

eligible," and that Commonwealth "failed to disclose in its Form ADV or otherwise the conflicts

of interest related to" receipt of fees and selection of share classes paying such fees.  The settled

adjudicatory order was the result of an inquiry conducted by the Staff of the Commission which

concerned the period from January 1, 2014 through December 31, 2018, which encompasses the

entirety of the period to which the Complaint relates.

102.    The Commission found that this conduct violated Section 206(2) of the

Investment Advisers Act, issued a cease-and-desist order against Commonwealth, and assessed

monetary sanctions totaling $1,637,303, including interest.  The staffing for that matter, resolved

less than five months before the filing of the present action, partially overlapped the

Commission's  staffing in the present matter.

103.    The Commission pursues essentially the same theory in the present action, which

again charges that Commonwealth pushed clients into mutual fund choices charging higher fees

when cheaper alternatives were available, that Commonwealth profited, and that there were

undisclosed conflicts.  Among other things, the present Complaint charges that Commonwealth

"failed to tell its clients that some investment choices generated additional multi-million dollar

revenues" for Commonwealth.  The Commission again charges a violation of Section 206(2) of the Investment Advisers Act, and seeks injunctive relief and monetary sanctions.

104.    For res judicata purposes, it is immaterial that the two proceedings concern different types of fees, or that the March 11, 2019 proceeding defined its relevant period as "January 1, 2014 to March 27, 2014," while the present action defines it as "July 2014 through December 2018."  In considering res judicata, the First Circuit follows the Restatement 2d of Judgments, §24, which provides that an extinguished claim "includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."  What is a "transaction" or "series of transactions" "are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."  *Havercombe v. Dept. of Educ. of Com. of P.R.*, 250 F.3d 1, 4-5 (1st Cir. 2001).

## ELEVENTH AFFIRMATIVE DEFENSE
### (Laches Barring Equitable Relief)

105.    The equitable relief sought in the Complaint is barred by the doctrine of laches. Prior to 2014, the Commission Staff inspected Commonwealth and, in connection with the examination, discussed Commonwealth's revenue sharing arrangement with NFS, and Commonwealth's disclosures relating to revenue sharing.  Subsequent to the examination, Commonwealth provided revised disclosures regarding revenue sharing to the Commission Staff, and Commonwealth reasonably believed that any issues had been resolved as the Staff did not raise further issues with respect to Commonwealth's disclosures.  The Staff also observed revenue sharing arrangements between NFS and other advisers not related to Commonwealth.  It

is unjust, unfair and inequitable for the Commission to have waited years before filing this action

seeking equitable relief in the form of an injunction and disgorgement.

## TWELFTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

106.    To the extent the Complaint seeks relief for actions more than five years before

the filing of this action, such relief is barred by the applicable statute of limitations, 28 U.S.C.

§2462.

**WHEREFORE,** Commonwealth requests that the Complaint be dismissed with

prejudice, and that Commonwealth have its costs and such other relief as may be just and proper.

Dated:  September 30, 2019

/s/ Stephen J. Crimmins
Thomas A. Ferrigno (*pro hac vice*)
Stephen J. Crimmins (Mass. BBO #544930)
Elizabeth L. Davis (*pro hac vice*)
Murphy & McGonigle PC
1001 G Street NW, 7th floor
Washington DC 20001
(202) 661-7000
tferrigno@mmlawus.com
scrimmins@mmlawus.com
edavis@mmlawus.com

## CERTIFICATE OF SERVICE

I certify that on September 30, 2019, I caused a copy of the foregoing to be served by

means of the Court's CM/ECF system.

/s/ Stephen J. Crimmins
Stephen J. Crimmins (Mass. BBO #544930)