UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 19-cv-11655-IT |
| ) | |
| COMMONWEALTH EQUITY SERVICES, LLC ) | |
| d/b/a COMMONWEALTH FINANCIAL ) | |
| NETWORK, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
TO COMPEL PRODUCTION OF ADVISORY ACCOUNT LIST AND DATA
<u>EXCLUSIVELY IN POSSESSION OF DEFENDANT</u>**

Alfred A. Day (Mass. Bar No. 654436)
Richard M. Harper II (Mass. Bar No. 634782)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8900
daya@sec.gov
harperr@sec.gov

## INTRODUCTION

The Securities and Exchange Commission ("Commission") moves this Court to compel Commonwealth Equity Securities, LLC ("Commonwealth") to provide (i) a list its fiduciary client accounts that were open during the relevant period alleged in the complaint and (ii) identifying the particular Commonwealth advisory programs and transaction fee codes associated with those accounts.  *See* Declaration of Richard Harper (Harper Decl.), ¶2 & Ex.A (Commonwealth's Response to SEC's Amended Third Production Request), Request No. 1.  So far, Commonwealth has refused to produce this account list and data principally claiming that data is not relevant on the ground that the Commission's case is only about the wording of disclosures, and consequently discovery about assets held or purchased in client accounts is objectionable.  *Id.*, Response No. 1(2).  This disclosure-only excuse distorts the Commission's case.  As *Commonwealth's own counsel* told Judge Burroughs at our initial scheduling conference:  "this is a case not only involving complex issues, and I think my friends on the other side would agree, but also it involves so-called 'big data,' *immense amounts of data that have to be processed and manipulated*."  *See* Harper Decl., ¶3 & Ex.B (scheduling conference transcript), p.3 (emphasis added).

As will be explained below, the requested list of advisory accounts will enable the Commission to perform an accurate analysis of the holdings and trading data that will support the Commission's claims and respond to certain of Commonwealth's defenses.  Indeed, this account data will form part of the evidentiary basis for the Commission's analysis illuminating the magnitude of Commonwealth's conflicts of interest.  Further, considering (i) the millions of dollars of mutual fund revenue that generated the financial conflicts of interest in this case, (ii) Commonwealth's status as an SEC-registered investment adviser with billions of dollars in assets

under management for retail clients, and (iii) that the cost of producing this list of advisory accounts is likely minuscule compared to Commonwealth's annual income, this request for a list of advisory accounts and associated data is proportional to the needs of this case.

## BACKGROUND

Commonwealth, located in Waltham, is an SEC-registered investment adviser and broker-dealer. *See* ECF No. 1 (Complaint), ¶9. Just a few months before the filing of this case in August 2019, Commonwealth reported approximately $85 billion in advisory assets under management, with approximately $60 billion of those assets owned by non-high-net-worth, retail clients. *Id.*

Commonwealth offers its investment adviser services through thousands of investment adviser representatives located throughout the United States. *Id.*, ¶11. They offer clients three types of customized advisory programs under the label Preferred Portfolio Service ("PPS") programs. *Id.*, ¶¶12-15. The three programs are PPS Custom, PPS Select, and PPS Direct. *Id.* In PPS Custom, Commonwealth's representatives act as portfolio managers for the advisory clients. *Id.* In PPS Select, Commonwealth offers a variety of model portfolios of pre-selected mutual funds, which are created and managed by Commonwealth's internal Investment Management and Research Team. *Id.* In PPS Direct, Commonwealth offers clients access to a variety of model portfolios that are managed by one or more third-party portfolio managers. *Id.*

In conducting its investment advisory business, Commonwealth is structured as an "introducing broker," meaning that it accepts client orders, but has an arrangement with another broker, known as a "clearing broker," to execute and clear trades and maintain custody of the investments held in Commonwealth's advisory clients' accounts. *Id.*, ¶¶9-10. For decades, Commonwealth has contracted with National Financial Services, LLC ("NFS"), an affiliate of

Fidelity Investments, to serve as its clearing firm. *Id.* Commonwealth requires substantially all of its PPS advisory clients to select NFS as the clearing broker for PPS investment accounts. *See* ECF No. 1 (Complaint), ¶20.

