UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case 1:19-cv-11655-IT |
| | ) | |
| COMMONWEALTH EQUITY SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT COMMONWEALTH'S MEMORANDUM IN OPPOSITION
TO PLAINTIFF COMMISSION'S MOTION TO COMPEL PRODUCTION**

Defendant Commonwealth Equity Services, LLC ("Commonwealth") files this

memorandum in opposition to the motion by Plaintiff Securities and Exchange Commission

("Commission") for an order compelling production.  As discussed below, the Commission's

motion concerns a so-called "big data" production request, Item 1 in its Amended Third Request

for Production of Documents, that seeks materials that are not relevant to its claim, and that are

not proportional to case needs given their burden on Commonwealth and on the efficient

resolution of this litigation.

**I.  Summary of the Parties' Claims and Defenses**

This is a civil case in which the Complaint alleges that Commonwealth negligently failed

to disclose certain purported conflicts in contravention of Investment Advisers Act §206(2), 15

U.S.C. §80b-6(2).  We briefly summarize the Commission's claims and Commonwealth's core

defenses as background for considering the relevance and proportionality issues discussed below.

**A.  Commonwealth and Its Programs.**  Commonwealth, based in Waltham and San

Diego, is registered with the Commission as an investment adviser and as a broker-dealer.

(Complaint ¶9).  Commonwealth offers investment advisory and brokerage services through a

network of over 2,000 independent contractors ("Advisors") who operate from offices located throughout the country. (Complaint ¶11).

In its capacity as an investment adviser, Commonwealth has developed a suite of advisory programs that are referred to as the Preferred Portfolio Services ("PPS") programs. (Complaint ¶11).   In the PPS Custom program, by far the largest of the PPS programs, Commonwealth's Advisors develop securities portfolios that are customized for their individual clients.  In the PPS Select program, an Advisor can assist a client in selecting one of a number of "model" portfolios developed by Commonwealth's Investment Management and Research team. In the PPS Direct program, an Advisor can recommend a variety of model portfolios created and managed by third parties and made available through Commonwealth.  (Complaint ¶15).

In its capacity as a broker-dealer, Commonwealth acts as an introducing broker and offers stocks, bonds, mutual funds and other securities to its brokerage customers.  Throughout its existence, Commonwealth has maintained a relationship with a clearing firm which carries accounts for customers of introducing brokers and executes, clears and settles transactions for such customers.  Since at least 1998, Fidelity Clearing and Custody Services has provided execution, clearing and settlement to Commonwealth's brokerage customers and maintains accounts for such customers. [1]  In September 2014, Commonwealth and NFS/Fidelity executed an Amended and Restated Fully Disclosed Clearing Agreement.  Generally, Commonwealth requires its advisory clients to maintain brokerage accounts with NFS/Fidelity.

In addition to providing execution, clearance and settlement services, NFS operates mutual fund platforms that provide correspondent firms such as Commonwealth with access to a

---

[1] Fidelity Clearing & Custody Services is an affiliate of Fidelity Investments and provided clearing and custody services through National Financial Services, LLC to many broker-dealers in addition to Commonwealth.  Fidelity Clearing & Custody Services is referred to in contemporaneous documents, in the pleadings and below as "Fidelity," "NFS/Fidelity" or "NFS."

significant number of mutual funds and mutual fund share classes. The mutual funds whose shares are available on the NFS/Fidelity platforms have entered into agreements with NFS/Fidelity that, among other things, set forth the fees that the mutual funds or their affiliates will pay to NFS/Fidelity for access to the platforms and for the services that NFS provides.[2] Such fees are calculated based holdings of customers of NFS/Fidelity's correspondent firms in particular share classes and/or the number of positions in particular share classes held by customers of NFS/Fidelity's correspondent firms.

