UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * * * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 1:19-cv-11655-IT |
| | * | |
| COMMONWEALTH EQUITY SERVICES, LLC, | * * * | |
| Defendant. | | |

MEMORANDUM & ORDER

April 7, 2023

TALWANI, D.J.

The Securities and Exchange Commission ("SEC") alleges that Commonwealth Equity

Services, LLC, d/b/a Commonwealth Financial Network ("Commonwealth"), negligently failed

to disclose material conflicts of interests to its advisory clients in violation of Section 206(2) of

the Investment Advisers Act of 1940 ("Advisers Act") (Count I) and failed to adopt and

implement required policies and procedures in violation of Section 206(4) of the Advisers Act

and Rule 206(4)-7 thereunder (Count II). Compl. ¶¶ 68–75 [Doc. No. 1]. The SEC moves for

partial summary judgment as to liability. See Pl.'s Mot. for Summ. J. [Doc. No. 65].

Commonwealth moves for summary judgment on both claims and on certain affirmative

defenses, including failure to allege facts showing conflict of interest (Third Affirmative

Defense), failure to allege facts showing insufficient disclosure (Fourth Affirmative Defense),

failure to allege facts showing deception (Fifth Affirmative Defense), and denial of fair notice

under the Due Process Clause (Seventh Affirmative Defense). See Def.'s Mot. for Summ. J.

[Doc. No. 69].

For the reasons set forth below, the SEC's <u>Motion for Summary Judgment</u> [Doc. No. 65] as to liability is GRANTED and Commonwealth's <u>Motion for Summary Judgment</u> [Doc. No. 69] is DENIED.

## I.    Factual Background

### A.    *Parties*

#### 1.    Commonwealth

Commonwealth is an SEC-registered investment adviser that manages billions of dollars in advisory client assets. Pl.'s Statement of Material Facts ("SOMF") ¶¶ 1–2 [Doc. No. 68-1].[1] Most of Commonwealth's advisory clients are "retail investors" with less than $1 million in assets under management or a net worth of less than $2 million. <u>Id.</u> at ¶ 4. Commonwealth's investment advisory services are offered through approximately 2,300 investment adviser representatives ("IARs"). <u>Id.</u> at ¶ 5.

Commonwealth is an introducing broker, meaning that it accepts client orders, but has an arrangement with a clearing broker who executes and clears client trades and maintains custody of the investments held by Commonwealth's clients. <u>Id.</u> at ¶ 17. Commonwealth has contracts with National Financial Services, LLC ("NFS") to provide clearing services for its brokerage and advisory accounts. <u>Id.</u> at ¶ 18.

#### 2.    National Financial Services, LLC

NFS, a Fidelity affiliate, is a clearing firm that serves many introducing broker-dealers. <u>Id.</u> at ¶ 19. As part of its clearing services, NFS provides account holders access to the Fidelity FundsNetwork ("FundsNetwork"), one of the largest mutual fund supermarkets. <u>Id.</u> The

---

[1] The court cites to the SEC's <u>Statement of Material Facts</u> [Doc. No. 68-1] to the extent that Commonwealth does not dispute the facts. <u>See</u> Resp. to Pl.'s SOMF, § B. [Doc. No. 91].

FundsNetwork connects NFS account holders with asset management companies offering thousands of mutual fund share classes. Id. Through the FundsNetwork, account customers can purchase, sell, or exchange these mutual fund shares. Id.

NFS enters into service agreements with mutual fund families to make their shares available to NFS customer accounts. Id. at ¶ 20. These service agreements specify the share classes that will be available through the FundsNetwork programs, the services to be provided by NFS, and the fees paid by the mutual fund families to NFS in return for those services. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 46 [Doc. No. 88].

Since at least January 2014, NFS has offered the mutual fund families two primary options for the distribution of their shares. Pl.'s SOMF ¶ 20 [Doc. No. 68-1]. Mutual fund companies choose between (i) the No Transaction Fee ("NTF") program, through which mutual fund families may offer fund shares to NFS account customers who can purchase or sell NTF program shares without paying a transaction fee, and (ii) the Transaction Fee ("TF") program, through which mutual fund families may offer fund shares to NFS account customers who can purchase or sell TF program shares with payment of a transaction fee. Id. at ¶¶ 21–23. Generally, the standard rate for a mutual fund share class to participate in the NTF and the TF program is 40 basis points ("bps") and 8-12 bps, respectively, of the average assets of a fund class in a given year attributable to the accounts of NFS and its introducing broker-dealers and their clients. Pl.'s SOMF ¶ 26–27 [Doc. No. 68-1]; § B., Pl.'s Responses to Def.'s Alleged Disputes, 26–28 [Doc. No. 97].

In 2017, Fidelity began offering the Institutional No Transaction Fee ("iNTF") program, through which participating mutual funds may offer institutional shares for purchase and sale without the payment of a transaction fee. Pl.'s SOMF ¶ 24 [Doc. No. 68-1].

Certain mutual fund families, which include the fund's advisor, distributor, and fund affiliate, pay NFS a fee to participate in the FundsNetwork program. Id. at ¶ 26; Resp. to Pl.'s SOMF, § B. ¶ 26 [Doc. No. 91]. Certain mutual fund companies pay NFS if assets attributable to NFS and correspondents/clients remain invested in a particular fund and share class. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 48 [Doc. No. 88]. NFS charges correspondent firms, including Commonwealth, a surcharge fee on transactions involving Non-Paying Fund Families ("NPFF"), which are certain fund families that do not pay program fees to have their shares participate in NFS's NTF or TF programs. Pl.'s SOMF ¶ 30 [Doc. No. 68-1].

3.      Commonwealth's Investment Advisor Representatives ("IARs")

Commonwealth's IARs establish their own businesses and offer advisory services through such businesses, while disclosing their affiliation with Commonwealth. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 3 [Doc. No. 88]. Commonwealth's IARs sign an agreement that they will offer only Commonwealth-specified advisory services and securities approved by Commonwealth as required by regulation. Id.; Resp. to Pl.'s SOMF, § B. ¶ 11 [Doc. No. 91].[2] Commonwealth-sponsored investment advisory programs require clients to use NFS as the clearing broker for accounts holding assets in these programs. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 4 [Doc. No. 88].

Clients often "designate Commonwealth and the IAR as their agent and attorney-in-fact" and grant both Commonwealth and the IAR discretionary trading authority. Pl.'s SOMF ¶ 10 [Doc. No. 68-1]; Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 93 [Doc. No. 88].

