UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-11655-IT |
| | * | |
| COMMONWEALTH EQUITY SERVICES, LLC d/b/a COMMONWEALTH FINANCIAL NETWORK, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

March 29, 2024

TALWANI, D.J.

Pending before the court are Plaintiff Securities and Exchange Commission's ("SEC")

Motion for Entry of Final Judgment [Doc. No. 121] and Motion to Strike the Declaration of Alex

J. Russell [Doc. No. 128]. For the following reasons, Plaintiff's Motion to Strike is GRANTED

and its Motion for Entry of Final Judgment is GRANTED in part and DENIED in part.

## I.      Background

SEC sued Commonwealth Equity Services, LLC d/b/a Commonwealth Financial

Network ("Commonwealth") in 2019 alleging violations of Sections 206(2) and 206(4) of the

Investment Advisers Act of 1940 ("Advisers Act"), and Rule 206(4)-(7) thereunder. SEC

claimed that Commonwealth negligently failed to disclose material conflicts of interest to its

advisory clients and failed to adopt and implement policies and procedures as required by the

Advisers Act and its regulations.

The court recited the facts of this dispute in its Memorandum and Order [Doc. No. 109]

and incorporates that discussion herein. The facts essential to the instant motion are as follows:

Commonwealth is an SEC-registered investment adviser that offers its advisory services to clients through approximately 2,300 investment adviser representatives ("IARs"). The conflicts of interest at issue involved Commonwealth's contracts with its clearing broker, National Financial Services, LLC ("NFS"). NFS provides its account holders access to a mutual fund supermarket run by Fidelity FundsNetwork. Through the funds network, customers can purchase, sell, or exchange mutual fund shares.

NFS has service agreements with mutual fund families to make the funds available to NFS customers. These agreements offer mutual fund families two primary options for distributing their shares: (1) the No Transaction Fee ("NTF") program, through which mutual fund families may offer fund shares to NFS account customers who can purchase or sell NTF program shares without paying a transaction fee, and (2) the Transaction Fee ("TF") program, through which mutual fund families may offer fund shares to NFS account customers who can purchase or sell TF program shares with payment of a transaction fee.

The crux of SEC's allegation was that Commonwealth had agreements with NFS to receive portions of the fees received by NFS's NTF and TF programs; that the mutual fund shares for which Commonwealth received those fees were sometimes more expensive for clients than shares of the same funds that did not generate fees for Commonwealth; that Commonwealth knew of the lower-cost alternatives to these share classes, their availability to clients, and that those lower-cost alternatives would generate less or no revenue for Commonwealth; and that Commonwealth failed to make robust disclosures regarding the revenue it generated from the higher-cost shares.

SEC moved for summary judgment on liability, asking the court to find that Commonwealth violated the Advisers Act by not disclosing to its clients information regarding

the payments that mutual fund companies paid to NFS which were, in turn, shared with Commonwealth. This court granted summary judgment in SEC's favor, finding that Commonwealth violated Sections 206(2) and 206(4), and Rule 206(4)-(7) thereunder. Specifically, the court found that Commonwealth violated these provisions by failing to (1) adequately disclose that Commonwealth had a potential conflict of interest where it received revenue sharing payments on NTF mutual fund class shares that had higher expenses as compared to other mutual fund class shares or that class shares of the same fund existed with lower internal expenses; (2) disclose its receipt of TF revenue sharing, and (3) adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act. Mem. & Order 28, 30 [Doc. No. 109].

SEC now moves for entry of final judgment, see Pl. Securities and Exchange Commission's Mot. for Entry of Final J. ("SEC Final J. Mot.") [Doc. No. 121], seeking disgorgement of Commonwealth's incremental revenues causally connected to its failures to disclose, plus pre-judgment interest, and that Commonwealth pay a civil penalty and be enjoined from future violations. In support of its motion, SEC provides the Second Declaration of Evgeny (Eugene) Orlov, Ph.D. ("Second Orlov Decl.") [Doc. No. 121-1], Third Declaration of Evgeny (Eugene) Orlov, Ph.D. ("Third Orlov Decl.") [Doc. No. 126-1], and the Declaration of Richard Harper ("Harper Decl.") [Doc. No. 121-2].

Commonwealth opposes the motion, see Def.'s Mem. Opposing Pl.'s Mot. for Entry of Final J. ("Commonwealth Final J. Opp.") [Doc. No. 136]. In support of its opposition, Commonwealth offers the Declaration of Alex J. Russell ("Russell Decl.") [Doc. No. 124-1], Declaration of Mark E. Potter, Ph.D. ("Potter Decl.") [Doc. No. 124-2], and Declaration of C.A. Trapnell ("Trap") Kloman ("Kloman Decl.") [Doc. No. 136-1].

## II.    Discussion

A.    *Motion to Strike*

SEC seeks to strike the Russell Declaration on the ground that Russell disclosed new opinions long after the July 2021 deadline for expert disclosures under the operative scheduling order, see Elec. Order [Doc. No. 53], and that this late disclosure precluded SEC from sufficiently examining or responding to Russell's new opinions. See Plaintiff's Mot. to Strike the Decl. of Alex J. Russell 1-2 ("Mot. to Strike") [Doc. No. 128].

Commonwealth responds that any allegedly undisclosed opinions offered by Russell were in response to undisclosed opinions offered by Orlov, SEC's expert. See Def.'s Mem. Opposing Pl.'s Motion to Strike Decl. of Alex J. Russell 1 ("Commonwealth Strike Opp.") [Doc. No. 130]. Commonwealth also states that it reached out to SEC following the disclosure of Orlov's opinions on disgorgement, and "offered [] SEC an opportunity to depose Russell on several alternative dates along with a stipulated proposed pause in the proceeding to allow [] SEC to make any further response after the deposition." Id. at 2; see id., Ex. A (Greenberg Email 8/4/2023) [Doc. No. 130-1]. Moreover, Commonwealth contends that SEC's substantive objections are both faulty and not a basis for exclusion. Id. at 3.