As clearing broker to Commonwealth, NFS offers mutual funds to Commonwealth's clients through two principal programs – (i) a "no transaction fee" ("NTF") program, through which investors can purchase and sell from a menu of funds without a transaction fee, and (ii) a "transaction fee" ("TF") program, through which investors can purchase from the menu of mutual funds with a transaction fee. *Id.*, ¶22. Many non-Fidelity mutual funds pay NFS a recurring fee to have their fund shares offered through these programs.[1] *Id.* NFS generally charges these mutual funds a higher fee for NTF share classes than for TF share classes. *Id.* Many mutual funds have multiple share classes with at least one in each of the NTF and TF programs.[2] *Id.*, ¶¶17, 33. And, share classes of the same fund in the NTF program typically have higher annual expense ratios than share classes in the TF program. *Id.*

Since at least March 2007, the clearing agreement between Commonwealth and NFS has provided that NFS will share its NTF program revenue with Commonwealth based on client assets invested in non-Fidelity[3] mutual fund NTF share classes. *Id.*, ¶24. In September 2009, Commonwealth and NFS amended their agreement to add sharing of TF program revenue based

[1] The Fidelity funds, as Fidelity affiliates, are exempt from paying any program fee to participate in NFS's NTF or TF offering programs.

[2] A mutual fund frequently offers different "share classes," which are invested in the same pool of securities, but have different fees and expenses, and, therefore, different returns. For example, some share classes have higher expense ratios because they pay brokers more for selling or servicing that particular share class. Share classes that have higher expense ratios generally have lower returns than share classes with lower expense ratios. Thus, depending on the share class held, an individual investor may pay more, or less, for precisely the same mutual fund investment. Complaint, ¶¶16-17.

[3] As mentioned in footnote 1 above, NFS did not charge Fidelity funds to participate in the NTF and TF programs. Accordingly, as set forth in the parties' clearing agreement, Commonwealth's revenue sharing was limited to program fees paid by non-Fidelity funds.

3

on Commonwealth's client assets invested in certain non-Fidelity mutual fund TF share classes. *Id.*, ¶26. And, in September 2014, Commonwealth and NFS amended their clearing agreement again so that Commonwealth would receive eighty percent (80%) of NTF and TF program revenue based on Commonwealth client assets invested in non-Fidelity mutual fund NTF and TF share classes. *Id.*, ¶26. Under this revenue sharing arrangement, Commonwealth received one revenue stream from client assets invested in NTF share classes and a second revenue stream from client assets invested in TF share classes. When mutual funds paid to have their share classes offered in both the NTF and TF programs, this revenue sharing arrangement created a financial incentive for Commonwealth to select and invest client assets in higher-cost NTF share classes that generated more revenue, when lower-cost TF share classes were available for the same fund. ECF No. 1 (Complaint), ¶¶30-33.

Between July 2014 and December 2018, Commonwealth received approximately $58.7 million in mutual fund revenue sharing payments from NFS related to advisory assets invested in the NTF share classes, and $77 million in revenue related to advisory clients' assets invested in the TF share classes. *Id.*, ¶¶58-59.

I.   Alleged Undisclosed Conflicts of Interest and Commonwealth's Denials

The Commission filed this securities enforcement action against Commonwealth for failing to disclose conflicts of interest generated by its receipt mutual fund revenue sharing payments from NFS.[4] As detailed in the Complaint, from July 2014 until the end of March 2018, Commonwealth's disclosures about its mutual fund revenue sharing with NFS were

---

[4] In addition to the failure to disclose the financial incentives created by its receipt of NTF revenue and the availability of lower-revenue generating, lower-cost share classes, the Commission alleges that Commonwealth failed to disclose (1) that it received mutual fund revenue sharing based on client assets invested in share classes in the TF program, and (2) that it did not receive any revenue sharing based on client assets invested in share classes of certain funds, including Fidelity funds. *See* ECF No. 1 (Complaint), ¶¶50-53 (alleging failure to disclose revenue sharing from investments in TF program share classes) & 54-57 (alleging failure to disclose mutual fund investments that did not pay revenue sharing).

limited to the revenue it received from the NTF program.  *See* ECF No. 1 (Complaint), ¶¶42-49.
These narrow disclosures failed to inform Commonwealth's clients of a number of conflicting
financial incentives created by Commonwealth's revenue sharing arrangement with NFS.  One
of these conflicts, in particular, was that Commonwealth failed to disclose to its advisory clients
that that many mutual funds that Commonwealth purchased or held for clients in the NTF
program (1) had share classes in the TF program that paid less or no revenue sharing to
Commonwealth; and (2) many of these lower revenue share classes also had lower expense
ratios, meaning they cost less for investors to hold over time.  *Id.*