Generally, NFS/Fidelity imposes a higher rate for mutual fund share classes that are available on its "No Transaction Fee" (or "NTF") platform. While the rates charged for mutual fund share classes that are available on its "Transaction Fee" (or "TF") platform are lower, NFS/Fidelity does impose transaction charges for the purchase or redemption of share classes available on the Transaction Fee platform.  Some mutual funds have share classes that are available on only one of the NFS/Fidelity platforms, while other funds have share classes available on both platforms. Also, a fund may move a share class from one platform to another, remove a share class from a platform or close a share class to new investors.  It is important to note that some mutual funds have share classes available through NFS/Fidelity, but neither the funds nor their affiliates pay NFS/Fidelity for access to platforms or for the services that NFS/Fidelity provides.  These mutual fund families include Fidelity Funds, Vanguard Funds, Dodge & Cox Funds, Sequoia Funds, Dimensional Funds and CGM Funds.

As Commonwealth has invested considerable amounts of money in its own technological systems and performs many of the services that NFS/Fidelity provides to other correspondent

---

[2]  The services that NFS/Fidelity provides to mutual funds include customer account set-up and maintenance; transaction processing and settlement; agency trading on behalf of mutual funds; confirmation preparation and distribution; shareholder account statement preparation and distribution; and distribution of prospectuses and periodic fund reports.

firms, NFS/Fidelity shares a portion of the fees which it receives from mutual funds or their affiliates.  Initially, NFS/Fidelity shared a part of the revenue it received with respect to share classes that were available on the NTF platform and subsequently shared revenue it received on the TF platform.  During 2014, Commonwealth and NFS/Fidelity amended and restated their clearing agreement and modified the relevant revenue participation provisions to provide that NFS/Fidelity would share 80% of the revenues it received from mutual funds and/or their affiliates with Commonwealth on mutual fund share classes on the no transaction fee platform and the transaction fee platform.

**B.  Commonwealth's Advisors.**  As independent contractors, Commonwealth's Advisors establish their own business entities and offer their services in the name of such businesses, while disclosing their association with Commonwealth.[3] (Complaint ¶13).  Commonwealth's Advisors identify prospective clients, discuss their financial and other circumstances, and describe the services that they offer.  With respect to prospective clients who express an interest in entering into an advisory relationship, Commonwealth's Advisors indicate the terms on which they offer their services, including advisory fees and allocation of expenses.  Pursuant to the terms of the arrangements between Advisors and Commonwealth, the Advisors receive a minimum of 50% and a maximum of 98% of advisory fees paid by their clients, depending  upon various factors, including the amount of their assets under management.

With respect to PPS Custom accounts, Advisors act as "portfolio managers" for their clients, and in doing so Advisors have "full investment discretion to develop custom investment portfolios for advisory clients." (Complaint ¶13).  Accordingly, after analyzing a client's

---

[3] For example, entities established by two of Commonwealth's Advisors, "Bucholtz Consulting, LLC" located in Painesville, Ohio, and "Rob Brown, LLC" located in Albuquerque New Mexico, are presently responding to non-party subpoenas issued by the SEC.

financial and other circumstances and considering the securities that may be appropriate for a client, the Advisor may purchase any of literally thousands of mutual funds and share classes offered through Commonwealth and NFS/Fidelity.

With respect to Commonwealth's PPS Select program, Commonwealth's Advisors assist their clients in selecting one or more of the model portfolios developed and maintained by Commonwealth's Investment Management and Research team.  With respect to Commonwealth's PPS Direct program, Commonwealth's Advisors work with their clients to select models developed by third party asset managers.

C. **Alleged Conflict of Interest.**  The Complaint alleges that Commonwealth's Clearing Agreement with NFS/Fidelity created an incentive for Commonwealth to select and hold more expensive mutual funds/share classes which paid more revenue sharing to Commonwealth.

With respect to the PPS Custom program, Commonwealth did not select and hold mutual funds/share classes that had higher expenses and paid more revenue sharing.  As noted above, Commonwealth's Advisors are independent contractors that conduct business through entities which they establish, while disclosing their affiliation with Commonwealth.  Advisors solicit clients, negotiate advisory fees, and sign advisory agreements.  Most importantly, account agreements vest discretionary authority in the Advisor and the Commission's Complaint acknowledges that "[i]n PPS Custom, IARs typically act as portfolio managers, with full investment discretion to develop custom investment portfolios for advisory clients." (Complaint ¶13).  For performing such services, Commonwealth's Advisors receive a significant percentage of the advisory fees paid by their clients.  However, Commonwealth's Advisors do not receive any portion of the revenue which NFS/Fidelity receives from mutual funds and/or their affiliates, some of which it shares with Commonwealth.