---

[2] IARs may offer third-party asset manager programs ("TPAM") that have agreements with Commonwealth to provide clients with access to portfolio managers that create and implement model portfolios and may provide wealth management and retirement plan consulting services. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 11 [Doc. No. 88].

IARs generally act as the primary portfolio managers to choose investments from the options put forward by Commonwealth. § B., Pl.'s Responses to Def.'s Alleged Disputes, SoF 10–11 [Doc. No. 97].

Commonwealth created model portfolios and made them available to its IARs and client base through the Preferred Portfolio Services ("PPS")[3] Select Program. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 8 [Doc. No. 88]. Commonwealth also gave IARs access to a Mutual Fund Resource Guide, which provided information regarding mutual funds and share classes available through Commonwealth and NFS, including fund family, fund name, type of fund, expense ratio and NTF, TF or iNTF status. Id. at ¶ 65. Commonwealth also provided IARs access to Commonwealth's Mutual Fund Recommended List ("MFRL"). Id. at ¶ 66. From August 2014 through July 2017, the MFRL only highlighted the NTF share class. Id. Alternatively, Commonwealth's Advisors could conduct their own research using such tools as Morningstar, which Commonwealth made available to IARs at a discounted cost. Id. at ¶ 67.

Pursuant to agreements between IARs and Commonwealth, IARs received a percentage of advisory fees paid by their clients to Commonwealth. Id. at ¶ 5. IARs did not receive any additional compensation for selecting funds and share classes that paid revenue sharing and IARs did not receive less compensation for selecting share classes that did not pay revenue sharing. Id. at ¶ 77.

---

[3] PPS is a program through which Commonwealth offers investment advisory services. Pl.'s SOMF ¶ 7 [Doc. No. 68-1].

B.   *Payments from NFS to Commonwealth*

In accordance with its agreements with Commonwealth, NFS shared a part of the FundsNetwork payments it received from mutual fund families with Commonwealth. Pl.'s SOMF ¶ 33 [Doc. No. 68-1]. In September 2014, NFS and Commonwealth executed an agreement that Commonwealth's portion of NFS program revenue would be 80% of "gross" NTF and TF revenue received by NFS based on assets or positions invested in non-Fidelity funds and held in Commonwealth customer accounts ("2014 Clearing Agreement"). Id. at ¶¶ 46, 49–50. The agreement was updated to include the iNTF program after it launched in February 2017. Id. at ¶ 52. Pursuant to the agreement, from July 2014 to December 2018, NFS paid Commonwealth over $189 million, which included fee revenue sharing and payments for other expenses. Id. at ¶ 53; Resp. to Pl.'s SOMF, § B. ¶ 53 [Doc. No. 91].

Under the clearing agreements between Commonwealth and NFS, Commonwealth did not receive any FundsNetwork program fee revenue sharing on Fidelity funds. Pl.'s SOMF ¶ 38 [Doc. No. 68-1]; Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 37 [Doc. No. 88].

Commonwealth's IARs and clients were not provided with information regarding the payments that mutual fund companies paid to NFS for NTF, TF or iNTF share classes, which were, in turn, shared with Commonwealth. Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 69 [Doc. No. 88].

C.   *Mutual Fund and Share Class Specific Information*

1.   Materials NFS Shared with Commonwealth

From 2014 through 2018, NFS provided Commonwealth with electronic access to the Institutional FundsNetwork ("IFN") directory, which contains a list of mutual fund share classes available for purchase, sale, or exchange by Commonwealth advisory accounts, and gave

Commonwealth permission to download the entire directory for its own use. Pl.'s SOMF ¶¶ 72–73 [Doc. No. 68-1]. For each share class listed, the IFN directory provided data on expense ratios and whether the share class may be purchased with or without a transaction fee. Id. at ¶¶ 74–75. Beginning in February 2017, the IFN directories also included data indicating whether a share class participated in the iNTF program. Id.

NFS provided Commonwealth with access to clearing reports detailing amounts paid to Commonwealth, which included revenue sharing and payments for other expenses. Id. at ¶ 84; Resp. to Pl.'s SOMF, § B. ¶ 84 [Doc. No. 91].

2.      Information in Commonwealth's Possession

Since at least December 2013, Commonwealth had been aware that some mutual fund families waive or modify investment minimums for institutional class shares. Pl.'s SOMF ¶ 77 [Doc. No. 68-1]. Commonwealth maintained an internal list of mutual fund families that had modified or eliminated minimum investment amounts for institutional class shares. Id. at ¶ 79. For purposes of determining which fund families to add to the list, Commonwealth's brokerage operations either received a communication from the fund family that it would allow trades in an institutional class below the stated investment minimums or Commonwealth's trading operations would attempt a trade below a share class's stated investment minimum and the trade went through. Id. at ¶¶ 80–82. NFS's brokerage trading system did not support customer-level waivers of mutual fund investment minimums. Id. at ¶ 83. Commonwealth maintained an internal webpage providing its IARs with the forms necessary to convert their clients' mutual fund shares to available institutional share classes. Id. at ¶ 78.

As part of Commonwealth's 2015 business plan, Commonwealth's Finance Department sought to verify that Commonwealth was receiving 80% of gross NTF and TF revenue that it

was entitled to under the 2014 Agreement. Id. at ¶¶ 86–88. By June 2015, Commonwealth's Finance Department had set up a data analysis program to monitor the streams of revenue sharing coming from NFS's program revenues. Id. at ¶ 89. In the same analysis, Commonwealth's Finance Department calculated that Commonwealth received NTF and TF program revenue on Commonwealth client assets at a rate of 30 basis points and 5.47 basis points, respectively. Id. at ¶¶ 91–92. Commonwealth's Finance Department did not provide a copy of this analysis to Commonwealth's Chief Compliance Officer or anyone in the Compliance Department. Id. at ¶ 95.

3.      Lower-cost share classes

In July and August 2016, Commonwealth and NFS had two meetings concerning lower-cost share classes and mutual fund conversions. Pl.'s SOMF ¶ 96 [Doc. No. 68-1].[4] At the July 2016 meeting between NFS and Commonwealth's Finance Department, NFS gave a presentation which in part showed that converting Commonwealth clients' investments in certain NTF program mutual funds to lower-cost alternatives would reduce the clients' investment expense (in terms of expense ratio) and reduce Commonwealth's NTF program revenue. Id. at ¶¶ 99–103. The presentation also noted the existence of fund families with investment minimum requirements that had available alternatives. Id. at ¶ 104.[5] Commonwealth's Finance Department did not share the NFS presentation with its Compliance Department. Id. at ¶ 106.