In reply, SEC asserts: (1) the deposition offer came a week after SEC moved to strike the declaration, would result in months of delay, and would reward Commonwealth's tactical choices in withholding discovery; (2) Commonwealth mischaracterizes the Second Orlov Declaration, which merely presents "a simple mathematical calculation" that takes Orlov's previously disclosed lower-cost share analysis based on a sample of funds and extrapolates that result to the entirety of Commonwealth's mutual fund revenue sharing; (3) Russell's declaration, by contrast, attempts to rebut the accuracy of the underlying lower-cost share analysis and offer a

new analysis two years too late; and (4) Commonwealth purports to support this new analysis with account-level data never disclosed to SEC during discovery. Reply Brief ISO Pl.'s Mot. to Strike Decl. of Alex J. Russell ("SEC Reply") 1-2 [Doc. No. 133].

1. Legal Standard

The admissibility of expert evidence is governed by Federal Rule of Evidence 702. Under Rule 702, a proponent of expert evidence must demonstrate that it is more likely than not that: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the expert's "testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Fed. R. Civ. P. 26(a)(2) governs the disclosure of expert testimony. A party must disclose the identity of any expert witnesses it may call at trial and provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(A)-(B). Fed. R. Civ. P. 26(a)(2)(D) provides that disclosure of expert testimony must be made "at the times and in the sequence that the court orders." If a party fails to abide by the requirements of Rule 26(a), it shall be precluded from using "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "[P]reclusion is not automatic," however, and a failure to disclose may be excused if a court determines that a different remedy is more appropriate under the circumstances. See Genereux v. Raytheon Co., 754 F.3d 51, 59 (1st Cir. 2014); Fed. R. Civ. P. 37(c)(1)(C).

"[A] 'late' expert declaration submitted in response to criticisms of the expert's opinion or methodology contained in a <u>Daubert</u> motion or motion for summary judgment is permissible as long as it is consistent with the overall opinion or methodology in the original report and merely provides additional subsidiary details, support, or elaboration." <u>Mass. Mutual Life Ins. Co. v. DB Structured Prods., Inc.</u>, 2015 WL 12990692, at *4 (D. Mass. Mar. 31, 2015). However, if a declaration submitted after expert discovery has closed "offers a whole new theory, opinion, or methodology" or is "outside of the scope or general scheme of the report," then supplementation is improper. <u>Id.</u> (citing <u>Curet-Velazquez v. ACEMLA De Puerto Rico, Inc.</u>, 656 F.3d 47, 56 (1st Cir. 2011)). In considering whether to allow supplementation, "[s]urprise and prejudice are important integers" a court contemplates. <u>Curet-Velazquez</u>, 656 F.3d at 56 (internal citation omitted).

2.      Discussion

There is no dispute that the expert declaration at issue has been offered years after the deadline for expert disclosures. The question is whether the lower-cost share analysis (and resultant disgorgement figure) that Russell offers in his declaration is a "new" opinion, theory, or methodology, or a permissible supplementation of opinions contemplated by the scope of his original disclosures. After reviewing the declaration in conjunction with Russell's original expert report, and Orlov's original report, declaration, and supplemental declarations, the court agrees with SEC that the alternative lower-cost share analysis Russell submits in his declaration is a new opinion.

If an untimely report "consists of new opinions, new bases for [expert] opinions, or new findings, then it should rightly be excluded as an impermissible supplementary report." <u>Zeolla v. Ford Motor Co.</u>, 2013 WL 308968, at *11 (D. Mass. Jan. 24, 2013) (citing <u>Fail-Safe, L.L.C. v.</u>

6

A. O. Smith Corp., 744 F. Supp. 2d 870, 878-79 (E. D. Wis. 2010) (excluding an expert's report that added new sections not included in expert's original report and offered new opinions, including calculations based on different numbers and a different methodological model, from that used in original report)). Russell's declaration submitted in opposition to the motion for entry of final judgment offers, for the first time, his lower-cost share analysis.

Compare Russell's declaration to the expert report at issue in Zeolla. In that case, defendant's expert submitted a supplemental affidavit in conjunction with defendant's opposition to a motion in limine. Zeolla, 2013 WL 308968, at *11. The court declined to grant plaintiff's motion to strike the affidavit, finding that "much of the affidavit [was] devoted to detailing *where* in [the] report, deposition, or attached exhibits [the expert] already addressed issues that plaintiff contend[ed] [the expert] did not adequately explain." Id. (emphasis in original). Russell's declaration, in contrast to Zeolla, does not reference his earlier report or declarations or seek to address criticism of his reliability or credibility.

Alternatively, consider the disputed reports in Mass Mutual Life Ins. There, plaintiff sought to strike four expert declarations submitted in opposition to defendants' Daubert motions. Mass Mutual Life Ins., 2015 WL 12990692, at *2. Defendants moved to strike the declarations on the grounds that they contained new and previously undisclosed opinions and methodologies; plaintiff responded that the declarations were responses to defendants' criticisms of plaintiff's experts. Id. at *2-3. The court determined that "most of the content in the four declarations constitute[d] proper expert supplementation in response to new criticisms raised after the experts provided their original reports." Id. at *4. However, the court found that some areas of the reports, including new analysis using guidelines which could have been used in the initial reports, new calculations of certain statistics, and extrapolations of findings based on different

models than were used in the original reports, were all improper supplementations. Id. Like those

supplementations, which the Mass. Mutual court deemed "new" material, the lower-cost share

analysis and resultant disgorgement calculations included in the Russell Declaration exceed the

scope of his original report.

While it is true that some courts have permitted new opinions or information offered in

supplemental expert reports, see Zeolla, 2013 WL 308968, at *11, those courts have emphasized

that new opinions are proper only where offered to support the reliability or credibility of

challenged expert testimony. See id.; see also Hearts of Fire Company, LLC v. Circa, Inc., 2017

WL 4364405, at *3 (D. Mass. Sept. 29, 2017); Garg v. VHS Acquisition Subsidiary Number 7,

2023 WL 3308949, at *9-10 (D. Mass. May 8, 2023); Advanced Analytics, Inc. v. Citigroup

Global Markets, Inc., 301 F.R.D. 31, 42-43 (S.D.N.Y. 2014).

Courts also consider whether the allegedly "new" opinions address merits issues or non-

merits issues that could not be known when Rule 26(a)(2) disclosures were required. Advanced

Analytics, 301 F.R.D. at 42. "In most cases, merits-related issues are capable of being known

from the inception of the case[,]" and where those issues have always been identifiable, parties

should address them at the time Rule 26(a)(2) disclosures are due. Id.; see also Mass. Mutual

Life Ins., 2015 WL 12990692, at *3.