Prior to the filing of this action, the Commission staff informed Commonwealth of its
intention to recommend an enforcement action, including this particular claim concerning
Commonwealth's failure to disclose the availability of lower-revenue generating, lower-cost
share classes.  In response, Commonwealth submitted a written submission arguing that the
Commission cannot prove that Commonwealth clients were harmed by the existence of lower-
cost share classes outside the NTF program.  Specifically, Commonwealth argued that the
evidence will not support the Commission's claim because, in certain circumstances (such as
clients with "modest" balances and who regularly traded for "rebalancing"), NTF share classes
"could have been more appropriate than share classes for which transaction fees were charged."
*See* Harper Decl., ¶4 & Ex.C (attaching relevant excerpt of Commonwealth Wells response),
pp.21-22.  And, in its answer to the Commission's complaint, Commonwealth denied the
Commission's particularized allegations that Commonwealth breached its fiduciary obligation by
failing to disclose the existence of non-NTF share classes with lower expenses that paid less or
no revenue sharing to Commonwealth.  *Compare* ECF No. 1 (Complaint), ¶¶42-49 *with* ECF No.
12 (Answer), ¶¶42-49.  Commonwealth's answer also added narrative affirmative defenses in

which it repeated its pre-litigation contention that higher expense NTF shares "may be preferable to those with lower expenses that are available on a TF platform" for clients who pursue investment strategies with frequent trading that would cause "significant transaction costs." *See* ECF No. 12 (Answer), ¶94.  Further, in conferring prior to the filing of this motion, Commonwealth confirmed that, as part of its defense, it intends to elicit testimony from investment advisor representatives attesting to transaction fees as a factor in assessing the appropriateness of purchasing or holding NTF share classes for advisory clients.

II.    NFS's Holding and Trading Data – Limited Historical Accuracy

The Commission's claim of conflicting financial incentives will depend, in part, on proving (i) the extent to which Commonwealth's purchased and held NTF mutual fund share classes for its advisory clients, and (ii) the availability of the lower revenue-generating, lower-cost share classes outside the NTF program.  To collect this evidence, the Commission subpoenaed NFS to produce holding and trading data for Commonwealth's advisory accounts within the complaint's relevant time period (2014-2018).  NFS produced the holdings data in May 2019, and the trading data in December 2019.

In producing this data, NFS noted an important limitation in its ability to produce accurate information for advisory accounts.  Specifically, NFS stated that could only identify whether an account was advisory (or not) as of the time the NFS pulled the data from its holdings and trading databases (in this case, May and December 2019, respectively).  Therefore, the holding and trading data produced by NFS is both under inclusive and over inclusive: (i) it excludes accounts that were advisory from 2014 to 2018, but changed to non-advisory brokerage accounts after 2018, and (ii) it includes accounts that were non-advisory brokerage accounts from 2014 to 2018, but became advisory after 2018.  NFS does not maintain a historical list of

Commonwealth advisory accounts.  Only Commonwealth has this data.

III.   The Commission's Request for an Advisory Account List

In an amended and considerably narrowed third document request, the Commission requested that Commonwealth produce a list of advisory accounts that were open during the relevant period, including, for each account, (i) start and end dates during which the account was advisory, (ii) the PPS program type during the period the account was advisory, and (iii) the commission (fee) schedule codes applicable to the advisory account during the period.  *See* Harper Decl., ¶2 & Ex.A, Request No. 1.  The Commission seeks this list of advisory accounts and data, which is exclusively in Commonwealth's possession, for several reasons, and Commonwealth should be ordered to produce it.

A.   *Fixing the Limitations of the NFS Holding and Trading Data to Determine What Accounts Were Advisory During the Relevant Period*

As noted above, the Commission plans to present evidence of NTF share class holdings and trading in Commonwealth's advisory accounts during the relevant period.  This evidence will establish the extent to which Commonwealth held and traded NTF share classes in its advisory clients' accounts.  NFS's trading data is, however, limited because its advisory account indicator is a current, rather than a historical, record.  Comparing the holdings and trading data produced by NFS, the Commission has identified approximately 50,000 instances in which accounts listed in the holdings data do not appear in the trading data, and vice versa.  In order to analyze these data sets and ensure that only Commonwealth advisory accounts are included, the Commission must be able to determine whether the accounts were advisory, or not – information that is solely within Commonwealth's possession.