5

In light of the functions that they perform and the compensation which they receive, Commonwealth's Advisors are investment advisers as that term has been construed by federal courts.[4]  While Commonwealth is registered as an investment adviser and is a party to advisory agreements with PPS Custom clients, it is not the investment adviser that has selected and held mutual fund share classes for PPS Custom advisory clients.  Rather, Commonwealth Advisors establish advisory relationships with clients, exercise discretion, and receive a significant portion of advisory fees paid by clients. In light of such facts and circumstances and the relevant provisions of the Investment Advisers Act as construed by federal courts, Commonwealth Advisors are investment advisers with respect to PPS Custom advisory clients and the investment adviser who selected and held mutual fund share classes for such advisory clients.

In addition, it is important to note that a number of Commonwealth's Advisors were previously associated with other investment advisers and selected and held mutual funds/share classes for advisory or brokerage clients prior to joining Commonwealth.  To the extent that the holdings of such clients were transferred to Commonwealth advisory accounts such holdings are not relevant to this litigation. Similarly, mutual funds/share classes were selected by Commonwealth Advisors prior to July 2014, the start of the period referenced in the SEC Complaint.  (Additionally, claims based mutual fund selections made more than five years before the filing of the Complaint are barred by the statute of limitations.)  Most importantly, with

---

[4] Section 202(a)(11) of the Investment Advisers Act, 15 U.S.C. §80b-2(a)(11), defines an investment adviser to include "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." *See also Abrahamson v. Fleschner*, 568 F. 2d 862, 871 (2d Cir. 1970) (multiple general partners who received substantial compensation for managing investments of investment partnership were investment advisers); *SEC v. Berger*, 244 F. Supp. 2d 180, 182 (S.D.N.Y. 2001) ("[[t]his circuit has held that 'persons who manage [] the funds of others, for compensation are 'investment advisers' within the meaning of the statute"); *SEC v. Ahmed*, 308 F. Supp.3d 628, 652 (D. Conn. 2018) ("This a broad definition, and reaches persons who receive compensation for investing funds of their clients or who advise their customers by exercising control over what purchases and sales are made with their clients' funds.") (internal quotations and citations omitted).

respect to mutual fund/share class selections which were made by Commonwealth Advisors prior to the amendment of the clearing agreement between Commonwealth and NFS/Fidelity in September 2014,  it would not have been possible to disclose information regarding the terms of the Amended and Restated Fully Disclosed Clearing Agreement when such mutual fund share classes were selected.

Similarly, with respect to the PPS Direct program, third parties and Commonwealth's Advisors play the significant roles in the management of advisory client funds.  The third parties develop model portfolios, including the selection of funds and share classes.  Commonwealth's Advisors assist advisory clients in selecting models developed by third parties which meet their objectives.  For advisory clients participating in the PPS Direct program, Commonwealth provides administrative and related non-discretionary services with respect to PPS Direct accounts, but does not play a role in the selection or holding of mutual funds/share classes.

To the extent that Commonwealth and its employees play a role with respect to the selection and holding of mutual funds/share classes, it does so in a manner that avoids any incentive to select and hold mutual funds/share classes with higher expenses and which pay higher amounts of revenue sharing.  Commonwealth and its employees are responsible for the model portfolios that are available through the PPS Select program and the preparation of Commonwealth's Recommended List which is made available to Commonwealth's Advisors.

With respect to the PPS Select program, which is managed by Commonwealth's Investment Management and Research team, practices were employed which precluded any incentive to select and hold more expensive mutual funds/share classes that were available through NFS/Fidelity.   In particular, Commonwealth's Investment Management and Research team observed a practice of screening and evaluating mutual funds and with respect to those

mutual funds which the team determined to include in one or more of its model portfolios, selecting and acquiring the share class of such funds with lower expenses.  And the SEC acknowledges such practices in its Complaint: "Between 2014 and 2018, Commonwealth's Investment Team, which was responsible for creating and managing the model portfolios that Commonwealth offered to advisory clients through the PPS Select program, had a practice of selecting the lowest-cost share class of mutual funds placed into the model portfolios" (Complaint ¶¶14, 9).