In response to the DOL meeting, Commonwealth began analyzing the possibility

_____

[4] The impetus for these meetings was a proposed Department of Labor ("DOL") rule that would have imposed a fiduciary duty standard on financial advisers working on retirement accounts. Pl.'s SOMF ¶ 97 [Doc. No. 68-1].

[5] By July 2016, Commonwealth had already included most of those fund families on its internal list as fund families that granted Commonwealth clients access to institutional share classes with reduced or eliminated investment minimums. Id. at ¶ 105.

of converting its client mutual fund holdings to a lower-cost share class. Id. at ¶ 108. In June

2017, Commonwealth completed building a software tool to identify lower-cost share class

alternatives. Id. at ¶¶ 110–111. Commonwealth listed the tool on Commonwealth's intranet

webpage as a service available to its IARs and reached out to certain representatives with larger

mutual fund holdings or who had independently requested conversion of client mutual fund

holdings, but Commonwealth did not distribute the tool more generally to its IARs. Id. at ¶ 112.

In late 2018, Commonwealth included the lower-cost share class analyzer tool as part of its

compliance review for IARs. Id. at ¶ 115.[6]

      In November 2018, Commonwealth announced that the mutual fund share class

selection for PPS Custom and all advisor-managed accounts would be limited to a single lower-

cost share class for each fund. Id. at ¶ 121. Commonwealth further announced that it would

"automatically convert existing PPS Custom and advisor-managed mutual fund holdings to the

single share class on a rolling basis starting in the first quarter of 2019." Id. at ¶ 122. In

connection with this decision, Commonwealth excluded lower-cost share classes that participate

in NFS's TF program without paying a fee ("Zero Paying CUSIPs" or "ZPCs"), even if they

were the lowest cost share class. Id. at ¶ 123.

      Ultimately, Commonwealth did not implement its decision to narrow its clients' share

class selection choices, or automatically convert their fund holdings, to the lowest cost share

class that paid NFS's fund supermarket fees. Id. at ¶ 131.

---

[6] The analyzer tool included institutional share classes from mutual fund families that
Commonwealth did not have listed in its running list of all available institutional share
classes. Id. at ¶ 117.

D.      *Commonwealth's Disclosure of Payments by NFS*

During the period of 2014 through 2018, Commonwealth updated its Form ADV,[7]

including its Part 2A Brochure, annually and filed the update with the SEC. Id. at ¶ 185.

1.      2014–2017 Disclosures

Item 5, Fees and Compensation, of Commonwealth's 2014 Form ADV provided as

follows:

> Additionally, NFS offers a "No Transaction Fee" program with more than 1,200
> no-load mutual funds. Participating mutual fund sponsors pay a fee to NFS to participate
> in this program, and a portion of this fee is shared with Commonwealth. None of these
> additional payments is paid to any advisors who sell these funds.

Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 82 [Doc. No. 88]. Commonwealth, in

Item 5 of the 2014 Form ADV, further disclosed:

> Commonwealth and your advisor may receive service fees and other compensation from
> investment product sponsors and distributors when they make recommendations or
> investment decisions for you. These fees and compensation include, but are not limited
> to, mutual fund and money market 12b-l and subtransfer agent fees, mutual fund and
> money market management fees and administrative expenses, mutual fund transaction
> fees, certain deferred sales charges on previously purchased mutual funds transferred into
> an account, variable annuity expenses, due diligence fees, marketing reimbursements or
> reallowances, or other transaction or service fees. Commonwealth and your advisor may
> receive a portion of these fees. This additional compensation presents a potential conflict
> of interest because Commonwealth and your advisor may have a greater incentive to
> recommend (or make investment decisions regarding) investments for your account that
> provide such additional compensation to Commonwealth or your advisor.

Id.

Item 10 of Commonwealth's 2014 Form ADV, Other Industry Affiliations, provided, in

part, as follows:

> Where permitted by law, Commonwealth and/or your advisor may receive transaction-
> based commissions, mutual fund l 2b-1 fees, distributor fees, service fees, due diligence
> fees, marketing reimbursements, revenue sharing, or other payments relating to your

---

[7] A Form ADV is a form investment advisers must use to register with the SEC. Id. at ¶ 171.

> investment in or otherwise supporting Commonwealth's or your advisor's activities
> regarding the securities and insurance products recommended, purchased, or held within
> your Commonwealth advisory program account. To the extent Commonwealth is the
> investment adviser, sponsor, or other service provider to your investment advisory
> program, Commonwealth receives compensation for its services. Clients should be aware
> that Commonwealth's or your advisor's receipt of commissions, fees, payments, and other
> compensation may present a potential conflict of interest because Commonwealth or your
> advisor may have an incentive to recommend those products or programs or make
> investment decisions regarding investments that provide such compensation to
> Commonwealth or your advisor.

Id. at ¶ 83.

Similar disclosures were included in Commonwealth's Forms ADV issued during 2015

and 2016. Id. at ¶ 84.

    2.    2017 Disclosures

In Item 14, Client Referrals and Other Compensation, of Commonwealth's 2017 Form

ADV, Commonwealth included the following disclosure:

> Additionally, NFS offers an NTF program composed of no-load mutual funds.
> Participating mutual fund sponsors pay a fee to NFS to participate in this program, and a
> portion of this fee is shared with Commonwealth. None of these additional payments is
> paid to any advisors who sell these funds. NTF mutual funds may be purchased within an
> investment advisory account at no charge to the client. Clients, however, should be aware
> that funds available through the NTF program may contain higher internal expenses than
> mutual funds that do not participate in the NTF program and could present a potential
> conflict of interest because Commonwealth may have an incentive to recommend those
> products or make investment decisions regarding investments that provide such
> compensation to Commonwealth.

Id. at ¶ 85.

In August 2017, Commonwealth amended its brochure language to add the following

disclosure:

> Clients . . . should be aware that funds available through the [No Transaction Fee]
> programs often contain higher internal expenses than mutual funds that do not
> participate in the [No Transaction Fee] program. Commonwealth's receipt of a
> portion of the fees associated with the [No Transaction Fee] program creates a
> conflict of interest because Commonwealth has an incentive to make available or
> to recommend those produc[t]s, or make investment decisions regarding

investments, that provide such compensation to NFS and Commonwealth over those mutual fund sponsors that do not make such payments to NFS and Commonwealth.