 Here, the new opinions in Russell's declaration were not offered to rebut accusations that

his original report was unreliable. As SEC points out, the declaration does not even reference

Russell's expert disclosures. Mot. to Strike 4 n.1 [Doc. No. 128]; see also id., Ex. B (Expert

Report of Alex J. Russell) [Doc. No. 128-2]. Instead, the new, alternative lower-cost share

analysis offered by Russell in his declaration falls squarely in the category of a new theory,

opinion, or methodology. Moreover, both parties could foresee from the inception of this case

that disgorgement would be a question if Commonwealth was found liable for violations of the Advisers Act. Thus, if Commonwealth wanted to offer its own expert's lower-cost share class analysis, or to critique the methodology or conclusions of Orlov's lower-cost share analysis, it should have done so in rebuttal to Orlov's original report in 2021.

Commonwealth does not dispute that Russell's declaration offers new opinions. Instead, it contends that these new opinions are permissible because "simple fairness dictates that Commonwealth be allowed to respond" to what it characterizes as new opinions offered by Orlov—namely, the extrapolation calculations. Commonwealth Strike Opp. 2 [Doc. No. 130]. It cites no case in support of this proposition.

Commonwealth is correct that the "extrapolation" portions of Orlov's second declaration are new. But the proper remedy if these portions were an improper supplementation would have been a motion to strike, not a new report. Commonwealth did not bring such a motion, presumably because, as SEC contends, the extrapolated disgorgement calculation "is a simple mathematical calculation that takes the *previously disclosed result of the sample lower-cost share class analysis*." SEC Reply 1 [Doc. No. 133] (emphasis in original).

Accordingly, SEC's Motion to Strike the Declaration of Alex J. Russell [Doc. No. 128] is GRANTED.

B.     *Motion for Entry of Final Judgment*

In light of the court's summary judgment order on liability [Doc. No. 109], SEC now requests that (1) Commonwealth "disgorge incremental revenues[1] causally connected to its

---

[1] "Incremental revenue" here means the difference between the revenue Commonwealth received by allowing clients to hold higher-cost NTF and TF share classes of funds and Commonwealth's revenue had clients moved their investments to the lower-cost share classes of those funds that paid less or no fees via revenue sharing to Commonwealth.

failure to disclose its conflicts of interest, plus prejudgment interest;" (2) Commonwealth "pay a civil penalty as a sanction and for deterrent effect;" and (3) Commonwealth be enjoined from future violations. SEC Final J. Mot. 1 [Doc. No. 121].

    1.   Disgorgement

"In any action or proceeding brought by the [Securities and Exchange] Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7). "Disgorgement forces the defendant to give up the amount by which he was unjustly enriched, 'even if it exceeds actual damages to victims.'" SEC v. Present, 2018 WL 1701972, at *2 (D. Mass. Mar. 20, 2018) (quoting SEC v. Cavanaugh, 445 F.3d 105, 117 (2d Cir. 2006)). It is SEC's burden to show that the amount it seeks in disgorgement reasonably approximates the profits causally connected to defendant's violations. See SEC v. Happ, 392 F.3d 12, 31-32 (1st Cir. 2004). Once SEC has demonstrated the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not reasonable. Id. at 31. Any "risk of uncertainty" in a disgorgement calculation "should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.

SEC seeks disgorgement from Commonwealth of $68,705,409, representing incremental revenue causally connected to Commonwealth's failures to disclose its conflicts of interest as required by the Advisers Act. Pl.'s Mem. of Law ISO Mot. for Entry of Final J. ("SEC Final J. Mem.") 7 [Doc. No. 122].[2] Commonwealth does not dispute that disgorgement is an appropriate

---

[2] SEC notes that "[b]y calculating disgorgement based on incremental revenue gain, Commonwealth is not liable for disgorgement of revenue sharing it received for advisory client holdings in mutual fund share classes that did not have lower-cost alternatives." SEC Final J. Mem. 5 [Doc. No. 122]. SEC also reduced the disgorgement amount for any revenue sharing

remedy, rather, Commonwealth contends that (1) SEC cannot show that the amount it seeks to disgorge is causally connected to Commonwealth's failures to disclose, and (2) even if SEC has demonstrated causality, its disgorgement figure is "grossly inflated[.]" Commonwealth Final J. Opp. 1-4 [Doc. No. 136].

a.   Causality

SEC asserts that the causal connection between Commonwealth's failures to disclose to its advisory clients that it had conflicts of interest derived from revenue-sharing arrangements with NTF and TF share classes and its receipt of incremental revenue is "readily apparent[.]" SEC Final J. Mem. 2 [Doc. No. 122]. Had Commonwealth disclosed its economic self-interest in having clients hold more expensive shares of NTF and TF funds when lower cost shares of the exact same funds were available, its clients would have "clear economic incentive" to convert their holdings to the lower-cost share options that paid less or no revenue to Commonwealth. Id.

Commonwealth disagrees, arguing that "proof of [a] causal connection" between Commonwealth's Advisers Act violations and purported unjust enrichment is "entirely absent here." Commonwealth Final J. Opp. 1 [Doc. No. 136]. Commonwealth maintains that SEC's "readily apparent" theory of causality "is tantamount to an admission that '[SEC] do[es]n't have any actual evidence supporting it.'" Id. at 2.

SEC cites SEC v. Westport Capital Markets, 547 F. Supp. 3d 157 (D. Conn. 2021), and SEC v. Ambassador Advisors, LLC, 2022 WL 4097327 (E.D. Pa. Sept. 7, 2022), in support of its position on causality. SEC Final J. Mem. 3-4 [Doc. No. 122]. In Ambassador Advisors, SEC alleged that defendants violated § 206(2) and § 206(4) of the Advisers Act by investing client

---

Commonwealth would have received on holdings in lower-cost share alternatives where available. Id.

money in mutual fund share classes that charged 12b-1 fees when their clients were eligible for share classes in the same fund that did not have 12b-1 fees and by failing to disclose their attendant conflicts of interest. 2022 WL 4097327, at *1-2. Following a summary judgment decision and jury verdict finding defendants liable for all alleged violations, SEC moved for entry of final judgment, seeking, *inter alia*, disgorgement. Id. at *1. In opposition to the motion, defendants argued in part that SEC had failed to show causality. Id. at *6. Namely, defendants contended that SEC had not adequately shown that their clients would have refused to pay the fees even if they had been disclosed. Id.