B.   *Identifying Holdings and Trading by PPS Program Type to Determine the Availability of Lower-Cost Share Classes*

In addition, the list of advisory accounts will allow the Commission to identify which

PPS program was associated with each account.  The Commission will use this data to aggregate client holdings in each of the three PPS programs and analyze the extent to which those NTF holdings qualified for lower revenue-generating, lower-cost share classes.  For example, Commonwealth sought access to lower-cost share classes for the mutual funds in the PPS Select program by aggregating program account holdings (of all clients holding the mutual fund in the PPS Select program) to meet a fund's initial minimum investments requirement.  *See* Harper Decl., ¶5 & Ex.D (attaching Brian Price Investigation Testimony), pp.50:13-54:24.  Once Commonwealth provides a list of account data identifying advisory accounts by PPS Program, the Commission will be able to sort NTF holdings by PPS program to identify each of the share classes for which Commonwealth held sufficient holdings to qualify for the lower-cost TF share classes.

By interrogatory answer, Commonwealth admitted that, in January 2014, the top ten PPS Select accounts held amounts that were, when added together, over $500,000 in an NTF share class, PRBLX, for the Parnassus Core Equity Fund.  *See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory No. 3, Attachment 3).  In 2014, the Parnassus funds' prospectus disclosed that an investor could qualify for the institutional share class, PRILX, which was in NFS's TF program and had a lower expense ratio than PRBLX and generated less revenue for NFS and Commonwealth, with a minimum initial investment amount of only $100,000 – just one fifth of what the PPS Select program's top 10 accounts collectively held. *See* Harper Decl., ¶7 & Ex. F (attaching excerpt of Parnassus prospectus dated May 2014), p.30.[5]

_____

[5] The Parnassus prospectus also published notice that the initial investment amount may be waived for accounts "invested through fee-based advisory accounts," like those at Commonwealth.  *See* Harper Decl., ¶6 & Ex.E (attaching excerpt of Parnassus prospectus dated May 2014), p.30 ("The minimum initial investment amount may be waived at the discretion of the Parnassus Funds for Institutional Shares purchased by individual accounts of a financial intermediary that charges on ongoing fee to its customers for its services or offers Institutional Shares

By the same interrogatory answer, Commonwealth admitted that, in January 2014, the top ten PPS Custom accounts held amounts that were, when added together, over $2.7 million in PRBLX, with individual account positions ranging in value from over $150,000 to over $600,000. *See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory No. 3, Attachment 3). These top ten PPS Custom accounts, whether evaluated collectively or individually, each met the minimum initial investment required to invest in the institutional share class, PRILX, which was in NFS's TF program and had a lower expense ratio than PRBLX and generated less revenue for NFS and Commonwealth.

Similarly, by a second interrogatory answer, Commonwealth admitted that, in January 2015, the top ten PPS Select accounts held amounts that, when added together, were over $150,000 in an NTF share class, DLTNX, for the DoubleLine Total Return Bond Fund. *See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory No. 2, Attachment 2). In 2014, the summary prospectus for the DoubleLine Total Return Bond Fund disclosed that an investor could qualify for the institutional share class, DBLTX, which was in NFS's TF program and had a lower expense ratio than DLTNX and generated less revenue for NFS and Commonwealth, with a minimum initial investment amount of only $100,000 – an amount lower than the total collective holdings of the top 10 accounts in the PPS Select program. *See* Harper Decl., ¶8 & Ex.G (attaching DoubleLine Total Return Bond Fund summary prospectus dated July 2014), p.11.[6]

---

through a no-load network or platform, and for accounts invested through fee-based advisory accounts and similar programs with approved intermediaries.").

[6] The DoubleLine summary prospectus also published notice that "[t]he minimum investment may be modified for certain financial intermediaries that submit trades on behalf of underlying investors." It further stated that "[t]he fund reserves the right to change or waive the minimum initial and subsequent investment amounts without prior notice or to waive the minimum investment amounts for certain intermediaries or individual investors in its discretion." *See* Harper Decl., ¶8 & Ex.G (attaching DoubleLine Total Return Bond Fund summary prospectus dated July 2014), p.11

By the same interrogatory answer, Commonwealth admitted that, in January 2015, the top ten PPS Custom accounts held amounts that were, when added together, over $2.7 million in DLTNX, with individual account positions ranging in value from over $220,000 to over $500,000.  *See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory No. 2, Attachment 2).  These top ten PPS Custom accounts, whether evaluated collectively or individually, held the minimum initial investment required to invest in the institutional share class, DBLTX, which was on NFS's TF program and had a lower expense ratio than DLNTX and generated less revenue for NFS and Commonwealth.