With respect to the Recommended List that is made available to Advisors, Commonwealth also acted in a manner that avoids any incentive to select and hold mutual funds/share classes which have higher expenses and which pay more revenue sharing.  The Recommended List is prepared by leveraging the screening and evaluating of mutual funds/share classes performed by Commonwealth's Investment Management and Research team and compiling lists that recommend lower expense share classes of those mutual funds that Commonwealth's Investment Management team has determined to be appropriate for consideration by Commonwealth's Advisors.

Notwithstanding the foregoing, information regarding Commonwealth's arrangement with NFS/Fidelity and revenues which it received was reflected in its Forms ADV Part 2A (brochures), was available on its public website, and included in other documents provided to its advisory clients during the period from July 2014 through December 2018.

**D.  <u>Departure From Established Regulatory Regime</u>.**  The Complaint alleges a correlation between the "higher expenses" of a share class available on the "no transaction fee" platform and the "revenue sharing "paid to NFS/Fidelity and shared with Commonwealth. Specifically, the Complaint alleges that "Commonwealth had an incentive to select and hold

more expensive mutual funds for clients, and to select and hold more expensive mutual fund share classes when lower-cost mutual funds were available for the same fund."[5] (Complaint ¶31). And the Complaint alleges that "From July 2014 through at least March 2018, certain of the mutual fund share classes offered through NFS/Fidelity's "no transaction fee" program to Commonwealth clients had higher on-going fees than other share classes of the same funds that were available, in at least some circumstances, outside the program. These higher expense share classes generated higher revenue sharing payments for Commonwealth than the alternative, lower-cost share classes that paid less revenue sharing to Commonwealth." (Complaint ¶42). The Complaint thus links the alleged higher expenses of a "no transaction fee" fund and payments to NFS/Fidelity which were shared with Commonwealth and characterizes such payments as revenue sharing. However, any payments to financial intermediaries such as NFS/Fidelity from mutual fund expenses must have been made in accordance with applicable SEC regulations and would not constitute revenue sharing as that term has been employed by the SEC and/or its Staff.

Regulatory requirements that are relevant to the SEC's allegations include Rule 12b-1, 17 C.R.F. § 270.12b-1, and Rule 18f-3, 17 C.F.R. § 270.18f-3, which were adopted pursuant to the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. SEC Rule 12b-1 permits mutual fund assets to be used "to cover distribution expenses and sometimes shareholder service expenses."[6] Section 12b-1(b) provides that "any payments made by such company in connection

---

[5]The Complaint further alleges that "Commonwealth did not disclose that there were instances in which a mutual fund in NFS's no transaction fee program otherwise had a lower-cost share class available for which Commonwealth would receive less or no revenue sharing, and that it thus had conflicts of interest associated with those investment decisions." (Complaint ¶¶42, 44)

[6] SEC Fast Answers, Distribution [and/or Service] (12b-1) Fees, available at https://www.sec.gov/fast-answers12b-1fees.html. ("Distribution fees" include fees paid for marketing and selling fund shares, such as compensating brokers and others who sell fund shares, and paying for advertising, the printing and mailing of prospectuses to new investors, and the printing and mailing of sales literature. . . . "shareholder service fees," which are fees paid to

with such distribution are made pursuant to a written plan describing all material aspects of proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing."  And Rule 12b-1(b)(2) provides, that "[s]uch plan, together with any related agreements, has been approved by a vote of the board of directors of such company, and of the directors who are not interested persons of the company and have no direct or indirect financial interest in the operation of the plan or in any agreements related to the plan."

SEC Rule 18f-3 permits a mutual fund to issue multiple share classes.  The rule provides, among other things, that each class shall have a different arrangement for shareholder services or the distribution of securities or both and shall pay all of the expenses of that arrangement.  The rule further provides that prior to the issuance of a share of any class in reliance upon the rule, and before any material amendment of a plan, a majority of the fund's directors and a majority of the fund's directors who are not interested persons of the company shall find that the plan as proposed to be adopted or amended, including the expense allocation, is in the best interests of each class individually and the fund as a whole.