Pl.'s SOMF ¶ 211 [Doc. No. 68-1] (emphasis omitted).

3.      2018 Disclosures

In its 2018 Form ADV, Commonwealth changed its generic disclosure language from

Commonwealth and/or your advisor "may receive" to Commonwealth and/or your advisor "will

receive commissions, mutual fund 12b-1 fees, service fees, due diligence fees, revenue-sharing

payments, marketing reimbursements, and other payments ('additional compensation') relating

to your investment(s) in or otherwise supporting the activities regarding the securities and

insurance products recommended, purchased, or held in your investment advisory program

accounts." Pl.'s SOMF ¶ 234 [Doc. No. 68-1].

Further, in its 2018 Form ADV, Commonwealth included the following disclosure:

Although NTF funds do not assess transaction charges, most NTF funds have higher internal expenses than fund[s] that do not participate in an NTF program. These higher internal fund expenses are assessed to investors who purchase or hold NTF funds. Depending upon the frequency of trading and hold periods, NTF funds may cost you more, or may cost Commonwealth or your advisor less, than mutual funds that assess transaction charges but have lower internal expenses. In addition, the higher internal expenses charged to clients who hold NTF funds will adversely affect the long-term performance of the client's account when compared to share classes of the same fund that assess lower internal expenses.

For those Commonwealth advisory programs that assess transaction charges to clients or to Commonwealth or the advisor, a conflict of interest exists because Commonwealth or your advisor have a financial incentive to recommend or select NTF funds that do not assess transaction charges but cost you more in internal expenses than funds that do assess transaction charges but cost you less in internal expenses. In addition to reading this Brochure carefully, clients are urged to inquire whether lower-cost share classes are available and/or appropriate for their account in consideration of the client's expected investment holding periods, amounts invested, and anticipated trading frequency. Further information regarding fees and charges assess by a mutual fund is available in the appropriate mutual fund prospectus.

Id. at ¶ 217 (emphasis omitted).

In December 2018, Commonwealth filed an amended Form ADV Part 2A brochure. Pl.'s

SOMF ¶ 225 [Doc. No. 68-1]. This amended disclosure included the following language:

> Commonwealth uses National Financial Services ("NFS") as its clearing and custody firm for substantially all of Commonwealth's PPS managed accounts. Commonwealth's business relationship provides Commonwealth considerable revenue-sharing benefits. In particular, Commonwealth receives substantial monthly revenue-sharing payments from NFS based on client assets held by Commonwealth with NFS in . . . non-Fidelity NTF funds that participate in Fidelity's NTF program, and non-Fidelity TF funds that participate in Fidelity's TF program.
>
> Commonwealth's revenue-sharing arrangement with NFS, and the existence of various fund share classes with lower-internal expenses that Commonwealth may not make available for purchase in managed account programs, present a conflict of interest between clients and Commonwealth or its advisers. A conflict of interest exists because Commonwealth and your advisor have a greater incentive to make available, recommend, or make investment decisions regarding investments that provide additional compensation to Commonwealth that cost clients more than other available share classes in the same fund that cost you less.

Id.

E.    *Commonwealth's Disclosure Policies*

From 2014 through 2018, Commonwealth had an "Investment Advisory Written

Supervisory Procedures" manual. Id. at ¶ 179. Commonwealth's written supervisory procedures

during the relevant period required that:

> Any form of compensation, where direct or indirect, in kind or in cash, must be disclosed to advisory clients. This includes sales incentive compensation, soft-dollar compensation, and directed brokerage compensation. As such, it is essential that any form of compensation that any form of compensation that Commonwealth receives be adequately disclosed in Commonwealth's Form ADV and in all client agreements. Although the Compliance department is primarily responsible for amending Commonwealth's Form ADV and client agreements, it is essential that the Finance, Wealth Management, Product, and Operations departments notify the Compliance department prior to acceptance by Commonwealth of any compensation not described in the above-referenced documents. This notification should be made in writing to Commonwealth's [Chief Compliance Officer] or his or her designee.
>
> Current Commonwealth policy prohibits the receipt of sales incentive compensation in its advisory program accounts. Additionally, Commonwealth does not receive any soft-dollar compensation or directed brokerage compensation. While Commonwealth does

> maintain certain revenue sharing arrangements with certain product and service providers, the nature and scope of such arrangements including the amount of compensation received, are disclosed in Commonwealth's Form ADV Part 2A and on the public side of Commonwealth's website.

Commonwealth App., Commonwealth Financial Services Investment Advisory Written Supervisory Procedures, Ex. 61 [Doc. No. 73-61]; Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 89 [Doc. No. 88].

Commonwealth's written supervisory procedures also provided that "Commonwealth revises its Form ADV Part 2A Brochure whenever material changes in its advisory programs or services occur, but in no event less frequently than annually." SEC Appendix, Written Supervisory Procedures as of December 2018, § V.C.2., Ex. 61 [Doc. No. 72-61]; Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 90 [Doc. No. 88].[8]

## II.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied

---

[8] Commonwealth asserts that the annual review also included reviews of conflicts of interest, Def.'s Mem. in Supp. 28 [Doc. No. 74-1], but provides no support in the record for that assertion.

in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 322–23.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 256. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Id. at 248. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotations omitted). The non-moving party must demonstrate through "submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate

ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting

that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather

require the court "to determine whether either of the parties deserves judgment as a matter of law

on facts that are not disputed").

### III.    Discussion

The parties bring cross motions for summary judgment on whether Commonwealth is

liable for failure to disclose material conflicts of interests to its advisory clients under Section

206(2) of the Advisers Act (Count I) and for failure to adopt and implement policies and

procedures required by Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

Commonwealth also moves for summary judgment on its affirmative defenses.

### A.    *Commonwealth's Due Process Affirmative Defense*

Commonwealth contends that the SEC failed to provide Commonwealth with fair notice

of the disclosure obligations asserted in the complaint. Def.'s Mem. in Supp. of Mot. for Summ.

J. 29 ("Def.'s Mem. in Supp.") [Doc. No. 74-1]; see also Answer ¶ 95 [Doc. No. 12]. The SEC

counters that the fiduciary obligation to disclose economic conflicts of interest under § 206(2) of

the Advisers Act has been an established, industry-wide standard of conduct for over 50 years.