The court squarely rejected this argument, finding it defied both "common sense" and basic economics. Id. The court noted that defendants provided no evidence that their clients would have willingly paid an additional fee if told about it. Id. It further observed:

> Defendants' speculation that their clients would have gladly paid more for their services is also entirely inconsistent with fundamental market principles. Had Defendants either properly disclosed the fact that they were increasing their clients' costs—and their own revenues—by investing in 12b-1 fee share classes or simply increased their own advisory fee by a commensurate amount, then their pricing would be less competitive in the market. Common sense dictates that at least some clients would have opted for a lower cost alternative.

Id.

Westport involved a similar set of allegations, including failure to disclose a conflict of interest. 547 F.3d at 162. The court and a jury found defendants liable on all counts, and the SEC moved for entry of final judgment. Id. at 165. The court ordered that all profits from the 12b-1 fees and selling dealer transactions be disgorged. Id. at 171. Defendants did not dispute disgorgement as to the 12b-1 fees, but contended that disgorgement was an inappropriate remedy for the selling dealer arrangements in part because there was no "reasonable relationship" between defendants' gains and SEC's disgorgement figure. Id. at 168-69. The court disagreed,

finding it was "beyond dispute that [Defendants] earned profits from wrongdoing by engaging in selling dealer transactions," and "the disgorgement request represent[ed] income defendants earned when they intentionally or recklessly engaged in selling dealer transactions without legally required disclosures." Id. at 169.[3]

The case on which Commonwealth principally relies—In re Robare Grp., Ltd., Investment Advisers Act of 1940 Release No. 4566, 2016 WL 6596009 (Nov. 7, 2016), vacated in part on other grounds, Robare Group, Ltd. v. SEC, 922 F.3d 468 (D.C. Cir. 2019), is inapposite here. In Robare, the Securities Exchange Commission, on an appeal of an ALJ determination, found that the registered investment advisers had violated § 206(2) of the Advisers Act by failing to adequately disclose conflicts of interest inherent in an arrangement whereby the advisers received compensation from their clients' investment custodian for maintaining client assets in certain investments. 2016 WL 6596009, at *1. In a footnote, the Commission denied the Division of Enforcement's request for disgorgement because the

---

[3] Commonwealth attempts to distinguish Westport and Ambassador Advisors because the investment advisors interacting with clients in those cases were aware of the revenue sharing agreements, while here it is "undisputed [] that the Commonwealth IARs *did not know* about Commonwealth's revenue sharing arrangement . . . much less receive any portion of the revenue." Commonwealth Final J. Opp. 3 [Doc. No. 136] (emphasis in original). This is merely a different flavor of the argument Commonwealth has made twice now, on summary judgment and on reconsideration, that its IAR's insulation from knowledge of the revenue sharing agreement meant that no harm came to its clients from the failure to disclose those agreements. The court has repeatedly rejected this reasoning and does not credit it now. The court determined on summary judgment that, regardless of the knowledge that Commonwealth's client-facing advisors had of the revenue sharing agreements, Commonwealth itself is an investment adviser for purposes of the Advisers Act and had a duty to disclose its conflicts of interests. See Mem. & Order 22-23 [Doc. No. 109]. Commonwealth's failures to disclose deprived its clients of the ability to make informed decisions about where their money was invested, regardless of whether its IARs knew of Commonwealth's failures. See Ambassador Advisors, 2022 WL 4097327, at *7 ("Because [d]efendants did not make their clients aware of the true cost of their services, they deprived their clients of an opportunity to make an informed decision about which adviser to invest with.").

Division had not established a causal connection between the failure to disclose the arrangement and the fees received from the custodian. See id. at *12 n.56. "Specifically," the Commission wrote, "there is no evidence in the record that, absent [the advisers'] failure to disclose the conflicts of interest, they would not have received the Fidelity fees either because their clients would have decided to withdraw their money or would have insisted upon investments that did not pay the fees." Id.

Crucially, there were no allegations in Robare that clients were invested in higher-cost shares of mutual funds for which lower-cost shares of the same fund existed. In other words, the Commission declined to order disgorgement where SEC did not establish that clients would have moved their money from Fund A to Fund B (or C, or D, etc.) had the conflicts of interest been disclosed. This makes sense, given there are myriad reasons why an investor might choose to place their money in one mutual fund versus another. But the violation here is that Commonwealth's failure to disclose its conflicts of interest kept clients invested in higher-cost shares of Fund A rather than lower-cost shares *also of Fund A*. The causality in this scenario, as explained by the Ambassador Advisors court, is self-evident.

Commonwealth points to a lack of testimony from clients stating that they would have selected different share classes had Commonwealth disclosed its revenue-sharing agreements. Commonwealth Final J. Opp. 2 [Doc. No. 136]. It also notes that, though SEC presented IAR testimony that some advisers shifted client holdings into lower-expense share classes of funds, "no IAR (much less any investor) testified that we would have made this shift *if only the revenue-sharing arrangement had been properly disclosed.*" Id. (emphasis in original). Commonwealth argues that SEC's failure to present client testimony precludes it from receiving the disgorgement it seeks. Id. (citing Montford and Co., Inc. v. SEC, 793 F.3d 76 (D. C. Cir.

2015)). In Montford, the court found that SEC had identified a sufficient causal connection in part by offering client testimony that, absent defendants' deception and failure to disclose conflicts, they would have made different investment decisions. Id. at 84. However, nothing in Montford suggests that direct client testimony is the only or even a necessary means of proving disgorgement, or that causality cannot be found without client testimony. Montford is also distinguishable where clients may have chosen to waive a conflict and proceeded with the recommended investment adviser had it been properly disclosed, while here, the nondisclosure involves identical investment opportunities at a lower fee.