As each of these examples demonstrate, lower-cost TF share classes were available to these accounts and were likely available to many more – a fact that should have been disclosed to investors.  The Commission seeks to establish with precision how many other accounts, individually or collectively, qualified for these lower-cost TF share classes and were, therefore, directly impacted by Commonwealth's inadequate disclosures.

As the Commission is limited to 25 interrogatories, it would not be possible (or practical) to continue this analysis by written discovery.[7]  Instead, the Commission proposes to simply have Commonwealth identify the advisory accounts by PPS program in its advisory account list, and the Commission will use that list to sort the data to show the holdings for each NTF share class that were sufficient to meet the prospectus requirements, if any, for lower-cost share classes.

C.    *Identifying Disparate Treatment of Advisory Clients*

Accurate and complete mutual fund trading and holdings data will also allow the

---

[7] Further, with 400,000 advisory client accounts, the snapshot of the top ten account holdings (while practical for an interrogatory answer) necessarily excludes all remaining accounts holding these shares and, therefore, most likely substantially under reports the total holdings value.

Commission to show that a subset of Commonwealth clients received access to the lower-cost, lower-revenue generating share classes, while holders of the NTF shares did not even receive notice this disparity.  For example, Commonwealth has admitted that, as of January 2018, the top ten PPS Custom accounts held amounts that were, when added together, over $5 million in the NTF share class, PONDX, for the PIMCO Income Fund.  *See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory No. 1, Attachment 1).  The PIMCO Income Fund's 2017 summary prospectus disclosed that the fund had an institutional share class, PIMIX, which was on NFS's TF program, had a lower expense ratio than PONDX, and generated less revenue for Commonwealth.  *See* Harper Decl., ¶9 & Ex.H (attaching excerpts from PIMCO Income Fund summary prospectus dated July 2017).  And, NFS's trading and holdings data show that other accounts were able to purchase and hold the lower-cost PIMIX share class during the period September through December 2017.  *See* Harper Decl., ¶10 & Ex.I (providing an excerpted list of advisory accounts purchasing the PIMIX share class between September and November 2017).[8]  Not only were these accounts able to trade PIMIX, but their year-end holdings data show that they held positions well below the stated $1 million investment minimum in the PIMCO Income Fund's prospectus.  *Id.*

Commonwealth's historical advisory account list will enable the Commission to confirm that advisory accounts were able to trade and hold lower revenue-generating, lower-cost TF share classes.  Furthermore, identifying all advisory accounts will allow the Commission to aggregate them and identify if it was hundreds or thousands of advisory clients that had access to these lower-revenue generating, lower-cost TF share classes (in contrast to the advisory clients

---

[8] This example is from the trading of one of Commonwealth's investment adviser representatives and, therefore, is only a small sample of the type of evidence the Commission intends to develop.  As noted above, identifying the full range of advisory accounts would allow the Commission to find examples of this disparate treatment across the 400,000 advisory accounts advised by Commonwealth's 2,300 advisor representatives.

who were left holding NTF shares without notice of Commonwealth's conflict of interest or the availability of lower-cost share classes outside the NTF program).

      D.    *Responding to the Transaction Fee "Factor" Defense*

The advisory account list, PPS program identification, and commission schedule code detail is relevant in responding to Commonwealth's transaction fee "factor" defense.  As noted above, Commonwealth intends to present testimony that its advisor representatives considered transaction fees as a "factor" favoring NTF share classes when a client's investment assets were modest or the client wanted to pursue a trading strategy that required frequent trading (such as "rebalancing").