During the 1990s, the SEC Staff examined a number of financial intermediaries that operated mutual fund platforms (or "fund supermarkets") and subsequently issued a No-action Letter (the "Fund Supermarket Letter"). [7]  The SEC Staff described a fund supermarket as a "program offered by a broker-dealer or other financial institution through which its customers may purchase and redeem a variety of funds, with or without paying transaction fees."  The Fund

---

persons to respond to investor inquiries and provide investors with information about their investments. A fund may pay shareholder service fees without adopting a 12b-1.")

[7] Letter from Douglas Scheidt, Associate Director and Chief Counsel, Division of Investment Management, Securities and Exchange Commission to Craig S. Tyle, Esq., General Counsel, Investment Company Institute dated October 30, 1998.

Supermarket Letter discussed the fees charged by financial intermediaries in order to compensate them for permitting the fund to participate in the fund supermarket and for providing the services used by the fund.[8]   The Fund Supermarket Letter stated "The sponsor of a fund supermarket usually charges a fee to the participating fund if the sponsor does not charge transaction fees to its customers.  The fee generally ranges from .25% to .40% annually of the average net asset value of the shares of the fund held by the sponsor's customers. (footnote omitted)."

Also, the Fund Supermarket Letter stated that "the board of directors of a fund that participates in a fund supermarket plays a critical role.  The board is responsible for determining whether any portion of a fund supermarket fee paid (or to be paid) by the fund is for distribution, i.e., services primarily intended to result in the sale of fund shares. "  The Fund Supermarket Letter concluded that a board may reach the following determinations:  that the entire amount paid to a fund supermarket is for distribution and should be paid pursuant to a Rule 12b-1 plan; that a portion of the fee paid to the supermarket is for distribution and should be paid pursuant to a Rule 12b-1 plan and a portion of the fee is for administrative services and may be paid outside a Rule 12b-1 plan; or that the entire amount is for administrative services and may be paid outside of a Rule 12b-1 plan.  The Fund Supermarket Letter noted that some or all of the supermarket fee may be paid by a fund's investment adviser or other affiliate and Rule 12b-1 would not be implicated. In subsequent guidance provided by the Commission's Division of Investment Management, the Staff stated that "[r]evenue sharing generally refers to payments

---

[8] These services can include certain administrative services to customers who purchase shares of the fund, and certain distribution services for the fund.

made by advisers or other affiliated entities out of their 'legitimate' profits to intermediaries to compensate them for their distribution efforts." [9]

Thus, the Commission's Division of Investment Management, based upon its examinations of fund supermarkets, indicated that the rates paid for access to fund supermarkets and for the services provided by fund supermarkets sponsors vary and that the boards of directors of different funds have reached different determinations regarding the purpose of payments to financial intermediaries. Depending upon the particular facts and circumstances, a mutual fund may be able pay all, some or none of the money paid to a financial intermediary in order to comply with applicable regulations. The SEC Staff further determined that affiliates of mutual funds, including investment advisers and distributors, have been the source of such payments. Accordingly, a mutual fund share class may be available on the "no transaction fee" platform, but payments to NFS/Fidelity may be borne entirely by mutual fund affiliates such as the investment adviser or the distributor. Under such circumstances, the higher expenses of a particular mutual fund would not be correlated with higher revenue sharing and the payment of revenue sharing by the investment adviser or the distributor would not have an impact upon advisory clients/investors. To the extent that the Commission contends, in this action, that higher expenses of "no transaction fee" funds correlate with higher revenue sharing its contention is at odds with its own pronouncements.

## II.  The Commission's Request

A.  **Text of Request.**  The text of Item 1 of the Commission's Third Amended Production Request to Commonwealth, which it served on July 9, 2020, is as follows:

---

[9] SEC Division of Investment Management, IM Guidance Update, "Mutual Fund Distribution and Sub-Accounting Fees" (Jan. 2016), available at:  https://www.sec.gov/investment/im-guidance-2016-01.pdf.