Pl.'s Opp'n to Def.s Mot. for Summ. J. ("Pl.'s Opp'n") 11 [Doc. No. 87]. The SEC further

contends that its Form ADV Part 2A instructions have existed for a decade and provide guidance

to investment advisers on how to make such disclosures in firm brochures. Id. (citing

Amendments to Form ADV, IA Rel. No. 3060, 2010 WL 2957506 (Final Rule Aug. 12, 2010)).

"The Investment Advisers Act of 1940 [] reflects a congressional recognition 'of the

delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent

to eliminate, or at least to expose, all conflicts of interest which might incline as investment

adviser—consciously or unconsciously—to render advice which was not disinterested." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963).

Commonwealth relies on Upton v. S.E.C., 75 F.3d 92 (2d Cir. 1996), where the Second Circuit found that a chief financial officer of a brokerage firm was not on "reasonable notice" that firm conduct might violate an SEC rule as "there was substantial uncertainty in the [SEC's] interpretation" of the rule and the SEC made a "substantial change in its enforcement policy that was not reasonably communicated to the public." Upton, 75 F.3d at 98. In doing so, the Second Circuit noted that the SEC was "aware" that brokerage firms were engaged in allegedly violative conduct but the SEC "took no steps to advise the public that it believed the practice was questionable" until later. Id.

Likening the factual scenario here to that in Upton, Commonwealth contends that the SEC has been aware of revenue sharing practices for over two decades, expressed concerns regarding revenue sharing and considered rulemaking relating to revenue sharing arrangements, but did not adopt rules requiring investment advisers to provide advisory clients with disclosures of such arrangements. Def.'s Mem. in Supp. 29 [Doc. No. 74-1]. However, unlike in Upton, where it was "undisputed" that the brokerage firm "complied with the literal terms of the Rule at all times," Upton, 75 F.3d at 94, Commonwealth contravened Capital Gains's clear directive that "[a]n investor seeking the advice of a registered investment adviser must, if the legislative purpose is to be served, be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving two masters or only one, especially . . . if one of the masters happens to be economic self-interest." Capital Gains, 375

17

U.S. at 196 (internal quotation marks omitted).[9] Accordingly, Commonwealth had an affirmative

obligation to disclose its economic conflicts of interest. See id. at 201 ("The high standards of

business morality exacted by our laws regulating the securities industry do not permit an

investment adviser to trade on the market effect of his own recommendations without fully and

fairly revealing his personal interests in these recommendations to his clients.").

Commonwealth cites Robare Grp., Ltd. v. S.E.C., 922 F.3d 468 (D.C. Cir. 2019), in

support of Commonwealth's contention that the standard for disclosure of revenue sharing

agreements by investment advisors is unclear under Section 206(2) of the Advisers Act. Def.'s

Reply in Supp. of Summ. J. ("Def.'s Reply") 15 [Doc. No. 99]. However, Defendant's reliance

on Robare Grp. is misplaced. In Robare Grp., the court reviewed the SEC's decision that an

investment advisor and its principals violated Section 206(2) and another provision of the

Advisers Act. See Robare Grp., 922 F.3d at 471. While the D.C. Circuit vacated in part and

remanded in part portions of the SEC's findings, see id. at 480, the court held that the SEC's

"findings of negligent violations under Section 206(2) [were] supported by substantial evidence,"

id. at 471, where the investment advisor did not disclose a revenue sharing agreement with

Fidelity through which Fidelity paid the investment adviser when its clients invested in certain

funds offered on Fidelity's on-line platform, id. at 473–474. Rejecting a variation of Defendant's

argument here that the disclosure requirements for revenue sharing are unclear, the D.C. Circuit

in Robare Grp. held that the investment adviser and its principals "had a fiduciary duty to fully

and fairly reveal conflicts of interest to their clients," which they failed to do where "for a decade

---

[9] The SEC's guidance under the Investment Company Act for how funds may disclose certain
payments, Def.'s Mem. in Supp. 19 [Doc. No. 74-1]; Def.'s Reply 14 [Doc. No. 99], has no
bearing on Commonwealth's disclosure requirements under § 206(2).

their disclosures simply did not refer to the payment arrangement with Fidelity, much less its terms." Id. at 478. This holding is in step with the directive from Capital Gains that economic conflicts of interest must be disclosed under the Advisers Act.

Accordingly, the court finds that the SEC did not fail to provide fair notice of the disclosure obligations asserted in the complaint to Commonwealth constituting a violation of due process.

B.      *Count 1: Disclosures Under Section 206(2) of the Advisers Act*

The parties filed cross-motions as to the SEC's charge that Commonwealth violated Section 206(2) of the Advisers Act.

To establish a Section 206(2) violation, the plaintiff must prove that "(A) the defendant was an investment adviser who (B) utilized the mails or any means or instrumentality of interstate commerce . . . (C) 'engage[d] in any transaction, practice, or course of business which operate[d] as a fraud or deceit upon any client or prospective client;' and (D) was negligent." S.E.C. v. Duncan, 2021 WL 4197386, at *8 (D. Mass. Sept. 15, 2021) (citing 15 U.S.C. § 80b-6(2)). "Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of . . . its investors, and includes an obligation to provide 'full and fair disclosure of all material facts' to investors and independent trustees of the fund.'" S.E.C. v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008), reh'g en banc granted on other grounds, opinion withdrawn, 573 F.3d 54 (1st Cir. 2009), and opinion reinstated in part on reh'g on other grounds, 597 F.3d 436 (1st Cir. 2010) (quoting Capital Gains, 375 U.S. at 191).

1.      Investment Adviser Under the Advisers Act

Section 202(a)(11) defines "[i]nvestment adviser" as "any person who, for compensation, engages in the business of advising others either directly or indirectly through publications or

writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b–2(a)(11).

Commonwealth is registered with the SEC as an investment adviser. The parties do not dispute that Commonwealth "renders investment advice to most managed account clients on a discretionary basis, pursuant to a written authorization granted by the client to Commonwealth and the IAR," which grants "Commonwealth and the IAR the discretion to buy, sell or otherwise trade in securities approved by Commonwealth." Pl.'s SOMF ¶ 6 [Doc. No. 68-1]; Resp. to Pl.'s SOMF, § B. ¶ 6 [Doc. No. 91]. Further, the parties do not dispute that "[c]lients who receive asset management services through one or more of Commonwealth's PPS programs or TPAM programs pay Commonwealth and their adviser for those services with an ongoing asset management fee based on a percentage of assets under management." Pl.'s SOMF ¶ 7 [Doc. No. 68-1]; Resp. to Pl.'s SOMF, § B. ¶ 7 [Doc. No. 91].