This court finds the reasoning of both Ambassador Advisors and Westport sound. At bottom, Commonwealth's negligent failure to disclose its conflicts of interest as to its revenue sharing agreements had the same effect as the failures to disclose by the defendants in Westport and Ambassador Advisors: clients were deprived of relevant information and therefore of their ability to give informed consent to the conflicts. Had Commonwealth's clients known they were invested in higher-cost shares of funds for which lower-cost shares existed, and that the higher cost resulted in greater profit for Commonwealth, there is reason to believe that at least some of those clients would have elected to move their money to the lower-cost funds. Accordingly, the court finds that SEC has established that the disgorgement it seeks is causally related to Commonwealth's wrongdoing.[4]

---

[4] After briefing on the pending motions was complete, Commonwealth offered, via a Notice of Supplemental Authority [Doc. No. 134], a recent case, SEC v. Govil, 86 F.4th 89 (2d Cir. 2023), to support its argument that SEC has not demonstrated a connection between harm suffered by Commonwealth's clients and any unjust enrichment by Commonwealth. In Govil, the Second Circuit held that the district court erred in not determining whether defrauded investors had suffered any pecuniary harm before awarding disgorgement and remanded for that determination. Govil, 86 F.4th at 102. Here, the court finds that SEC has demonstrated that Commonwealth's clients suffered pecuniary harm, namely, the difference between the higher

b.      Disgorgement Calculation

Having established that SEC has sufficiently demonstrated causality, the next question is

whether its requested disgorgement amount of $68,705,409 reasonably approximates

Commonwealth's net profits gained from Commonwealth's violations. The district court has

"broad discretion not only in determining whether or not to order disgorgement but also in

calculating the amount to be disgorged." SEC v. Druffner, 802 F. Supp. 2d 293, 297 (D. Mass.

2011) (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996)). As noted, it

is SEC's responsibility to show that the disgorgement sought is a reasonable approximation of

profits Commonwealth earned as a result of its wrongdoing. See Happ, 392 F.3d at 31. The

burden then shifts to Commonwealth to demonstrate that the amount sought is not reasonable. Id.

SEC proposes that disgorgement be calculated based on incremental revenue. SEC Final

J. Mem. 4-5 [Doc. No. 122]. That is, SEC does not seek disgorgement of all NTF and TF

revenue sharing received by Commonwealth between July 2014 and December 2018, and

"includes only the specific gains tied to Commonwealth's failure to disclose its conflicts of

interest and its clients' economic interest to hold cheaper share classes[.]" Id. at 4-5.

The Second Orlov Decl. [Doc. No. 121-1] recaps the lower-cost share analysis Orlov

performed in his initial expert report. In that analysis, Orlov looked at NTF share classes and

identified the top ten mutual fund families that generated the highest amount of revenue sharing

for Commonwealth from July 2014 through December 2018. Second Orlov Decl. ¶ 2 [Doc. No.

121-1] (citing First Orlov. Decl. ¶ 4 [Doc. 72-74]; id., Ex. A (Expert Report of Evgeny (Eugene)

Orlov, Ph.D.) ¶ 25). Within those top ten fund families, Orlov identified the highest revenue

---

fees associated with the share classes they were invested in and the fees associated with the
lower cost share classes of the same funds that were available.

16

generating NTF fund share classes that accounted for 80 percent of Commonwealth's revenue from these fund families. Second Orlov Decl. ¶ 3 (citing First Orlov. Decl. ¶ 5; id., Ex. A ¶ 25). Orlov then compared the sample to lower-cost or lower-expense ratio alternative share classes of the same funds that were listed as available to Commonwealth clients, excluding share classes that charged sales loads or had their sales load charges waived, potential alternative share classes that were limited to specific types of accounts, such as retirement share classes and 529 plan share classes, and potential alternatives if it failed to have an expense ratio lower than the NTF share class. Second Orlov Decl. ¶¶ 5-8 (citing First Orlov. Decl. ¶¶ 7-10; id., Ex. A ¶¶ 23, 25, and Exs. 4 & 5). Orlov then calculated the incremental revenue—the difference between the revenue sharing Commonwealth generated from client participation in higher cost share classes and the revenue sharing had those clients held lower-cost shares. Second Orlov Decl. ¶¶ 10-13 (citing First Orlov. Decl. ¶¶ 13-31; id., Ex. A, Exs. 4, 5, 7 & 8). For NTF share classes, Orlov calculated the incremental revenue received by Commonwealth to be $16,927,828, or approximately $16.9 million. Second Orlov Decl. ¶ 14 (citing First Orlov. Decl. ¶ 30).

For TF and iNTF program share classes, Orlov performed a similar calculation, starting with the five mutual fund families that generated the highest amount of revenue for Commonwealth during the same period. Second Orlov Decl. ¶¶ 17-18 (citing First Orlov. Decl., Ex. A ¶¶ 21-26, 32-36 and Exs. 7 & 8). Orlov calculated the incremental revenue to Commonwealth from investing in higher-cost TF and iNTF share classes in the top five fund families as $9,867,838, or approximately $9.9 million. Id. ¶ 20 (citing First Orlov. Decl., Ex. A, ¶ 36 and Ex. 8).

To calculate disgorgement, Orlov used the incremental revenue calculations he performed on the sample of revenue sharing funds (which he concluded comprised holdings

17

corresponding to approximately 39.92% of the total NTF revenue and 31.37% of total TF/iNTF revenue to Commonwealth) and "extrapolate[ed] that result to the entirety of Commonwealth's NTF revenue from advisory client holdings for the relevant period" by taking the sample incremental revenue and dividing it by the ratio between Commonwealth's revenue attributable to the sample and Commonwealth's total incremental revenue. SEC Final J. Mem. 6 [Doc. No. 122]; Second Orlov Decl. ¶¶ 15, 21 [Doc. No. 121-1]. Orlov, after performing these calculations, concludes that the total incremental NTF revenue for the July 2014 through December 2018 period is $42,405,921, or approximately $42.4 million, and the total incremental TF and iNTF revenue is $31,451,658, or approximately $31.5 million. Second Orlov Decl. ¶¶ 16, 21 [Doc. No. 121-1]. SEC also calculated the incremental NTF revenue for the period from July 2014 through March 2018 to be $37,253,832, or approximately $37.3 million, and requests that lower amount so as not to seek disgorgement of incremental NTF revenues Commonwealth received after April 2018 when it made its first share-class based disclosure related to NTF revenue. SEC Final J. Mem. 6 [Doc. No. 122]; Second Orlov Decl. ¶ 16 [Doc. No. 121-1]. In total, SEC seeks $68,705,409 in incremental revenue be disgorged from Commonwealth. SEC Final J. Mem 7 [Doc. No. 122].

SEC notes that the disgorgement it seeks would benefit Commonwealth's harmed clients, that the disgorgement and penalty amounts (discussed below) may be combined for distribution under the Fair Fund provisions of the Sarbanes-Oaxley Act[5] subject to the court's approval of SEC's distribution plan, and that, through discovery, SEC identified the particular advisory accounts holding higher-cost TF and NTF share classes, and with additional information from

---

[5] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 308(a), 116 Stat. 745, 784 (2002).