The problem with this defense strategy is that many categories of Commonwealth advisory accounts do not charge mutual fund transaction fees on a transaction-by-transaction basis.  Indeed, two of Commonwealth's three PPS programs, PPS Select and PPS Direct, do not charge transaction-based mutual fund fees.  *See* Harper Decl., ¶11 & Ex.J (attaching excerpt of Commonwealth Form ADV Part 2A filed Dec. 27, 2018), p.8 (describing PPS Select and PPS Direct as "wrap" programs that pay an asset-based or platform or program fee, but not transaction-by-transaction charges).  Furthermore, in the third PPS advisory program, PPS Custom, advisor representatives could assume the cost of client mutual fund transaction fees by either (1) opening a PPS Custom account with an account prefix that would identify the account as one in which transaction fees were assumed by the advisor representative, or (2) using a commission schedule code to shift transaction costs to the advisor representative on a transaction-by-transaction basis.  *See* Harper Decl., ¶12 & Ex. K (identifying guidance to Commonwealth adviser representatives on how prefix codes "B37" and "B36" allocate transaction fee costs), and ¶13 & Ex.L (Commonwealth answer to Interrogatory No. 21,

explaining commission schedule code 88 "may be used when responsibility for transaction charges have been reallocated.").  In short, there were a wide swath of advisory accounts that do not charge mutual fund transaction fees, identifiable by PPS program, account prefix, or commission schedule code.  The list of Commonwealth advisory accounts, including their PPS program and commission schedule codes, will allow the Commission to identify the precise number of accounts for which Commonwealth's transaction fee "factor" defense has no bearing.

## ARGUMENT

Under Federal Rule of Civil Procedure 26(b), parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b).

I.     The Requested Data Is Relevant to the Commissions Claims and Commonwealth's Defenses

As set forth above, there are multiple ways in which the advisory account list is relevant to the Commission's claims.  The advisory account list is necessary for the Commission to be able to analyze NTF holdings and trading using the limited data produced by NFS.  The Commission can also use the accurate advisory account list to aggregate advisory account holdings, by PPS Program, to analyze and prove the extent to which these advisory accounts collectively met the prospectus requirements to purchase lower-cost, lower-revenue generating TF share classes.  The advisory account list will also enable the Commission to identify and quantify the number of advisory accounts, in each PPS program, that were able to hold and trade lower-cost, lower-revenue generating TF share classes (in contrast to those clients invested in

NTF share classes that did not receive notice of the conflict of interest or that other clients received access to the lower-cost TF share classes).

The requested historical advisory account list is also relevant to assessing the merit and applicability of Commonwealth's transaction fee "factor" defense.  As Commonwealth plans of presenting testimony from its adviser representatives identifying transaction fees as a basis for choosing NTF share classes over TF share classes, the Commission should be entitled to discover and to present evidence showing the wide range of accounts for which transaction fees were not a factor because they were not charged.  The historical list of advisory accounts, and their applicable PPS program and commission schedule codes, would enable the Commission to aggregate accounts by PPS program and commission schedule code and show the total number of accounts and dollar value of NTF assets that were not subject to any transaction fees.

  II.  <u>The Requested Data is Proportional to the Needs of the Case</u>

The requested historical advisory account list is proportional to the needs of this case. The Commission instituted this securities enforcement action alleging Commonwealth committed fraud on its advisory clients.  On our call last week, Commonwealth characterized this as a "negligence" case, but this label merely glosses over the seriousness of the issues. Commonwealth is an investment advisor with a fiduciary duty owed to its advisory clients.  It holds approximately $85 billion in advisory assets, most of which are owned by non-high-net-worth, retail clients.  The mutual fund revenue it received from 2014 through 2018 that generated its conflicts of interest was over $100 million.  The failure of such a large investment advisor to meet its affirmative obligations to provide full and fair disclosure of conflicting financial interest to thousands of retail clients is a serious breach that more than justifies Commonwealth providing a historically accurate list of advisory accounts.

Commonwealth is also *the only* source of this information.  Neither Commission, nor

Commonwealth's clearing broker, NFS, possesses a historically accurate list of

Commonwealth's advisory accounts.  If Commonwealth succeeds in withholding this

information, it will deprive the Commission of the ability to present an accurate picture of its

clients advisory account holdings and trading data.

III.  <u>Commonwealth's Objections Lack Merit</u>

Commonwealth has not identified any specific monetary burden to producing this

historical advisory account list.  *See* Harper Decl., ¶2 & Ex.A, Request No. 1(1).  Its burden

argument merely recounts the procedural steps that would be required to have computer

databases pull this data and make certain that it is accurate – the normal process for producing

computer-housed data.  *Id.*  This failure to specify financial burden is likely because it is

insignificant in relation to the income Commonwealth generates as an SEC-registered investment

advisor for thousands of retail clients across the country.  With approximately 85 billion in

advisory client assets under management and sweeping in millions of dollars in mutual fund

revenue sharing payments, among other sources of income, the relative cost of producing this

advisory account list is tiny.[9]

Furthermore, the Court should be skeptical of Commonwealth's claim that it does not

have the data to produce.  *See* Harper Decl., ¶2 & Ex.A, Request No. 1(7).  Commonwealth has

already produced similar information in response to the Commission's first set of interrogatories.