"1.  For the time period of July 2014 through December 2018, Documents in Microsoft Excel format providing a list of all advisory accounts, by account number, that were open as advisory accounts, including, for each account, (i) the start date(s) for the period(s) during which the account was an advisory account, (ii) the end date(s) for the period(s) during which the account was an advisory account; (iii) the PPS Program Type of the account during the period; and (iv) the commission schedule code(s) applicable to the account during the period.  For the purpose of responding to this request, it is important that Commonwealth differentiate between the two types of PPS Custom – PPS Custom (platform) and PPS Custom (transactions).  Further, if an account's PPS Program Type or applicable commission schedule code(s) changed during the period, please provide separate entries for each period the account was associated with a different PPS Program Type or commission schedule code(s)."

**B.  Information Actually Requested.**  The Complaint (¶¶13-15) states that

Commonwealth had 329,718 advisory accounts as of the end of 2017.  And over the 54 months

covered by this request (each month from July 2014 through December 2018), Commonwealth

had a far greater number of accounts, likely exceeding 400,000 accounts, in view of accounts

being opened and closed in the normal course over this 54-month period.

For "all" of these over 400,000 accounts, this request seeks detailed information on an

account-by-account basis at any point at which any account changed in any specified respect

over 54 months.  Specifically, the request would require Commonwealth to assign personnel to

perform the following tasks in order to create a document that presently does not exist:

- List all 400,000-plus "advisory" accounts (as distinguished from "brokerage" accounts) at Commonwealth by account number.

- For each such account, specify the date it began operating as an advisory account.

- Specify the date each account ceased operating as an advisory account.

- If the account switched from operating as an advisory account to operating as a brokerage account (or vice versa) over the 54-month period, specify each date it switched from one type of account to the other.

- Specify whether over the 54-month period the account operated as a "PPS Custom" advisory account, for which the Advisor would make individually tailored fund purchase

and sale decisions on behalf of the client, and/or as a "PPS Select" account invested in one of the Commonwealth low-expense model portfolios, and/or as a "PPS Direct" account invested in third-party model portfolios.

- If the account operated as a PPS Custom advisory account, specify whether over the 54-month period the account operated as one or another sub-type of PPS Custom account – referred to as "platform" type or "transactions" type.

- Where an account switched PPS account categories or sub-types, provide separate entries for each period that the account operated as a PPS Custom account, as a PPS Select account, and as a PPS Direct account.  And also provide separate entries where PPS Custom accounts switched between platform and transaction sub-types.

- Specify each commission schedule code that each advisory account operated under over the 54-month period.  Where an account operated under separate commission schedule codes, provide separate entries for each commission schedule code that the account operated under over the 54-month period.

If we multiply these individual data elements, including changes in each account over the requested 54 months, by over 400,000 accounts, the burden and cost are quickly magnified.

### III.  Request Not Relevant to Claim or Defenses

With respect to the scope of discovery, Rule 26(b) provides that parties may obtain discovery of "nonprivileged matter that is relevant to any party's claim or defense."  The extensive data collection sought in Item 1 of the Commission's Amended Third Request for Production of Documents is not relevant to the Commission's claims or to Commonwealth's defenses.

The Commission's memorandum, at pages 13 and 14, offers the following with respect to its relevance argument:  **(i)** The data sought in Item 1 would let it "analyze NTF holdings and trading."  **(ii)** The data would let it "aggregate advisory account holdings, by PPS Program, to analyze" accounts able to meet fund prospectus requirement to purchase TF share classes.  **(iii)** The data would let it "identify and quantify the number of advisory accounts, in each PPS program, that were able to hold and trade" TF share classes.  **(iv)** The data would let it show "the

14

wide range of accounts for which transaction fees were not a factor" in choosing NTF share classes over TF share classes.  **(v)** The data would let it show "the total number of accounts and dollar value of NTF assets that were not subject to any transaction fees."

        **A.**  **The Commission's Claim.**  On its face, the Complaint (¶¶38-57) challenges the sufficiency of specified Commonwealth disclosures regarding the "revenue sharing" payments it appropriately and legally received from Fidelity.  The substantial and detailed 54-month account-by-account information sought by this request would not show whether Commonwealth's specified disclosures were sufficient or negligently deficient under applicable legal standards. The Complaint quotes these disclosures verbatim, as follows:

- "Additionally, NFS [Fidelity] offers a 'No Transaction Fee' program with more than 1,200 no-load mutual funds.  Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth.  None of these additional payments is paid to any [Commonwealth] advisors who sell these funds."  (Commonwealth disclosure, July 2014 through March 2017, quoted in Complaint ¶44)