Accordingly, Commonwealth is an investment adviser under the Advisers Act.

### 2. Use of the Mails or Means or Instrumentalities of Interstate Commerce

It is undisputed that Commonwealth used a web-based instrumentality of interstate commerce in offering its advisement services where Commonwealth posted its Form ADV Part 2A brochures containing its disclosures on its website and filed them with the SEC using the web-based registry. Pl.'s SOMF ¶ 187 [Doc. No. 68-1]; Resp. to Pl.'s SOMF, § B. ¶ 187 [Doc. No. 91].

### 3. Mitigation of Conflicts of Interest

Commonwealth does not dispute that it had discretion to render investment advice but contends it has mitigated any potential conflict arising from its arrangement with NFS where Commonwealth's business model vests its IARs with responsibility for formulating investment

advice for their advisory clients and the IARs were neither aware of the money NFS paid to Commonwealth nor compensated based on those fees. Def.'s Mem. in Supp. 16–17 [Doc. No. 74-1]. The SEC contends that (i) Commonwealth could not and did not mitigate its conflicts with respect to the revenue sharing arrangement, Pl.'s Opp'n 1–2 [Doc. No. 87]; (ii) Commonwealth has an affirmative obligation to disclose its conflict of interests, Pl.'s Opp'n 2–3 [Doc. No. 87]; and (iii) Commonwealth's "focus on investment selection is misplaced" where Commonwealth need not have taken affirmative steps to be liable under Section 206(2) and, further, Commonwealth benefitted from client holdings and it was Commonwealth's inaction that resulted in its continuing to receive higher amounts of revenue sharing, Pl.'s Opp'n 4–5 [Doc. No. 87]. The court takes each of the SEC's arguments in turn.

As for mitigation of the conflict, the SEC contends that an adviser's mitigation of a conflict is only permissible in cases where an investment adviser cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent. Id. at 1. According to the SEC, Commonwealth cannot have satisfied its fiduciary duty through mitigation where there is no evidence that Commonwealth undertook the analysis required to determine whether it was capable of disclosing the economic conflicts. Id. at 2. However, the SEC's interpretation of the standard of conduct for investment advisers provides no such limitation. See Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers, Release No. 5248, 2019 WL 3779889, at *9 (June 5, 2019) ("When allocating investment opportunities among eligible clients, an adviser may face conflicts of interest either between its own interests and those of a client or among different clients. If so, the adviser must eliminate or at least expose through full and fair disclosure the conflicts associated with its allocation policies, including how the adviser will allocate investment opportunities, such that a client can provide

informed consent"). To the extent that Commonwealth successfully mitigated its conflict of interest, disclosure may not be required.

The SEC further contends that Commonwealth did not mitigate its conflict of interests through IARs lack of receipt or knowledge of NFS revenue where Commonwealth collects an advisory fee from its clients to act as an investment adviser, receives discretionary authority to manage and invest client assets along with IARs, and is entitled to revenue sharing based on certain client holdings. Pl.'s Opp'n 2 [Doc. No. 87]. Commonwealth contends that it mitigated any conflict where its IARs are vested with the authority to exercise discretion with respect to the client holdings, the IARs did not receive any portion of the revenue sharing, and the IARs did not receive less compensation when selecting funds and share classes that did not partake in revenue sharing. Def.'s Reply 5 [Doc. No. 99].

"The Act was designed to apply to those persons engaged in the investment-advisory profession—those who provide personalized advice attuned to a client's concerns, whether by written or verbal communication." Lowe v. S.E.C., 472 U.S. 181, 207–08 (1985). Commonwealth's argument that IARs exercised decision-making authority with respect to client holdings ignores the advisory role exercised by Commonwealth's Investment Team in creating model portfolios, the Mutual Fund Recommended List, and the Mutual Fund Resource Guide with information on investments, all of which it provided to its IARs. Moreover, in November 2018, Commonwealth announced its decision to limit share class selection and automatically convert clients' assets, demonstrating that while IARs may have exercised discretionary authority generally Commonwealth retained authority to manage clients' assets.

But even if Commonwealth did not actively advise IARs which funds to select on behalf of the clients, the SEC contends that Commonwealth had an affirmative obligation to disclose its

conflict of interest where Commonwealth is an investment adviser that was paid fee revenue based on client holdings and continued to receive the benefit of higher amounts of revenue sharing from such holdings. Pl.'s Opp'n 4–5 [Doc. No. 87]. "Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation enacted for the purpose of avoiding frauds,[] not technically and restrictively, but flexibly to effectuate its remedial purposes." Capital Gains, 375 U.S. at 195 (internal quotation marks omitted). "[I]in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, [Congress] did not intend to require proof of intent to injure and actual injury to the client." Id. "Failure to disclose material facts must be deemed fraud or deceit within [the Advisers Act's] intended meaning . . ." Id. at 200.

Accordingly, Commonwealth's corporate structure and business practices do not exempt it from its disclosure obligations regarding conflicts of interests under § 206(2) of the Advisers Act.

### 4. Commonwealth's Disclosures

Commonwealth contends that it appropriately disclosed the potential conflict that arose from its arrangement with NFS. Def.'s Mem. in Supp. 20–21 [Doc. No. 74-1]. Specifically, Commonwealth cites its disclosures which provide that it had entered into an arrangement with NFS, that Commonwealth received compensation pursuant to the arrangement, that the arrangement presented at least a potential conflict of interest, and that Commonwealth's IARs did not know the terms of its arrangements with NSF nor received any part of the revenue sharing. Id. The SEC contends that Commonwealth's general disclosures regarding a service fee and broker compensation and specific disclosure regarding NFS supermarket fees were inadequate. Pl.'s Opp'n 13–14 [Doc. No. 87].

a.    Standards Required for Disclosure

Under Section 206(2) "[f]ailure to disclose material facts must be deemed fraud or

deceit." Capital Gains, 375 U.S. at 200. "Citing Capital Gains, the Securities and Exchange

Commission has long held that '[f]ailure by an investment adviser to disclose potential conflicts

of interest to its clients constitutes fraud within the meaning'" of the provision. Robare Grp.,

Ltd., 922 F.3d at 472 (citing Fundamental Portfolio Advisors, Inc., Investment Advisers Act

Release No. 2146, 80 SEC Docket 1851, 2003 WL 21658248 at *15 & n.54 (July 15, 2003)); see

also Vernazza v. SEC, 327 F.3d 851, 859 (9th Cir.), amended, 335 F.3d 1096 (9th Cir. 2003) ("It

is indisputable that potential conflicts of interest are 'material' facts with respect to clients and

the Commission.").

b.    Adequacy of Disclosures

The SEC contends that Commonwealth's statements regarding NFS supermarket fees

from March 2014 to 2018 are inadequate where Commonwealth only disclosed its receipts of

NTF program revenue sharing and not TF program revenue sharing or the fact that

Commonwealth's revenue sharing was limited to non-Fidelity funds. Pl.'s Opp'n 14 [Doc. No.