Commonwealth as to the names and contact information of the account holders, distribution could feasibly be made to the harmed advisory clients. Id. at 8-9.

Commonwealth does not dispute SEC's ability to distribute the funds to its harmed clients, nor does it contest that disgorgement would help harmed clients. Commonwealth's fundamental complaint is that the disgorgement figure is "grossly inflated," and that this figure was calculated based on flawed methodology. Commonwealth Final J. Opp. 4 [Doc. No. 136]. Specifically, Commonwealth contends: (1) SEC's analysis is based on a "cherry-picked" sample of funds not representative of the entire universe of funds that paid revenue-sharing to Commonwealth; (2) SEC incorrectly assumes that an IAR was involved in recommending or selecting a share class for every mutual fund position, and thus funds from programs that did not involve an IAR, and mutual fund positions clients purchased at other firms and then transferred to Commonwealth, should be excluded from the analysis; (3) SEC's analysis assumes that fund companies that offered funds with institutional share classes would have waived investment minimums for every investor and purchase; (4) SEC fails to account for transaction fees charged on all transactions in a TF fund; and (5) SEC ignores that certain fees for clients who held positions in TF funds were rebated. Id. at 5-7. The court takes each of Commonwealth's objections in turn.

First, Commonwealth's assertion that SEC "cherry-picked" the sample of funds on which it based its disgorgement extrapolations by focusing on 229 funds in fifteen families that generated the highest amount of revenue sharing from Commonwealth, rather than analyzing all twelve thousand funds or selecting a random sample, is unfounded. Without any evidence that SEC's expert had foreknowledge of what this sample would show as to whether there were lower

cost alternatives and, if so, what those differences would be, the criticism is wholly unwarranted.[6]

Second, Commonwealth asserts that (1) funds from programs that did not involve an IAR, (2) mutual fund positions purchased by clients at other firms and then transferred to Commonwealth, and (3) holdings where there were no IAR recommendations during the 2014-2018 period should be excluded from the disgorgement analysis. But the involvement of an IAR is irrelevant to whether Commonwealth received revenue sharing from a particular fund that it failed to disclose. Revenue sharing for Commonwealth was based on client holdings, regardless of the holding's origination or the involvement of an IAR. See Mem. & Order 6 [Doc. No. 109] ("In September 2014, NFS and Commonwealth executed an agreement that Commonwealth's portion of NFS program revenue would be 80% of 'gross' NTF and TF revenue received by NFS based on assets or positions invested in non-Fidelity funds and held in Commonwealth customer accounts").

Commonwealth's third objection is that SEC failed to consider that not all fund companies that offered funds with institutional share classes would have waived investment minimums for every investor purchase. Commonwealth Final J. Opp. 7 [Doc. No. 136]. SEC explained on summary judgment that it determined investment minimum waivers by looking at executed trades below the stated minimums. See Pl.'s LR 56.1 Statement of Facts ISO its Mot. for Summ. J. ¶¶ 80-83 [Doc. No. 68-1]. Commonwealth did not dispute that description or method on summary judgment, and here offers only the anodyne statement that "just because a

---

[6] Relatedly, Commonwealth asserts that the sample included more Zero Paying Cusips than appear more generally, but this new criticism is untimely. As noted above, the fund sample analysis on which Orlov's disgorgement figure extrapolation is based was disclosed in his first report in 2021. If Commonwealth sought to challenge the representativeness of the fund sample, the time to do so was in 2021 when Commonwealth's expert rebuttal reports were due.

purchase was accepted in certain instances does not mean that the fund company would have ignored the investment minimums . . . during the entire relevant period." Commonwealth Final J. Opp. 7 [Doc. No. 136]. This assertion does not meet Commonwealth's burden to demonstrate that the amount of disgorgement is not a reasonable approximation of the profits it received as a result of its violation.

Commonwealth's fourth and fifth objection are that SEC did not consider certain account-level details—namely transaction charges and rebates—in performing its disgorgement calculation. And for the account-level detail, Commonwealth merely insists that SEC's expert ignored the total cost of ownership of one fund compared to another and that some funds were rebated to clients and that these things should have been considered in the disgorgement calculation. Id.

SEC's expert addresses the last two of Commonwealth's objections as to ownership costs and rebates in the Third Orlov Decl. [Doc. No. 126-1]. Orlov assessed the impact of transaction fees and rebates on his initial disgorgement calculation and determined that consideration of transaction fees could reduce the total extrapolated NTF incremental revenue from $37.3 million (before consideration of fees) to $34,137,248. Third Orlov Decl. ¶¶ 18-20. Orlov also determined that consideration of potential 12b-1 rebates actually increased the amount of TF incremental revenue to $9,087,015. The court adopts the $34,137,248 figure as a reasonable approximation of the amount to be disgorged for the NTF incremental revenue and otherwise overrules Commonwealth's objections to the disgorgement calculation.[7]

---

[7] To the extent that Commonwealth seeks to rely on the calculations in the Russell Declaration for an alternative disgorgement proposal, the court has stricken that Declaration for reasons discussed above. However, even if the Russell Declaration were properly before the court, the court would not adopt Russell's proposed award. Russell limited the universe of funds on which he based his calculation to holdings in PPS Custom accounts that were purchased by IARs.

In sum, the court finds that SEC's proposed disgorgement figure, with the modification set forth above based on the Third Orlov Declaration, reasonably approximates the revenue that Commonwealth received as a result of its wrongdoing, and that Commonwealth's objections to SEC's analysis have not demonstrated that the amount sought is unreasonable. Accordingly, the court orders $65,588,906 be disgorged from Commonwealth.

c.     Expenses

"Courts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into the account. Accordingly, courts must deduct legitimate expenses before ordering disgorgement[.]" Liu v. SEC, 140 S. Ct. 1936, 1949-50 (2020) (internal quotations and citations omitted). "Legitimate expenses" are those "unrelated to the wrongdoing." SEC v. Navellier & Assocs., Inc., 2021 WL 5072975, at *4 (D. Mass. Sept. 21, 2021).