*See* Harper Decl., ¶6 & Ex.E (attaching Commonwealth Response to Interrogatory Nos. 1

---

[9] While the Commission does have a copy of Commonwealth's financial statements for the year-ended December 31, 2018, which shows substantial net income, Commonwealth has not specifically raised financial cost as a reason for withholding the historical list of advisory accounts.  If Commonwealth does raise financial burden in opposing this motion, however, the Commission reserves the right to provide the Court with details of Commonwealth's income and expenses.

through 6, Attachments 1-6).  In answering the Commission's first six interrogatories,

Commonwealth produced a list of advisory accounts by year, and by PPS Program.  *Id.*

Finally, Commonwealth raises a few objections which are simply red herrings.  For

example, Commonwealth objects to the request because it seeks client and business information.

*See* Harper Decl., ¶2 & Ex.A, Request No. 1(5).  This objection is completely unnecessary. At

the outset of this case, the parties jointly entered a stipulated protective order to protect such

information.  *See* ECF No. 18.  Similarly, Commonwealth points to documents collected and

testimony taken in the Commission's abbreviated investigation prior to the commencement of

this action.  *See* Harper Decl., ¶2 & Ex.A, Request No. 1(4).  As the First Circuit has observed,

"'there is no authority which suggests that it is appropriate to limit the SEC's right to take

discovery based upon the extent of its previous investigation into the facts underlying its case.'"

*SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000) (quoting *SEC v. Saul*, 133 F.R.D. 115, 118 (N.D.

Ill. 1990)); *see also SEC v. Espuelas*, 699 F. Supp.2d 655, 659 (S.D.N.Y. 2010) (acknowledging

SEC's right to engage in discovery following administrative investigation).  Commission non-

public investigations are for the purpose of determining whether there have been violations of the

federal securities laws, not for collecting evidence in preparation for trial.  *Saul*, 133 F.R.D. at

119; *Espuelas*, 699 F. Supp.2d at 659.  And, that is precisely the difference here.  Now that this

securities enforcement action has been filed, for the reasons set forth above, the Commission

needs Commonwealth, the sole source of this information, to produce the historically accurate

list of advisory accounts and associated data so that the Commission can (i) present accurate data

exposing the financial conflicts of interest that Commonwealth failed to disclose to its advisory

clients, and (ii) respond to Commonwealth's purported reasons for not making these required

disclosures. [10]

## CONCLUSION

Based upon the importance of the historically accurate list of advisory accounts and associated data to establishing the claims and challenging the defenses in this case, the importance of the issues at stake in this regulatory enforcement action against a fiduciary investment advisor holding billions of dollars of assets under management for thousands of retail investors, the relatively small expense of producing such a list compared with the size of Commonwealth's financial resources, and Commonwealth's status as the only person capable of producing this data, the Commission respectfully requests that the Court compel Commonwealth to produce the historically accurate list of advisory accounts as requested.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/Richard M. Harper II
Alfred A. Day (Mass. Bar No. 654436)
Richard M. Harper II (Mass. Bar No. 634782)
Securities and Exchange Commission
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-8900
daya@sec.gov
harperr@sec.gov

---

[10] Commonwealth also previously asserted an objection under LR 26.1(c) that the Commission is limited to only two requests for production.  At the beginning of this case, however, *Commonwealth* proposed modifying the discovery limits so that each party would have four requests for production.  The Commission agreed to this proposal, and the parties submitted this change to the Court as part of their joint scheduling conference report.  *See* ECF No. 14, Section V.  Following the initial scheduling conference, however, the Court's scheduling order did not explicitly adopt the parties' agreement.  ECF No. 20.  It did not mention it.  *Id.*  And, in the parties' series of meet and confer sessions prior to the filing of this motion, Commonwealth offered to withdraw its objection if the Commission agreed that both parties could serve three requests for production.  The Commission agreed to this proposal, and served the amended third request for production.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/Richard M. Harper II*
Richard M. Harper II

Dated:  August 27, 2020