- "Additionally, NFS offers an NTF program composed of no-load mutual funds. Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth.  None of these additional payments is paid to any advisors who sell these funds.  NTF mutual funds may be purchased within an investment advisory account at no charge to the client.  Clients, however, should be aware that funds available through the NTF program may contain higher internal expenses than mutual funds that do not participate in the NTF program and could present a potential conflict of interest because Commonwealth may have an incentive to recommend those products or make investment decisions regarding investments that provide such compensation to Commonwealth."  (Commonwealth disclosure, March 2017 through March 2018, quoted in Complaint ¶46)

        The Complaint goes on to specify the particular ways in which the Commission contends that these specified Commonwealth disclosures were "negligently" deficient:  **(i)** No pre-2017 disclosure that NTF funds were "generally" more expensive, and that "some" NTF fund shares had "higher internal expenses" (Complaint ¶¶44-45, 49).  **(ii)** No pre-2017 disclosure that "there

were instances" where NTF funds "had a lower-cost share class available," with "lower expenses," for which there would be "less or no" revenue sharing (Complaint ¶¶44-45, 47). **(iii)** No 2017 disclosure that revenue sharing allegedly created an "actual" conflict that allegedly "did create" incentives to select more expensive investments (Complaint ¶47). **(iv)** No disclosure that Commonwealth also received revenue sharing for funds that charged transaction fees ("TF funds"), not just for funds that did not charge transaction fees (Complaint ¶50). And **(v)** no disclosure before 2018 that Fidelity did not pay revenue sharing to Commonwealth on Fidelity funds and certain other funds (Complaint ¶¶54-55). This is what is at issue in this case.

**B. <u>Account-Level Detail Irrelevant.</u>** Drilling down to obtain details on over 400,000 individual accounts as they changed over 54 months accomplishes nothing except to create a large, complex and confusing record. It is not disputed that of the thousands of mutual funds and share classes on Fidelity's platforms, some funds and share classes had higher internal expenses, and others had lower expenses, all as approved by each fund's board under Commission Rule 18f-3, 17 C.F.R. §270.18f-3. It is not disputed that the rates paid Fidelity by fund sponsors for access to Fidelity's platform and for services differed in amounts, depending on each fund sponsor's particular arrangements with Fidelity. It is not disputed that the Advisors – and not Commonwealth – assessed whether their clients' individual needs and objectives were best accomplished through a share class that did not charge a transaction fee ("NTF") versus a share class that did charge a transaction fee ("TF"). It is not disputed that it was the Advisors – and not Commonwealth – who made the investment decisions on funds and share classes and placed the orders to be executed. It is not disputed that Fidelity's clearing agreement paid Commonwealth the same fixed percentage of whatever revenue sharing Fidelity received, whether for an NTF fund or a TF fund.

Injecting detailed data on over 400,000 client accounts into this record will not assist the jury in determining whether Commonwealth's specified disclosures were or were not legally sufficient. *E.g. Bucceri v. Cumberland Farms, Inc.*, 2020 WL 58428 at \*5 (D. Mass. Jan. 6, 2020) (Talwani, J.) (motion to compel denied; "courts focus on the direct connection between the material sought and a party's claim," and "[s]peculative inferences" will "not meet the standards under" Rule 26(b)(1)), *citing United Therapeutics Corp., v. Watson Laboratories, Inc.*, 200 F. Supp. 3d 272, 279 (D. Mass. 2016) (relevance of requested materials "simply too speculative").

## IV.  Request Not Proportional to Case Needs

Rule 26(b) further provides that the scope of discovery should be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  The extensive data collection sought in Item 1 of the Commission's Amended Third Request for Production of Documents is not proportional to the needs of this case. [10]

The Commission's memorandum, at pages 14 and 15, offers the following with respect to its proportionality argument:  **(i)** While this is a "negligence" case, Commonwealth owes a fiduciary duty to advisory clients.  **(ii)** Commonwealth has about "$85 billion in advisory assets, most of which are owned by non-high-net-worth, retail clients."  **(iii)** The revenue sharing Commonwealth received from Fidelity from 2014 through 2018 totaled over $100 million, and

---

[10] In the months since this action was filed on August 1, 2019, Commonwealth has responded to the Commission's multiple non-big-data discovery requests – responding to three sets of document requests and three sets of interrogatories.  Commonwealth has also assisted six of its Advisors in responding to Commission subpoenas during discovery.  Commonwealth did so during the pandemic shutdown that closed offices and required staff to work remotely.

this allegedly generated a conflict.  **(iv)** Only Commonwealth has a "historically accurate list of"
its advisory accounts, and this will let the Commission "present an accurate picture of" their
"account holdings and trading data."