87]. The SEC further argues that between March 2014 and March 2017, Commonwealth made

no disclosures about NTF share classes as compared to lower-cost alternatives of the same funds

that paid less or no revenue sharing to Commonwealth. Id. at 15.[10]

---

[10] While Commonwealth amended its Form ADV statements in March 2017 to discuss
differences in investor cost between NTF funds and other funds, the SEC contends that the
amendment was inadequate because Commonwealth's revenue sharing payments were based on
share class and its disclosure failed to advise clients that NTF share classes often had lower costs
alternatives of the same fund that paid less or no revenue sharing to Commonwealth. Pl.'s Opp'n
15 [Doc. No. 87].

Commonwealth contends that its disclosure of compensation from NFS is consistent with the SEC's opinion in In the Matter of the Robare Grp., Ltd., Mark L. Robare, & Jack L. Jones, Jr., SEC Release No. 4566, 2016 WL 6596009 (Nov. 7, 2016), Def.'s Mem. in Supp. 20 [Doc. No. 74-1], particularly where the SEC has not shown that Commonwealth's clients would have acted differently with "more fulsome disclosures." Def.'s Reply 16 [Doc. No. 99].

However, Commonwealth's reliance on Robare. Grp. is misplaced where Commonwealth quotes language from the SEC's discussion of what is required for disgorgement, after having found that a disclosure was inadequate under § 206(2). In that case, the SEC "decline[d] to order disgorgement . . . . [because] the Division did not establish that there was a causal connection between the [r]espondents' failure to disclose the Arrangement and the fees they received from Fidelity." Robare Grp., 2016 WL 6596009, at *12 n.56. A failure to prove causation did not prevent the SEC from finding that the disclosure was inadequate.

Indeed, in Robare Grp. the SEC found that the investment adviser's disclosures were inadequate because the investment adviser initially failed to disclose the fee arrangement and when the investment adviser did disclose the fee arrangement, it only stated that it "'may receive selling compensation' from a broker-dealer when they are 'acting as registered representatives of [that] broker-dealer.'" Robare Grp., Ltd, 2016 WL 6596009, at *6. The SEC concluded that such disclosure about possible compensation was not "full and fair" where the investment adviser did not disclose that it had entered into a fee arrangement under which it received payments, and thus its clients did not know about its "financial incentive to purchase certain mutual funds over others—and to maintain client assets in those funds—or to prefer investments offered on the Fidelity platform over those that were not." Id.

To the extent that Commonwealth seeks to show what disclosures are required, Commonwealth misses the mark by relying on Robare Grp., where the SEC found the disclosure requirement not met, rather than focusing on what is required under the Advisers Act. As in Capital Gains, "what is required is a picture not simply of the show window, but of the entire store * * * not simply truth in the statements volunteered, but disclosure." Capital Gains, 375 U.S. at 201 (internal citations omitted). While Commonwealth disclosed that "NFS offers a 'No Transaction Fee' program . . . . [and] [p]articipating mutual fund sponsors pay a fee to NFS to participate in this program, and a portion of this fee is shared with Commonwealth," Pl.'s Resp. to Def.'s SOMF and Statement of Add. Facts ¶ 82 [Doc. No. 88], the disclosure made no mention of the TF program revenue sharing or that the arrangement was limited to non-Fidelity funds.[11]

Moreover, to the extent that Commonwealth relies on its disclosure that it "may receive . . . revenue sharing . . . relating to [] investment[s] . . . [and] [that] [c]lients should be aware that Commonwealth's . . . receipt of commissions, fees, payments, and other compensation may present a potential conflict of interest because Commonwealth . . . may have an incentive to recommend those products or programs or make investment decisions regarding investments that provide such compensation to Commonwealth . . . ," such disclosure is insufficient for the same reason as in Robare Grp.: Commonwealth presents the payments it receives from the revenue

_____

[11] Commonwealth contends that a requirement that it disclose that its revenue participation arrangement is limited to non-Fidelity Funds amounts to a requirement to disclose non-existent conflicts since "an inclination to render advice that was not disinterested would not arise in the absence of an arrangement through which compensation would be received." Def.'s Opp'n to Pl.'s Mot. for Summ. J. 18 [Doc. No. 92]. However, such disclosure is not to inform the clients that Commonwealth has no economic incentive to put clients into Fidelity Funds but to inform them that it has an economic incentive to put clients into non-Fidelity Funds.

sharing arrangement as a hypothetical rather than disclosing it as a matter of fact. See, e.g., SEC v. Westport Cap. Markets, LLC, 408 F. Supp.3d 93, 101-02, 104 (D. Conn. 2019) (finding that adviser's disclosure that it "may receive additional commission-based compensation" was inadequate because it did not disclose adviser was "*actually* doing so"); SEC v. Blavin, 760 F.2d 706, 708–709, 711 (6th Cir. 1985) (per curiam) (affirming summary judgment for SEC based on statement that investment adviser "may trade for its own account" when adviser, in fact, was doing so).

Accordingly, the court finds that Commonwealth's disclosure of certain details related to the revenue sharing arrangement or the revenue sharing arrangement only as a hypothetical is inadequate under the Advisers Act.

Commonwealth contends that it is not required by the Advisers Act or any rule adopted by the SEC to disclose that NTF share classes for which revenue sharing is paid are generally more expensive for clients. Def.'s Mem. in Supp. 21–23 [Doc. No. 74-1]. Commonwealth notes that the expenses of mutual fund shares had no bearing on the payment arrangement where payments were based on the assets of a mutual fund share class attributable to Commonwealth. Id. Although Commonwealth's revenue arrangement may not have been directly tied to the expenses of the mutual fund share class, Commonwealth had a potential conflict where pursuant to the 2014 Agreement it received "a flat 80% of 'Gross' NTF and TF revenue received by NFS based on assets or positions invested in non-Fidelity funds and held in Commonwealth customer accounts[,]" and certain mutual fund share classes had higher expenses as compared to others. "[I]t is well-settled that potential conflicts of interest are material facts that investors would consider important in making investment decisions." Duncan, 2021 WL 4197386, at *10.