Relying on Liu, Commonwealth asks that $49.5 million be deducted from any disgorgement award for various costs associated with supporting accounts maintained at NFS, including, *inter alia*, changes to account features, account maintenance, client and advisor phone support, processing of client fees, and maintenance of account profiles. Commonwealth Final J. Opp. 11-12 [Doc. No. 136].

SEC counters that the kind of expense deduction discussed in Liu is inapplicable here. In Liu, investor proceeds were used for a mix of lawful and unlawful activities, and the Supreme Court held that any disgorgement award had to deduct expenses that were put toward defendant's

---

Russell Decl. ¶ 3 [Doc. No. 124-1]. As noted, Commonwealth received revenue sharing whether funds were purchased by its IARs or not. Both fund shares that were purchased without IAR involvement and fund shares purchased by clients and then transferred to Commonwealth generated revenue for Commonwealth. A disgorgement award that includes only revenue generated by funds purchased by Commonwealth IARs would be incomplete.

legitimate business activities. 140 S. Ct. at 1950. Here, by contrast, SEC has limited its disgorgement request to incremental revenue Commonwealth received due to its failures to disclose conflicts of interest, which are, in their entirety, unlawful gain. SEC Final J. Reply 7-8 [Doc. No. 126].

SEC is right. Where the entirety of the disgorgement award is based on "ill-gotten gains," the court is not required to deduct Commonwealth's overhead expenses. See Ambassador Advisors, 2022 WL 4097327, at *7. Allowing Commonwealth to pay down expenses with profit obtained by denying its clients the ability to make informed decisions about their investments would be to reward that withholding. Accordingly, the court declines to deduct any of Commonwealth's expenses from the disgorgement award.

### 2.      Prejudgment Interest

"Prejudgment interest, like disgorgement, prevents a defendant from profiting from his securities violations." SEC v. Sargent, 329 F.3d 34,  40 (1st Cir. 2003) (internal quotations omitted). Despite having similar aims, disgorgement and prejudgment interest are distinct remedies, and the court has broad discretion in determining whether to award prejudgment interest. Druffner, 802 F. Supp. 2d at 297-98. "An award of prejudgment interest is based on consideration of a variety of factors, including the remedial purpose of the statute [involved], the goal of depriving culpable defendants of their unlawful gains, and . . . unfairness to defendants." Sargent, 329 F.3d at 40 (citing SEC v. First Jersey Securities, 101 F.3d 1450, 1477 (2d Cir. 1996)).

SEC asks the court to award prejudgment interest on the entire disgorgement award from Commonwealth's receipt of the ill-gotten gains through entry of final judgment based on the Internal Revenue Service rate for underpayment of penalties. SEC Final J. Mem. 10 [Doc. No.

122]. Because NTF and TF revenue sharing was paid to Commonwealth on a monthly basis,

SEC calculated prejudgment interest from the month following each NTF and TF revenue

sharing payment, respectively July 2014 through March 2018 and July 2014 through December

2018, through June 30, 2023, the end of the month in which SEC filed its Motion for Entry of

Final Judgment [Doc. No. 121]. Id. at 11; Second Orlov Decl. ¶¶ 25-39 [Doc. No. 121-1]. In total

for both NTF and TF revenue sharing, SEC seeks $22,191,790 in prejudgment interest. SEC

Final J. Mem. 11 [Doc. No. 122].

The court agrees that prejudgment interest should be assessed in this case to "prevent

defendants from receiving the benefit of what would otherwise be an interest-free loan,"

Druffner, 802 F. Supp. 2d at 298, and that the appropriate basis for calculation is the IRS

underpayment rate, see SEC v. Esposito, 260 F. Supp. 3d 79, 92 (D. Mass. 2017). Accordingly,

the court will order prejudgment interest.

                3.       Civil Penalty

SEC also asks the court to impose a penalty on Commonwealth under Section 209(e) of

the Advisers Act. SEC Final J. Mem. 11 [Doc. No. 122].

Section 209(e) provides that SEC may seek penalties for violations of the Advisers Act

under a three-tiered scheme. First-tier penalties may be imposed for any violation of the Act.

Second-tier penalties may be imposed if a violation involved fraud, deceit, manipulation, or

deliberate or reckless disregard of regulatory requirements. Third-tier penalties are appropriate

where a defendant meets the requirements for the second tier and a violation directly or

indirectly resulted in substantial losses or created a significant risk of substantial losses to other

persons. Under the statute, the court may impose a penalty on an entity defendant of up to the

greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or

$50,000 for the first tier, $250,000 for the second tier, and $500,000 for the third tier. 15 U.S.C. § 80b-9(e).

SEC characterizes Commonwealth's conduct as a second tier violation and seeks a penalty of $20.6 million, calculated as approximately 30% of Commonwealth's gross amount of pecuniary gain from the violation. SEC Final J. Mem. 13 [Doc. No. 122]. Commonwealth contends that it received no pecuniary gain as a result of its violation, and that only a first tier penalty of $50,000, plus interest, for a total of $111,614 may be imposed because none of the aggravating criteria for second-tier penalties are warranted by the evidence. Commonwealth Final J. Opp. 13 [Doc. No. 136].

As explained above, contrary to Commonwealth's claim, the pecuniary gain to Commonwealth was $65,588,906. The court finds further that imposing a flat dollar penalty without regard to the pecuniary gain would in no way reflect the seriousness of the violation. Accordingly, the court turns next to the appropriate penalty up to the $65,588,906 Commonwealth gained "as a result of the violation." 15 U.S.C. § 80b-9(e)(2).

The court determines the precise amount of the penalty "in light of the facts and circumstances." 15 U.S.C. § 80b-9(e)(2)(A). The tier 1 and tier 2 framework focuses on the egregiousness of the violation and the degree of scienter involved (whether the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements). SEC asserts that "[i]n failing to make full and fair disclosure of its economic conflicts of interest and the material fact that clients could have chosen lower-cost share classes that paid less or no revenue sharing to Commonwealth, Commonwealth deceived and defrauded its advisory clients." SEC Final J. Mem. 12 [Doc. No. 122]. Commonwealth counters that this court's finding on summary judgment that Commonwealth was "negligent in its failure to fully

disclose its economic conflicts," Mem. & Order 29 [Doc. No. 109], means that the conduct here does not meet the requirements for a second-tier penalty. Commonwealth Final J. Opp. 12 [Doc. No. 136].