A.  **Data the Commission Does Not Need.**  The Commission conducted a "big data"
investigation in this matter beginning in 2018 and continuing to the filing of this case in August
2019.  This included substantial productions of data and documents from Commonwealth and
Fidelity, and seven pre-litigation depositions from Commonwealth and Fidelity executives.
Then, after filing a Complaint charging simply negligently insufficient disclosure of Fidelity
revenue sharing, the Commission appropriately abandoned its big-data approach until now.

The Commission has been provided with detailed data regarding revenue sharing
payments by funds and their sponsors to Fidelity.  That data includes detail down to a monthly
basis of the amount that was paid to Fidelity for each share class of each fund (by unique
identifiers called "cusips" in the securities industry) and the amount paid to Commonwealth, as
well as transaction data and position data.  Breaking data that the Commission already has down
to the level of individual accounts will not provide information that is relevant to the claims that
the Commission has pled in its Complaint.

B.  **Burden on Commonwealth to Produce.**  This request imposes an excessive and
unreasonable burden and cost on Commonwealth.  The Complaint (¶¶13-15) states that
Commonwealth had 329,718 advisory accounts at the end of 2017.  And over the 54 months
(each month July 2014 through December 2018) covered by this request, Commonwealth had a
far greater number, likely exceeding 400,000 accounts, in view of accounts being opened and
closed over this 54-month period.  For "all" of these over 400,000 accounts, this request seeks

detailed information on an account-by-account basis at any point at which any account changed in any specified respect over 54 months.

The particular information sought for these over 400,000 accounts over 54 months includes account number, the start and stop dates for each account's advisory account status over 54 months, each account's program type and changes in program type over 54 months, the account's changes in sub-categories within program types over 54 months, commission schedule codes applicable to each account at various times over 54 months, and other account-specific information.  Multiply these data elements, including changes in each account over the requested 54 months, by over 400,000 accounts, and the burden and cost quickly becomes excessive and unreasonable.  But the work does not stop with retrieval.  The information would also need to be assembled, formatted, reviewed and quality-checked before production.  Nor should Commonwealth be required "to create a document where none exists."  *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012).

**C. <u>Burden Going Forward</u>.**  After production, the cost ramps considerably higher as Commonwealth then has to do its own analysis of what this huge data set may or may not show, in order to be prepared to respond to any attempt that may be made during depositions, during expert discovery, at the summary judgment stage, or at trial to use it for some previously unanticipated purpose.

And if allowed at trial, the presentation of such data to the jury with accompanying summary witness and/or expert testimony, and Commonwealth's necessary challenge to the data, cross-examination and counter-presentation, will needlessly burden, confuse and prolong the trial and complicate the record.  The concepts involved in fund industry litigation like this are

difficult enough for a lay jury to learn and evaluate. The jury's task becomes that much harder if they are set adrift in an ocean of detailed and irrelevant data.

**WHEREFORE**, for the reasons stated above, Commonwealth asks that the Commission's motion be denied.

Dated: September 4, 2020        */s/ Stephen J. Crimmins*
                                      Thomas A. Ferrigno (*pro hac vice*)
                                      Stephen J. Crimmins (Mass. BBO #544930)
                                      Elizabeth L. Davis (*pro hac vice*)
                                      Murphy & McGonigle PC
                                      1001 G Street NW, 7th floor
                                      Washington DC 20001
                                      (202) 661-7031 (Crimmins)
                                      scrimmins@mmlawus.com

## CERTIFICATE OF SERVICE

I certify that on September 4, 2020, I caused a copy of the foregoing to be served by means of the Court's CM/ECF system.

                                   */s/ Stephen J. Crimmins*