Commonwealth further contends that the availability of lower-cost share classes cannot be determined with reference solely to the internal expenses of share classes of a fund since the total cost of ownership of a share class of a mutual fund includes transaction charges and advisory fees. Def.'s Mem. in Supp. 23 [Doc. No. 74-1]. Even if that is the case, the SEC has found that "there is a substantial likelihood that a reasonable investor would consider information that might have enabled them to understand the likely return differences between an investment in [one class's shares] and investment [in another class's shares] to be important in making the decision about which share class to purchase." In the Matter of Ifg Network Sec., Inc., Release No. 2533, 2006 WL 1976001, at *11 (July 11, 2006). Here, "[w]ithout additional information about the cost differences between share classes, [Commonwealth's] customers did not have the 'total mix of information' necessary to make their investment decisions." Id.

Accordingly, the court finds that to the extent that Commonwealth did not disclose that (i) Commonwealth may have a potential conflict of interest where it receives revenue sharing payments on mutual fund class shares that have higher expenses as compared to others mutual fund class shares or (ii) class shares of the same fund existed with lower internal expenses, such disclosure is inadequate under the Advisers Act.

c.    Negligence

Section 206(2) requires "proof of 'simple negligence.'" Duncan, 2021 WL 4197386, at *13 (quoting Robare Grp., Ltd., 922 F.3d at 472). "Negligence is the failure to exercise ordinary care." Id., at *15 (quoting SEC v. Nutmeg Grp., LLC, 162 F. Supp. 3d 754, 775 (N.D. Ill. 2016)). "Phrased differently, negligence is the failure to use the degree of care that a reasonably careful person would use under like circumstances." Id. (quoting Nutmeg Grp., LLC, 162 F. Supp. at 775) (further internal citations omitted")). "Under that standard, 'a violation of the Advisers Act

may be established by showing that a defendant 'should have' acted differently.'" Id. (Nutmeg Grp., LLC, 162 F. Supp. at 775).

The SEC contends that there is no genuine dispute that: (i) Commonwealth should have revealed its economic conflicts of interest to meet its affirmative obligation to disclose all material facts where Commonwealth has been receiving TF and NTF program review based on non-Fidelity Funds since 2009 and, for several years, received monthly clearing statements detailing the amounts of revenue sharing it received in each program; (ii) Commonwealth knew about the existence of lower-cost alternatives to NTF share classes, their availability and potential availability to clients, and that they would generate less or no revenue sharing for Commonwealth; and (iii) Commonwealth failed to act upon multiple prompts, such as the guidance provided in the instructions to the Form ADV, to make robust disclosures. Pl.'s Mem. in Supp. of Summ. J. ("Pl.'s Mem. in Supp.") 26–28 [Doc. No. 66-1].

Commonwealth does not directly address the issue of negligence but maintains that its disclosures were not deficient under the Advisers Act. However, where the court has found that Commonwealth's revenue paying arrangement with NFS created undisclosed conflicts of interest, and that Commonwealth made material omissions in its disclosures related to the arrangement, the court finds that Commonwealth was negligent in its failure to fully disclose its economic conflicts.

Accordingly, the court finds that Commonwealth is liable for violation of Section 206(2) of the Advisers Act.

C.    *Count 2: Written Policies Under Section 206(4) of the Advisers Act and Rule 206(4)-(7)*

The parties filed cross-motions for summary judgment on the SEC's claim that Commonwealth violated Section 206(4) of the Advisers Act and Rule 206(4)-(7) thereunder,

which require registered investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Advisers Act and corresponding rules. 17 C.F.R. § 206(4)-7(a); 15 U.S.C. § 80b-6(4).

The SEC contends that the absence of any policy in place to identify and disclose of conflicts of interest caused by receipt of third-party compensation amounts to a violation of § 206(4) and Rule 206(4)-7. Pl.'s Mem. in Supp. 29 [Doc. No. 66-1]. For support, the SEC relies on S.E.C. v. SBB Rsch. Grp., LLC, 2020 WL 6075873, at *6 (N.D. Ill. Oct. 15, 2020), where the court found that the SEC adequately pled a violation of § 206(4) and Rule 206(4)-7 because the defendant had "no [] written policies or procedures to prevent the violations." Commonwealth contends that written policies instructing disclosure of conflicts of interest are not required. Def.'s Opp'n 20 [Doc. No. 92].

Commonwealth's argument is unsuccessful where § 206(4) and Rule 206(4)-(7) require adoption and implementation of written policies "reasonably designed to prevent" violations of the Advisers Act and as discussed in detail above non-disclosure of conflicts of interest is of primary concern. See, e.g., S.E.C. v. Ambassador Advisors, LLC, 576 F. Supp. 3d 286, 303 (E.D. Pa. 2021) ("[A]ny reasonable jury would find that [d]efendants violated Rule 206(4)-7 . . . . [where] this compliance manual simply does not contain a policy addressing [d]efendants' duty to disclose conflicts of interest . . .").

The SEC further contends that with respect to TF revenue sharing, Commonwealth failed to implement its written policy to disclose the compensation. Pl.'s Mem. in Supp. 29 [Doc. No. 66-1]. Commonwealth contends that in alleging that Commonwealth failed to implement its written policies and procedures requiring that all forms of compensation be disclosed to all clients, the SEC ignores the totality of Commonwealth's disclosures regarding revenue sharing.

Def.'s Mem. in Supp. 28 [Doc. No. 74-1]. The court has discussed in detail above the reasons why Commonwealth's disclosures with respect to its revenue sharing arrangement were inadequate.

Accordingly, the court finds that Commonwealth violated Section 206(4) of the Advisers Act and Rule 206(4)-(7) thereunder.

## IV.     Conclusion

For the reasons set forth above, the SEC's <u>Motion for Summary Judgment</u> [Doc. No. 65] as to liability is GRANTED and Commonwealth's <u>Motion for Summary Judgment</u> [Doc. No. 69] is DENIED.

IT IS SO ORDERED.

April 7, 2023                                                    /s/ Indira Talwani
                                                                     United States District Judge