The court finds a second-tier penalty is warranted. In cases involving violations similar to Commonwealth's, including material misstatements and omissions in promotional materials, see SEC v. Eiten, 2014 WL 4965102, at *2 (D. Mass. Sept. 30, 2014), and SEC v. Locke Capital Management, 794 F. Supp. 2d 355, 370 (D. R. I. 2011), misrepresentations to fund investors, see SEC v. Manterfield, 2009 WL 935953, at *2 (D. Mass. Apr. 8, 2009), and failures to disclose conflicts of interest to clients, see Ambassador Advisors, 2022 WL 4097327, at *8, courts have found those violations to constitute deceit or recklessness as required by § 209(e). In contrast, in SEC v. Tropikgadget FZE, 2016 WL 4582248 (D. Mass. Aug. 31, 2016), the court imposed a tier 1 penalty where defendants participated in and unjustly profited from a fraudulent pyramid scheme but did not create or control the illegal scheme. Id. at *7.

Commonwealth's failures to disclose were egregious. The court determined that Commonwealth was aware that lower-cost share classes of funds in which its clients were invested were available, knew that it was generating revenue from keeping its clients in the higher cost share classes, and failed to disclose any of this to its clients. This is a fundamental violation of an investment advisers' fiduciary duty to act in the best interest of its clients. The egregiousness of Commonwealth's actions is compounded by its failure to keep its Chief Compliance Officer—which it was required to appoint under the Advisers Act—adequately apprised of any conflicts of interest regarding Commonwealth's revenue-sharing agreements with NFS. See Mem. & Order 8 [Doc. No. 109].

Regardless of whether the conduct at issue crosses the line between a tier 1 and tier 2 violation, when determining the precise penalty based on gain from the violation (as permissible for both tier 1 and tier 2), courts may also consider (1) the defendant's willingness or failure to admit wrongdoing; (2) the defendant's cooperation with authorities; (3) the isolated or repeated nature of the violations; and (4) the defendant's financial condition. Esposito, 260 F. Supp. 3d at 93. Courts also consider whether the violation resulted in substantial loss or risk of loss to others, Locke Capital Management, Inc., 794 F. Supp. 2d at 370, as required for a tier 3 violation.

The court finds that each of these additional factors weigh in favor of a considerable penalty. First, although the court declines to hold Commonwealth's history with FINRA regulatory actions against it, the court notes that Commonwealth still has not accepted responsibility for its actions (though the court does acknowledge that Commonwealth altered its disclosure practices starting in 2019). Second, while the fact of litigation itself does not demonstrate a lack of cooperation with authorities, Commonwealth has delayed the litigation by refusing to produce certain account-level data discovery to SEC (data on which it now seeks to rely) and by seeking reconsideration without sufficient grounds. Third, Commonwealth's violations were ongoing over a four-year period. Fourth, given Commonwealth's net income— starting at approximately $56.5 million annual net income in 2014 and up to $119.4 million annual net income by 2018— only a significant sum will have a deterrent effect. And, finally, Commonwealth's violation caused a substantial loss to others when the individual losses are aggregated.

In sum, a substantial penalty is warranted here based on the egregiousness of Commonwealth's conduct, the four-year duration of Commonwealth's violations, Commonwealth's failure to accept responsibility, and Commonwealth's finances. That said, in

light of the $65,588,906 disgorgement award, the court finds a $6,500,000 penalty

(approximately 10 percent of that amount) to be appropriate.

          4.      Injunctive Relief

SEC's final request is that the court issue a permanent injunction against Commonwealth

from further violations of the Advisers Act "to ensure that Commonwealth will (i) not engage in

transactions, practices, and courses of business, like the ones in this case, that operate as fraud or

deceit upon its advisory clients, and (ii) adopt and implement written policies and procedures

reasonably designed to prevent breaches of fiduciary duty in failing to disclose economic

conflicts of interest." SEC Final J. Mem. 20 [Doc. No. 122]. Commonwealth contends that SEC

has not demonstrated a likelihood of future violations as required to justify a permanent

injunction. Commonwealth Final J. Opp. 15 [Doc. No. 136].

Section 209(d) of the Advisers Act authorizes courts to enjoin future violations of the Act

upon a showing that a person has engaged or will engage in practices violating the Act. 15

U.S.C. § 80b-9(d). Injunctive relief is appropriate where there is a "reasonable likelihood of

recidivism." Sargent, 329 F.3d at 39.

SEC emphasizes Commonwealth's "history of regulatory failures." SEC Final J. Mem.

20 [Doc. No. 122]. But "[p]ast violations of securities law do not provide, *ipso facto*, a basis for

issuance of an injunction, because they are not in and of themselves indicative of future

misconduct." SEC v. John Adams Trust Corp., 697 F.Supp. 573, 577 (D. Mass. 1988). And,

though SEC brushes aside Commonwealth's compliance with the operative regulations since

2019, the court finds the compliance itself must be taken into account.

In determining whether injunctive relief is appropriate, "[c]ourts consider, among other

things, the nature of the violation, including its egregiousness and its isolated or repeated nature,

as well as whether the defendants will, owing to their occupation be in a position to violate again." Sargent, 329 F.3d at 39. Courts also consider whether a defendant has recognized the wrongfulness of their conduct. Id. Considering these factors, in the absence of the substantial disgorgement award and civil penalty imposed, a permanent injunction would be warranted. But here, the court is imposing those remedies and finds that they will reduce the actual risk of harm, such that a permanent injunction in addition would be unduly punitive. See Ambassador Advisors, 2022 WL 4097327, at *2 ("Injunctions cannot be used to punish, so an injunction must be denied as a matter of equitable discretion if it cannot be supported by a meaningful showing of actual risk of harm.") (internal quotations omitted).

Accordingly, SEC's request that a permanent injunction issue against Commonwealth from future violations of the Advisers Act is denied.

## III.    Conclusion

For the forgoing reasons, SEC's Motion to Strike [Doc. No. 128] is GRANTED and SEC's Motion for Entry of Final Judgment [Doc. No. 121] is GRANTED in part and DENIED in part. The court will order Commonwealth to pay $65,588,906 in disgorgement plus  prejudgment interest. The court will also impose on Commonwealth a civil penalty of $6,500,000. The court declines to issue a permanent injunction against Commonwealth. A separate final judgment will follow.

IT IS SO ORDERED

March 29, 2024                                              /s/ Indira Talwani
                                                                    United States District Judge